Andrew R. Muehlbauer
Nevada Bar No. 10161
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
andrew@mlolegal.com

Casey E. Sadler
Charles H. Linehan (*pro hac vice*)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
csadler@glancylaw.com
clinehan@glancylaw.com

*Lead Counsel for Lead Plaintiffs*

*(Additional counsel on the signature page)*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| MARILYN EZZES, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VINTAGE WINE ESTATES, INC., PATRICK RONEY, KATHERINE DEVILLERS, and KRISTINA JOHNSTON,<br><br>Defendants. | Case No. 2:22-cv-01915-GMN-DJA<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

# **TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE .......................................................................... 3

III.    PARTIES ............................................................................................................. 3

        A.      Plaintiffs .................................................................................................. 3

        B.      Defendants ............................................................................................... 4

        C.      Former Employees ................................................................................... 5

IV.     SUBSTANTIVE ALLEGATIONS ..................................................................... 6

        A.      Special Purpose Acquisition Companies And Their Inherent Conflicts Of
                Interest ..................................................................................................... 6

        B.      Bespoke Capital, A SPAC Focused On The Cannabis Industries, Rushes Into A
                Transaction Taking Vintage Wine Public ................................................ 8

        C.      Defendants Failed To Disclose Vintage Wine's Mismanagement Of Inventory And
                Improper Accounting Practices ................................................................ 9

                1.      The Company Touted A Growth By Acquisition Strategy ........................... 9

                2.      Defendants Failed To Manage Inventory Properly ...................................... 9

                3.      The Company Did Not Accurately Record Costs Of Goods Sold ............. 13

        D.      The Company Admits That Its Financial Statements Were Overstated And
                Announces The Removal Of Its Founder And CEO ............................... 17

        E.      Defendants Violated Generally Accepted Accounting Practices During The Class
                Period ..................................................................................................... 21

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND
        OMISSIONS ..................................................................................................... 22

VI.     ADDITIONAL SCIENTER ALLEGATIONS ................................................. 28

                1.      The Individual Defendants Were Actively Involved In Running The Business
                        And Were Certainly Aware Of The Facts That Were Central To Vintage
                        Wine's Business ........................................................................................ 29

                2.      The Fact That The Individual Defendants Were Aware Of Weaknesses In The
                        Company's Internal Control Further Supports Their Scienter .................... 29

i

3.    The Full Truth Was Only Revealed After Long-Standing Management Of Vintage Wine Were Removed From Their Positions.................................. 30

4.    Defendants' Violations Of Basic Accounting Guidelines Further Support Scienter ............................................................................................... 30

5.    Corporate Scienter And *Respondeat Superior* ........................................... 31

VII.    LOSS CAUSATION ......................................................................................... 31

VIII.   CLASS ACTION ALLEGATIONS.................................................................. 32

IX.     FRAUD ON THE MARKET ............................................................................ 33

X.      NO SAFE HARBOR......................................................................................... 34

XI.     PRAYER FOR RELIEF ................................................................................... 39

XII.    DEMAND FOR TRIAL BY JURY .................................................................. 40

Lead Plaintiffs Marilyn Ezzes and Jeffrey A. Davies, and additional plaintiff Michael F. Salbenblatt (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation, review and analysis of: (i) information publicly disseminated by Vintage Wine Estates, Inc. ("Vintage Wine" or the "Company"), including its public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) public filings and other documents related to Bespoke Capital Acquisition Corp. ("Bespoke Capital"), a publicly traded special purpose acquisition company that merged with Vintage Wine; (iii) social media postings, news reports, press releases, analysts' reports and other publicly available documents; and (iv) interviews with former employees of Vintage Wine. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired Vintage Wine common stock between October 13, 2021 and February 8, 2023, inclusive (the "Class Period"), and were damaged thereby.

2.    Vintage Wine was founded in 2007.  According to the Company, Vintage Wine sells wine and spirits and reportedly has over 60 wine and spirits brands totaling around 3 million cases annually, making it the 14th largest wine producer in the United States. The Company describes its business as consisting of curating and marketing its brands and services to customers via various channels, including direct-to-consumer, wholesale, and retail.

3.    Vintage Wine was a private company that became public through a June 8, 2021 merger with Bespoke Capital, a publicly traded special purpose acquisition company ("SPAC").

4.    At the start of the Class Period, the Company acknowledged that it had "identified a material weakness in our internal control over financial reporting" that "relates to our process and

controls regarding the tracking of costs through the various stages of inventory accounting, particularly as they pertain to bulk wine and spirits."

5.    While the Company claimed it was remedying these internal control deficiencies, Vintage Wine was unable to maintain accurate records of its inventory or properly track and record its costs of goods sold because its accounting department was understaffed and lacked adequate procedures to manage the scale and complexity of its business.  These facts have been confirmed both by the Company itself and many of its former employees.

6.    Yet, during the Class Period, Defendants failed to disclose that: (i) the Company had not taken significant measures to remediate the material weakness concerning inventory balances; (ii) due to the mismanagement of inventory, Vintage Wine's reported inventory did not reflect the value of inventory that was damaged and/or destroyed; and (iii) as a result, its inventory balances were overstated.

7.    On September 13, 2022, after the close of trading, Vintage Wine disclosed, amongst other things, that it had recorded $19.1 million in inventory adjustments and that its fourth quarter 2022 results included $6.8 million in overhead burden related to the first and second quarter of 2022.

8.    On this news, on September 14, 2022, the price of Vintage Wine stock, fell from the prior day's close of $5.53 per share to close at $3.30 per share, a decline of 40.3%, on unusually heavy trading volume.

9.    The September 13, 2022 disclosure did not reveal the full extent of the accounting issues at Vintage Wine.  Defendants still failed to disclose that: (i) the Company had an accounting error relating to the classification of certain assets and the classification and timing of recording certain costs; and (ii) that, as a result, the Company's cost of goods sold and net revenue were understated and its expenses was overstated, resulting in an overstatement in net income.

10.    On February 8, 2023, after the close of trading, the Company disclosed that the filing of the Company's next quarterly report would be delayed because management had identified impairment indicators. Vintage Wine also stated that certain previously issued financial statements should no longer be relied upon and should be restated as a result of an accounting error related to the classification and timing of recording certain costs.  The Company further disclosed that Patrick

Roney, the Company's founder and long-term Chief Executive Officer had been removed as CEO since "It was critical that the Board make the necessary leadership changes to find the right talent to continue to execute our strategy...."

11.     On this news, on February 9, 2023, Vintage Wine's stock price fell from the prior day's close of $2.79 per share to close at $2.02 per share, a drop of 27.6%, on unusually heavy trading volume.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

13.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

14.     This Court has subject-matter jurisdiction over this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

15.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District. In addition, the Company's principal executive offices are in this District.

16.     In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## III.    PARTIES

### A.    Plaintiffs

17.     Lead Plaintiff Marilyn Ezzes purchased Vintage Wine common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged below. *See* ECF No. 1-1.

18.     Lead Plaintiff Jeffrey A. Davies purchased Vintage Wine common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged below. *See* ECF No. 15-4.

19.     Additional Plaintiff Michael F. Salbenblatt purchased Vintage Wine common stock during the Class Period, and suffered damages as a result of the federal securities law violations and/or misleading statements and/or material omissions alleged below. *See* ECF No. 14-5.

**B.     Defendants**

20.     Defendant Vintage Wine is incorporated under the laws of Nevada with its principal executive offices located at 937 Tahoe Boulevard, Suite 210, Incline Village, Nevada 89451. Vintage Wine's common stock trade in an efficient market on the NASDAQ exchange under the symbol "VWE."

21.     Defendant Patrick Roney ("Roney") founded Vintage Wine in 2009 and served as its Chief Executive Officer ("CEO") until February 8, 2023. He began his career as a sommelier in Chicago. In 2000, he acquired and began to operate fine wine brand Girard Winery of Napa Valley, California. In 2007, he and his business partner Leslie Rudd acquired Windsor Vineyard, a direct-to-consumer winery, and merged it with Girard Winery to form Vintage Wine.

22.     Defendant Kathy DeVillers ("DeVillers") served as Vintage Wine's Chief Financial Officer ("CFO") from August 2018 until March 7, 2022. She then served as the Company's Executive Vice President of Acquisition Integrations until her resignation on January 27, 2023. Before joining Vintage Wine, DeVillers was the CFO at a private wine producer. DeVillers oversaw the Company's accounting department, which experienced high turnover and personnel shortages in her time as CFO.

23.     Defendant Kristina Johnston ("Johnston") has been the Company's CFO since March 7, 2022.

24.     Defendants Roney, DeVillers, and Johnston (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The

4

Individual Defendants were provided with copies of the Company's reports and press releases alleged below to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information available to them, the Individual Defendants knew that the adverse facts specified below had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded below.

### C.    Former Employees

25.    Former Employee #1 ("FE 1") was a direct-to-consumer brand manager at Vintage Wine from February 2018 to September 2022. FE 1 was responsible for overseeing all facets of direct-to-consumer sales for one of Vintage Wine's acquisitions, including managing the sourcing, compliance, promotion, and marketing of dozens of unique wines. FE 1 interacted directly with senior corporate officers at Vintage Wine, notably Terry Wheatley, the Company's President, several times. In the course of his[1] official responsibilities, FE 1 became familiar with the problems associated with Vintage Wine's calculations of cost-of-goods, many difficulties with inventory management, and the challenges facing the Accounting Department as a result of high employee turnover.

26.    Former Employee #2 ("FE 2") was a regional sales manager at Vintage Wine from October 2018 until March 2022, when he resigned to take a position at another company. FE 2 covered sales territory in several midwestern states. His core responsibility was to facilitate wine sales in his sales territory, including managing inventory, pricing, and relationships with the distributors who sold Vintage Wine's brands to end customers. These end customers typically included restaurants, bars, and stores. Apart from selling Vintage Wine's products to distributors, FE 2 also created programs to assist distributors with selling the products to end customers. During his tenure, FE 2 reported directly to either Vice President for the Midwest Matt Marani or Vice

---

[1] All former employees are defined using the masculine pronoun to protect their anonymity.

President for the West Jason Strobe, each of whom reported to Senior Vice President of Sales Mike Gilboy. Gilboy reported to Terry Wheatley, the Company's President.

27.    Former Employee #3 ("FE 3") worked for Vintage Wine from 2007 through his termination in March 2023. FE 3 began his tenure as a winemaker and was promoted to the role of Senior Winemaker – Strategic Brands & New Development in 2020. As his title suggests, FE 3's job consisted of managing the production of wine. FE 3 most recently reported to Chief Operating Officer Zach Long, who reported to President Terry Wheatley and CEO Pat Roney. FE 3 described Roney as a "very hands-on CEO" who was "well-informed about everything all the time."

28.    Former Employee #4 ("FE 4") worked in marketing for Vintage Wine from March 2019 to April 2022, when he left the Company of their own volition. FE 4's job mainly consisted of executing direct-to-consumer email marketing campaigns, including campaigns targeting wine club members or other individual customers who had signed up for Vintage Wine's mailing lists. FE 4 disseminated advertisements for 23 Vintage Wine brands, 15 of which had wine clubs. Each wine club had its own mailing list, and Vintage Wine maintained separate lists for individual customers who were not members of wine clubs. FE 4 described Vintage Wine as a "very hierarchical company" where Roney "set the tone" and "everything came from the top."

IV.    SUBSTANTIVE ALLEGATIONS

A.    Special Purpose Acquisition Companies And Their Inherent Conflicts Of Interest

29.    Special purpose acquisition companies ("SPACs") are publicly traded companies with no business activities that are formed specifically to acquire an existing operating company. The capital from the SPAC's initial public offering ("IPO") is held in trust for a specific period of time to fund the acquisition.

30.    If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities (typically about 20% of the SPAC's stock, in addition to warrants to purchase additional shares). However, if an acquisition is not completed within that time frame, then the SPAC is dissolved and the money held in trust is returned to investors, with no compensation paid to the founders and

managers of the SPAC, whose SPAC securities expire worthless.  Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious.

31.    The business combination effectuated by the SPAC is in many respects similar to a traditional IPO, in that a previously private company becomes publicly traded. However, SPAC transactions and IPOs have certain key differences. In a traditional IPO, banks underwrite the offering and perform substantial due diligence in order to evaluate the company going public, to formulate appropriate disclosures to prospective investors, and to accurately price its securities. However, in a SPAC transaction, there are no underwriters; the due diligence and the disclosures supporting the business combination are solely determined by the SPAC and its controlling persons, who have strong incentives to agree to, and obtain shareholder approval for, an acquisition regardless of its true merits.

32.    Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC stockholders, which includes the target company's financial statements and the terms of the proposed business combination. Public stockholders in SPACs rely on management of the SPAC and the target company to honestly provide accurate information about any contemplated transactions.

33.    Amidst a recent boom in SPAC transactions, SEC officials have noted widespread concerns including "risks from fees, conflicts, and sponsor compensation, . . .  and the potential for retail participation drawn by baseless hype." These concerns raise questions as to whether SPAC sponsors have "sufficient incentives to do appropriate due diligence on the target and its disclosures to public investors, especially since SPACs are designed not to include a conventional underwriter."[2]

34.    Numerous other commentators have similarly noted the conflict of interest between SPAC management and shareholders with respect to the completion of a business combination. For

_____

[2] John Coates, Acting Director, SEC Division of Corporation Finance, Apr. 8, 2021, SPACs, IPOs and Liability Risk under the Securities Laws, *available at* https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

7

example, in the Yale Journal on Regulation, law professors at Stanford and New York University address "misaligned incentives inherent in the SPAC structure," including that "the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to liquidate."[3]  Based on empirical research of post-merger returns to SPAC shareholders, that paper concludes that "SPAC sponsors have proposed losing propositions to their shareholders, which is one of the concerns raised by the incentives built into the SPAC structure. . . . [S]ponsors do quite well, even where SPAC shareholders have experienced substantial losses."

**B.**    **Bespoke Capital, A SPAC Focused On The Cannabis Industries, Rushes Into A Transaction Taking Vintage Wine Public**

35.    Bespoke Capital was formed in 2021 in Toronto as a SPAC originally focused on acquiring a Canadian cannabis company. Under Bespoke Capital's originating documents, the company needed to initiate a reverse merger with a suitable target company before February 15, 2021, or it would begin winding down and returning its investment capital to shareholders. In the third and fourth quarters of 2020, Bespoke Capital entered into agreements-in-principle with four separate cannabis companies. None of these resulted in binding merger agreements, however. With time running out, Bespoke Capital shifted its focus to the beverage industry in the United States.

36.    On February 3, 2021, just two weeks before it would have been forced to wind up operations, Bespoke Capital signed an agreement with Vintage Wine to take the company public through a reverse merger. Specifically, under the agreement, (i) Bespoke Capital would change its jurisdiction of incorporation from the province of British Columbia to the State of Nevada; (ii) a subsidiary would merge with Vintage Wine with Vintage Wine surviving the merger as a wholly owned subsidiary of Bespoke Capital, and (iii) Bespoke Capital would change its name to Vintage Wine Estates, Inc.

37.    After the merger, on June 8, 2021, Vintage Wine's common stock began trading under the new ticker symbol "VWE" on the Nasdaq.

---

[3] Klausner, Michael D. and Ohlrogge, Michael and Ruan, Emily, A Sober Look at SPACs (December 20, 2021). YALE JOURNAL ON REGULATION, 2022, Volume 39, Issue 1. Available at SSRN: https://ssrn.com/abstract=3720919

**C.    Defendants Failed To Disclose Vintage Wine's Mismanagement Of Inventory And Improper Accounting Practices**

**1.    The Company Touted A Growth By Acquisition Strategy**

38.    Vintage Wine sells wine and spirits and reportedly has over 60 wine and spirits brands totaling around 3 million cases annually, making it the 14th largest wine producer in the United States. The Company describes its business as consisting of curating and marketing its brands and services to customers via various channels, including direct-to-consumer, wholesale, and retail. Its brands range from $10 to $150 per bottle, with the majority selling in the $12 to $20 price range.

39.    The Company's growth strategy was focused on acquisitions.  As the Company explained, "Our strategy is to continue to grow organically and through acquisitions with a view towards making two to three acquisitions per year over the next five years." Indeed, the Company's prospectus filed in advance of the business combination with Bespoke Capital explained that Vintage Wine acquired fifteen other wine and beverage entities in the five-year-period from 2017 to 2022.

40.    While this string of acquisitions created the appearance of growth on the Company's balance sheet, in reality, Vintage Wine failed to integrate its new brands into the Company's infrastructure and the brands typically struggled after Vintage Wine acquired them.  As FE 3 put it, a brand's "death march would slowly start" just after it was acquired by Vintage Wine.

**2.    Defendants Failed To Manage Inventory Properly**

41.    With all of these acquisitions and Vintage Wine's increase in size, the Company struggled to maintain accurate records of its inventory as its accounting department was not robust enough to manage the scale and complexity of its business. Several former employees described the Company's inventory as "mismanaged," and believed there was a "general consensus" that there was "dysfunction" at the Company's major warehouse in Santa Rosa, California. The problems were myriad: lack of training with inventory management, a failure to properly use electronic scanners or update the Company's inventory management system, and ad hoc storage within the facility.

42.    Former employees described several instances of the Company misplacing, spoiling, or otherwise diminishing the value of inventory because of mismanagement. According to FE 1,

Vintage Wine's main warehouse in Santa Rosa, California was a constant source of inventory mismanagement. "The warehouse was a mess. . . things were stacked so far back, and not organized with any rhyme or reason. They'd just put things where there was space."

43.     Complicating the storage problems, the warehouse kept paper records, resisting the implementation of a scan gun procedure when inventory arrived until the Chief Technology Officer ("CTO"), Chris Saylor, insisted on its use and made repeated in-person trips to ensure that inventory was being scanned properly. "[Saylor] became de facto warehouse manager" but the Company's inventory counts remained consistently unreliable.

44.     These archaic methods led to misreporting of inventory. For example, in 2022, FE 1 "heard we had 300 bottles" of Chardonnay that he had previously thought had been sold out. "So I sold them to customers and charged the cards. Then I was told the next day the warehouse didn't actually have that wine at all. So I had to give the customers another wine." In a separate incident after Vintage Wine's annual physical inventory count, FE 1 learned that that five pallets of Chardonnay from a different brand had been located in the warehouse after having gone missing for five years.

45.     FE 2 corroborates this account. FE 2's supervisors set annual budgets and sales goals for FE 2 based on the Company's inventory as reported in its internal tracking systems. Yet many times FE 2 reported, brands "that were supposed to be in stock were not in stock." According to FE 2, inventory was routinely unavailable for sale until many months after the relevant products were supposed to have launched. FE 2 and other sales employees' goals were based on internal sales projections that were "baked into the Company's forecasts" and reported to investors. FE 2 questioned, "how can I sell a brand that doesn't exist?"

46.     For example, in 2021, FE 2 was given the goal to sell over $100,000 of a brand called "Photograph" that FE 2 characterized as "created out of thin air": the Photograph brand was not physically available for FE 2 to sell at the time he was expected to achieve their sales goals. Vintage Wine did not begin shipping the Photograph brand until many months after it was supposed to have launched. As a result, FE 2 missed his targets for Photograph because the brand did not exist in time for him to achieve those targets.

47.     This same problem arose when FE 2 was instructed to sell two other brands: Vintage Wine's "Cherry Pie Rosé" and its "Bar Dog" prosecco. FE 2 was given sales goals for both brands, yet both failed to launch for many months after the goals were in effect. With Cherry Pie Rosé, Vintage Wine did not commence shipment until after FE 2 left the Company in March 2022. Because FE 2 was instructed to sell Photograph, Cherry Pie Rosé, Bar Dog, and other brands that were mistakenly reported as available for sale, FE 2 often offered these brands to distributors who were angered when they were informed that the brands were not ready to ship. This cycle eroded the trust that distributors had in Vintage Wine and in FE 2.

48.     The misreporting of inventory frustrated the Company's marketing efforts. In several instances, Vintage Wine Vice President Karla Reed would send FE 1 a report identifying "wines with no movement in a while" and ask whether FE 1 wanted to use any of them for direct-to-consumer efforts. After identifying wines FE 1 thought would be appropriate, "they would look in the warehouse and the wine wasn't actually there. Inventory would be off all the time, just saying bottles were there that weren't."

49.     FE 4 described the frequent frustration of seeing products identified in the inventory management system, constructing promotional campaigns around them, or even initiating email campaigns to consumers only to learn that the amount of inventory reported in the system was wrong. FE 4 only operated email campaigns for brands that Vintage Wine's internal marketing software showed were available for sale. Marketing associates accessed a direct-to-consumer sales platform called "CORESense," which showed how many cases of each brand were available. FE 4 determined when and whether to launch a campaign for a brand based on inventory levels and how quickly the brand was selling.

50.     FE 4 confirmed that Vintage Wine mismanaged its inventory both before and during the Class Period. Beginning in fall 2019 and continuing through the end of his employment at Vintage Wine, FE 4 observed that at least once per quarter, the email marketing campaigns he managed would result in sales that the Company could not fulfill because there were "often times issues with finding the wine." Once a wine club member or other individual customer ordered a brand that Vintage Wine had advertised, warehouse workers would be unable to locate the ordered

wine or would otherwise fail to ship the product. On other occasions, the Company simply did not have the wine the FE 4 was marketing: as FE 4 explained, "There would just be these situations where we would not have what we thought we did" in inventory. FE 4 would then send apology emails to the customers who did not receive the wine they ordered. The inability to fulfill orders resulted from CORESense overreporting the number of a brand's cases that were available for sale. FE 4 was astonished by these failures, asking "How did we not know that there was not enough wine" to fulfill sales?

51.    FE 4 stated that inventory was "mismanaged" at Vintage Wine and there was a "general consensus" that there was "dysfunction" around the inventory process. FE 4 understood that there was a lack of training for employees who were responsible for managing inventory. FE 4 corroborated reports from FE 1 that entire pallets of wine went missing in Vintage Wine's warehouses. According to FE 4, employees were recruited across many functions within Vintage Wine to participate in the Company's end-of-year physical inventory audit—effectively a manual examination to ensure that the products in Vintage Wine's warehouses matched its records. FE 4 learned that colleagues tasked with locating wine would find that the Company had "lost multiple pallets of wine—they would not be able to find them." Often, employees blamed the haphazard manner in which wine was stored "all over the place" in the Company's storage facilities. FE 4 described that it was "amazing" that the Company "could function and get wine out the door with the way we tracked inventory."

52.    Along with causing frustration for the Company's marketing efforts, mismanagement also complicated the Company's ability to maintain product quality, which also affected the value of Vintage Wine's inventory. In 2021 for example, according to FE 1, two imports, a Provençal Rosé and Côtes de Rhone, each approximately 2600 cases of finished volume, arrived at the Company's warehouse, were improperly stored, and went bad. Apparently, instead of being transferred to stainless steel storage containers, the wines were left to languish in the large plastic bladders they were shipped in.

53.    Contamination and poor recordkeeping combined to have a similarly corrosive effect on the value of Vintage Wine's inventory. In 2019, for example, contamination during bottling of a

1    Pinot Noir caused the wine to become fizzy, likely due to secondary fermentation. According to FE
2    1, the Company's efforts to determine which specific batches of the wine had been affected did not
3    succeed, resulting in customer complaints about the unsatisfactory wine for years afterward. In
4    2021, a Russian River Pinot Noir and an Atlas Peak Cabernet Sauvignon were determined to have
5    been affected by contamination after purchase by Vintage Wine.

6        54.    Former employees corroborate that senior management was well aware of these
7    inventory management problems. FE 1's understanding is that Vintage Wine's upper management,
8    including the Individual Defendants, were "hyper aware" of the problems with its inventory
9    management before taking the Company public. According to FE 1, the warehouse manager's
10    longstanding personal relationship with Defendant Roney insulated him from any accountability.
11    FE 2 had many discussions with his supervisors about these inventory problems. The supervisors
12    whom he made aware of the inventory issues included Jason Strobbe, Mike Gilboy, and Terry
13    Wheatley. FE 2 blamed the problems on "lack of good leadership from Roney on down."

14        55.    After the Company went public, annual physical counts of Vintage Wine's inventory
15    were conducted in June, instead of December as they had been previously. According to FE 1, "[i]t
16    was routine" for miscounts or inaccurate data to surface "shortly after the completion" of the
17    physical recount. Corrections were asked for on known miscounts or issues, but "little to no follow
18    up occurred on if they were corrected or not after being identified."

19        **3.    The Company Did Not Accurately Record Costs Of Goods Sold**

20        56.    According to FE 1, Vintage Wine's internal calculations of accrued costs on
21    inventory "were screwed up." According to FE 1, for Vintage Wine's inventory, accrued costs
22    largely represented the price of storing and maintaining wine in stock. Vintage Wine's internal
23    calculations of those costs in the Company's inventory management software were wrong. A
24    colleague in the Accounting Department reportedly confirmed to FE 1 that the Company's formulas
25    for calculating internal costs "racked up costs incorrectly." This impaired the ability of the Company
26    to both sell its products profitably and get an accurate sense of the value of its inventory. FE 1
27    explained, for example, that a bottle of sauvignon blanc from Napa might have been fair value $30
28    per gallon, but Vintage Wine's inaccurate internal cost calculations generated a recommend price

1  of $68 per gallon—either substantially reducing the likely market for the bottle or reducing the

2  profitability of its sale at a lower price, and, in either event, affecting the accuracy of the Company's

3  estimates of the value of its inventory.

4        57.    According to FE 1, Vintage Wine relied on Microsoft Navision (or "Microsoft

5  NAV") as its primary inventory management system during the Class Period. The program used

6  formulas written by Vintage Wine employees to calculate both the cost-of-goods for units of

7  inventory, and volumes, sales prices and estimated margins based on the unique characteristics of

8  each product. According to FE 1, the system was not set up properly and did not integrate well with

9  other systems used by Vintage Wine's recent acquisitions. According to FE 1, Defendant DeVillers

10 received internal blame for the apparent shortcomings with Vintage Wine's calculations in

11 Microsoft NAV during the Class Period, with one colleague stating simply "Kathy's numbers are

12 screwed up."

13       58.    According to FE 1, Vintage Wine's senior officers knew of the problem. For

14 example, Vintage Wine's President, Terry Wheatley, and Zach Long, one of the three individuals

15 serving as COO during the Class Period, acknowledged the problems with the calculations in

16 Microsoft NAV during multiple weekly production meetings, and directed the personnel responsible

17 for marketing the affected wines to sell the product for "what they could."

18       59.    For example, during the Class Period, FE 1 was told by COO Zach Long that the

19 Company hoped to get $69 a bottle for a 2018 Moon Mountain Cabernet Franc because of the high

20 cost-of-goods-sold ("COGS") associated with the wine. FE 1 said there was no way the wine could

21 sell at that price, but was given 98 cases and instructed to sell it for what it would go for, ideally in

22 the $60's.

23       60.    Similarly, during the Class Period, FE 1 was told an Atlas Peak Rose of Sangiovese

24 had an internal GOGS of $4 a bottle. After arranging to sell the wine for $16 a bottle, FE 1 learned

25 that the internal COGS was, in fact, $9.57, meaning that it would be difficult to sell the bottle at a

26 profit. FE 1 was told to sell the wine for what they could, and that the Company would "settle the

27 numbers issues on the back end."

28

14

61.    According to FE 1, three lots of Napa Valley Cabernet Sauvignon released between July and October 2022 had the same issues. The wine was purchased internally from Delectus and had the same problem, with internal COGS in Vintage Wine's inventory management software noted as $18.54 per bottle. According to FE 1, the "COGS numbers were wrong." The wine was to be sold for prices ranging from $30 to $35 a bottle—meaning margins were well below 50% even though the Company's projections and internal targets were based on average margins over 60%. FE 1 stated there was "never an internal wine we purchased that did not have [a COGS] issue." According to FE 1, it was the "same thing every time. We'd say COGS were through the roof…we were told it was inaccurate. By Terry [Wheatley], Zach [Long], they told us Kathy [DeVillers's] formula is screwed up." FE 1 inferred "I think they never understood how much it cost to keep wine in a tank in the first place, so they couldn't build a formula around it."

62.    In short, several times, Vintage Wine's top managers acknowledged that the estimated costs included in Vintage Wine's inventory management software were inaccurate. Those same numbers were provided to the accounting department and ultimately used to calculate the value of the Company's inventory in SEC filings.

63.    FE 3 explained that his expenditures were closely monitored, and that he needed to keep track of all the costs that went into making a stock keeping unit ("SKU"), or product. But until September 2022, the Company did not have an organized way of tracking the costs that went into making an SKU. Instead, each winemaker was expected to track this information for his or her brands without being given any standardized method of organizing it.

64.    In the same period, FE 3 had to obtain the approval for significant expenditures by emailing CFO Katherine DeVillers and Chief Winemaker Marco DiGuilio. FE 3 provided the example of asking to acquire 42,000 gallons of Paso Robles chardonnay from another winemaker who did not need it by sending DeVillers and DiGuilio an email containing information about costs and how the product would be used. DeVillers had authority to approve or deny the request.

65.    In September 2022, when Kristina Johnson was CFO, the Company began tracking the cost of producing SKUs through a "communal spreadsheet" that was accessible through Microsoft Teams to all winemakers and finance employees, including FE 3, Johnson, DiGuilio, and

Long. When FE 3 wanted to make a new blend, they plugged in the costs they would incur into the spreadsheet. The spreadsheet also auto-populated additional expected costs that would accrue before a product was sold such as the costs of glass, cork, dry goods, storage, and taxes. Once the spreadsheet was in effect, FE 3 began obtaining approval for large expenditures through the spreadsheet. According to FE 3, the Company used the spreadsheet to evaluate profitability and the cost of goods sold.

66.     FE 3 was also familiar with the Microsoft NAV system the Company used to track inventory and the problems it caused. He provided the example of dividing a California cabernet between three brands under the supervision of three winemakers. If one winemaker used his or her portion of the cabernet but did not update Microsoft NAV, the system would not reflect that only two-thirds of the blend was available. FE 3 also recounted that he would spend significant time trying to requisition a certain volume of wine for a blend, only to later learn that Vintage Wine had the wine available in stock even though NAV did not reflect its availability.

67.     Additionally, Vintage Wine's operations and accounting departments were plagued by frequent turnover, short staffing, and inadequate training—problems that gradually rose to the level of crisis after the Company went public. Between June 2021 and February 2023, Vintage Wine went through three Chief Operating Officers.  Similarly, there was high turnover in the Accounting Department—with multiple new hires leaving after only a few days or weeks. FE 1 reported that short staffing led to delays in correcting errors and FE 2 stated that the high turnover and understaffing caused the Company to pay distributors' invoices late.  Vintage Wine's difficulties with staffing its Accounting Department during the Class Period reportedly made it difficult to correct mistakes and even pay vendor invoices promptly, as there simply were not enough staff to get the work done.

**D.      The Company Admits That Its Financial Statements Were Overstated And Announces The Removal Of Its Founder And CEO**

68.      On September 13, 2022, after the close of trading, Vintage Wine issued a press release, disclosing that it had recorded $19.1 million in inventory adjustments. The press release stated, in relevant part:[4]

> *[T]he Company recorded $19.1 million in non-cash inventory adjustments identified through efforts t[o] improve and strengthen inventory management, processes and reporting.* This included physical inventory count adjustments of $12.4 million, $3.7 million related to the establishment of inventory reserves and $3.0 million related to the impact of additional remediation efforts. *In addition, the quarter included approximately $6.8 million in overhead burden that was related to the first and second quarter of fiscal 2022, but not material to the respective periods.* Also impacting gross profit were inefficiencies created by supply chain constraints and inflation. These impacts were partially offset by gross profit contributions of the acquisitions and improved pricing in DTC.
>
> Kristina Johnston, Chief Financial Officer, commented, "Since joining VWE in March, I have been impressed by this team of very dedicated people who are intent upon executing our strategy to drive growth and deliver on our mission to provide the finest quality wines and create incredible customer experiences. We are now diligently applying this focus and intensity in our financial processes in order to remediate our material weakness. We have instituted improved accountability metrics, updated assumptions for overhead absorption processes better reflecting the current business and created greater discipline around timeliness in reporting throughout the organization. *The implementation of more stringent processes drove the adjustments in inventory, but we expect this will also drive greater transparency and better future results for the Company*."

69.      Also on September 13, 2022 after the close of trading, Vintage Wine filed a Form 10-K for the fiscal year ended June 30, 2022 ("2022 10-K"). Defendants Roney and Johnston signed the 2022 10-K. In the 2022 10-K, the Company reiterated that:

> *For the year ended June 30, 2022, the Company recorded a $19.1 million non-cash inventory write down.* Specifically, the inventory write down related to physical inventory count adjustments of $12.4 million, $3.7 million related to the establishment of inventory reserves and $3.0 million related to the impact of additional remediation efforts.

The 2022 10-K revealed the degree to which Vintage Wine's inventory mismanagement impacted its financials by reducing profit and increasing its losses from operations. According to the 2022 10-K, "Gross profit for the year ended June 30, 2022 increased $14.6 million, or 19.4%, to $90.0

---

[4] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

million, from $75.4 million for the year ended June 30, 2021 . . . . ***These increases were partially offset by $19.1 million of non-cash inventory write-downs identified through material weakness remediation efforts***." Meanwhile, "Loss from operations for the year ended June 30, 2022 was $7.9 million, a decrease of $17.1 million from income of $9.2 million for the year ended June 30, 2021. ***The decrease was driven by $19.1 million non-cash inventory write-downs identified through material weakness remediation efforts***, offset by increased growth in our B2B and DTC segments."

70.     On this news, the price of Vintage Wine common stock fell $2.23, or 40.3%, to close at $3.30 per share on September 14, 2022, on unusually high trading volume.

71.     On February 8, 2023, after the close of trading, the Company filed a Form 8-K with the SEC in which it disclosed that Defendant Roney was no longer going to serve as CEO. The same Form 8-K further stated that certain previously issued financial statements should no longer be relied upon and should be restated as a result of an accounting error related to the classification and timing of recording certain costs.  As the Form 8-K, in relevant part, disclosed:

**Item 4.02 — Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**

On February 5, 2023, the Audit Committee (the "Audit Committee") of the Board of Directors (the "Board") of the Company, after discussion with management and the Company's independent registered public accounting firm, determined that the Company's previously issued financial statements as of and for the three months ended September 30, 2022 (the "Subject Period") should no longer be relied upon and should be restated due to the identification of an accounting error.

***The restatement results from an accounting error relating to the classification of certain assets and the classification and timing of recording certain costs for the Subject Period. Accordingly, investors should no longer rely on the Company's previously issued financial statements, earnings release or similar communications relating to the Subject Period.***

These required adjustments were identified during the Company's financial close process for the second quarter of fiscal 2023 and did not involve any misconduct with respect to the Company, its management or employees.

As a result of the accounting error identified, the Company will:

    a)      restate its unaudited condensed consolidated financial statements and the notes thereto for the Subject Period; and

18

1

2

       b)      amend its Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") for the Subject Period.

3

4

5

6

7

***For the Subject Period, the restatement is expected to result in an increase in net revenue of approximately $0.7 million, an increase in cost of goods sold of approximately $2.9 million and a decrease in selling, general, and administrative expenses of approximately $0.6 million, resulting in an approximately $0.8 million decrease in net income.*** After giving effect to these changes, the Company expects diluted earnings per share allocable to common stockholders for the Subject Period as previously reported will be reduced from $0.02 to $0.00. The restatement is not expected to impact the Company's historical net earnings beyond the Subject Period.

8

9

10

In addition, current assets decreased $1.3 million and current liabilities decreased $0.5 million. The description in this report of the accounting error, the required adjustments and the expected impacts of the restatement are preliminary, unaudited and subject to further change in connection with the completion of the restatement.

11

12

The Company intends to file an amendment to its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2022 (the "Amended Q1 10-Q") in order to restate the financial statements for the Subject Period as soon as practicable.

13

14

The Company's management and the Audit Committee have discussed the matters disclosed in this Item 4.02 with the Company's independent registered public accounting firm, Cherry Bekaert LLP.

15

16

17

72.     Moreover, the Form 8-K disclosed that the filing of the Company's next Quarterly Report would be delayed because management had identified impairment indicators.  As the Company explained:

18

19

20

21

22

On February 8, 2023, the Company issued a press release announcing, among other things, that ***the filing of the Company's Quarterly Report on Form 10-Q for the quarterly period ended December 31, 2022 and the announcement of the related financial results will be delayed due to management identifying impairment indicators, which require additional analysis, late in the financial reporting and closing process***. Due to the time required to complete this process, the Company expects it will file its second quarter financial results in mid-March 2023 following the filing of the Amended Q1 10-Q.

23

24

25

26

27

28

73.     Attached to the Form 8-K were two press releases that had been issued after the close of trading that same day. The first press release was titled "Vintage Wine Estates to Restate First Quarter Fiscal 2023 Financial Statements; Announces Preliminary Unaudited/Unreviewed Second Quarter Fiscal 2023 Financial Results." In the press release, Vintage Wine announced that it planned to restate its consolidated financial statements for the first fiscal quarter of 2023, which ended on September 30, 2022 due "to the misclassification and accounting for certain assets and also the

timing of recording certain costs." Vintage Wine added that "***Investors should no longer rely upon the Company's previously released financial statements for the first quarter of fiscal 2023***." The Company further announced that it would delay filing its second quarter 2023 financial results.

74.     The second February 8, 2023 press release, which was also attached to the Form 8-K, was titled "Vintage Wine Estates Announces Changes in Executive Leadership and Board Structure; Executing Business Realignment Plan to Deliver Stronger Earnings Power." In the press release, the Company announced that Roney would no longer serve as Vintage Wine's CEO. According to the Company, Roney "has elected to transition from Chief Executive Officer to Executive Chairman of the Board of Directors." The Board appointed independent director Jon Moramarco interim CEO with immediate effect. In addition, the Company announced "that it has retained Arthur Bert, a corporate strategy and acquisition integration advisor, to assist in the reorganization and simplification of VWE." Paul Walsh, the newly appointed Lead Independent Director, added:

> Pat [Roney] successfully grew VWE over the last 20 plus years and we have greatly appreciated his contributions as we advanced VWE as a public company. ***We have mutually determined that his role as CEO has changed significantly since our IPO, adding a complex dimension to his responsibilities, and taking him from what he has truly enjoyed. It was critical that the Board make the necessary leadership changes to find the right talent to continue to execute our strategy while maintaining the years of institutional knowledge and industry relationships that Pat has to offer.*** As a result, we have implemented our succession plan and have begun a search for a new CEO.

75.     In response to this news, the price of Vintage Wine common stock fell $0.77, or 27.6%, to close at $2.02 per share on February 9, 2023, on unusually high trading volume

76.     On April 5, 2023, Vintage Wine disclosed in a press release entitled "Vintage Wine Estates Provides Preliminary Results of Fair Value Evaluation of Goodwill and Tradenames," in relevant part, that:

> total non-cash impairment charges for the second quarter of fiscal 2023 that ended December 31, 2022 is expected to be in the range of $130 million to $145 million. The total is comprised of approximately $120 million to $130 million in estimated goodwill impairments driven by changes in performance of certain lines of business in the Wholesale and B2B segments, and an estimated $10 million to $15 million write down in indefinite-lived tradename and trademark assets primarily related to revised expectations of future net sales for the Layer Cake brand and the expected future cash flow from the ACE Cider business.

**E.     Defendants Violated Generally Accepted Accounting Practices During The Class Period**

77.     Compliance with generally accepted accounting principles ("GAAP") is a fundamental obligation of publicly traded companies such as Vintage Wine.  GAAP is the official standard for accounting accepted by the SEC and is primarily promulgated by the Financial Accounting Standards Board ("FASB") and American Institute of Certified Public Accountants ("AICPA"), which standards are referenced as "Accounting Standards Codification" ("ASC"). GAAP is recognized by the accounting profession as conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  In addition, the FASB has issued guidance in the form of FASB Concept Statements ("FASCON"), which set the objectives, qualitative characteristics, and other concepts used in the development of GAAP and which reflect the basis and framework for the promulgation of accounting standards.

78.     At all times throughout the Class Period, Vintage Wine asserted in its SEC filings that the Company's financial statements complied with GAAP.  Contrary to these statements, the restatement was an admission that the Company's historical financial statements violated GAAP. SEC Regulation S-X provides that the Company's annual and interim financial statements filed with the SEC "which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a).

79.     As discussed below, Vintage Wine's financial statements included in its Class Period SEC filings were not prepared in accordance with GAAP. The Company violated ASC 330-10-35-1B, which states:

> Inventory measured using any method other than LIFO or the retail inventory method (for example, inventory measured using first-in, first-out (FIFO) or average cost) shall be measured at the lower of cost and net realizable value. ***When evidence exists that the net realizable value of inventory is lower than its cost, the difference shall be recognized as a loss in earnings in the period in which it occurs. That loss may be required, for example, due to damage, physical deterioration, obsolescence, changes in price levels, or other causes.***

80.     In other words, for companies that measure inventory using the FIFO method (as Vintage Wine purports to do), inventory is measured by comparing the net realizable value (for example, the sale price of a bottle of wine) minus the price of getting the goods to market (such as

storage, materials, shipping costs etc.). Accordingly, where there is evidence that the inventory is worth less than the associated costs of selling it, because of, for example, damage or deterioration, a company must recognize that difference as a loss *during the time period* when that damage or deterioration occurs.

81.     Here, Vintage Wine recognized a $19.1 million write-down of the value of its inventory in its 2022 10-K. As disclosed by the Company's simultaneously filed press release, the write-down included $12.4 million in "physical inventory count adjustments." FE 1 states that the Company's 2022 physical inventory count took place in June 2022. But the Company's problems with missing, spoiled, or improperly priced inventory all substantially pre-dated the period covered by the 2022 10-K. Indeed, based on the information provided by former employees and the Company's own SEC disclosures, those problems were endemic throughout the Class Period and well-known to the Company's senior management, including the Individual Defendants.

82.     The September 13, 2022 press release states that "[t]he implementation of more stringent processes drove the adjustments in inventory" and states that, going forward, the Company would employ "more rigorous procedures with inventory management, expand[] and upgrad[e] the accounting and finance team, and measurably increase[] training throughout the organization regarding inventory, reporting and reconciliation procedures."

83.     Put simply, based on Vintage Wine's own explanations of how it accounted for the value of its inventory and why the Company reduced that estimate by $19.1 million in September 2022, every previous earnings disclosure during the Class Period was materially incorrect for reasons well-known to the Individual Defendants—the inadequacies of its inventory management system and the shortcomings of its accounting team.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

84.     On October 13, 2021, Vintage Wine filed its Form 10-K with the SEC for the period ended June 30, 2021 ("2021 10-K"), which Defendants Roney and DeVillers each signed. In the 2021 10-K, the Company stated that in concluding its financial close process for the 2021 fiscal year, it "*identified a material weakness in our internal control over financial reporting*" that

"*relates to our process and controls regarding the tracking of costs through the various stages of inventory accounting*, particularly as they pertain to bulk wine and spirits." As a result, the Company's "disclosure controls and procedures were not effective as of June 30, 2021." The 2021 10-K continued:

> **Material Weakness**
>
> **Despite not conducting a formal assessment regarding internal control over financial reporting, management identified the material weakness described below during the fiscal 2021 audit**. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis.
>
> Control Activity—The Company did not have effective business processes and controls to perform reconciliations of certain account balances related to inventory, and the received not invoiced and cellar accruals, on a regular basis.
>
> **The Company is actively pursuing resources necessary to remediate this deficiency in an effort to remediate this material weakness. We have engaged third party consultants to assist with business processes and control activities related to inventory and account reconciliations.**

85.    The statements identified in ¶ 84 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that the Company had not taken significant measures to remediate the material weakness concerning inventory balances.

86.    The 2021 10-K reported the following about inventory:

Inventory consists of the following at June 30, 2021 and June 30, 2020:

| (in thousands) | June 30, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Bulk wine and spirits | $ 119,333 | $ 124,944 |
| Bottled wine and spirits | 90,083 | 68,684 |
| Bottling and packaging supplies | 10,482 | 11,798 |
| Nonwine inventory | 1,247 | 1,032 |
| Total inventories | $ 221,145 | $ 206,458 |

During the year ended June 30, 2021, **we recognized impairment of inventory of $3.3 million** associated with inventory damage caused by the 2020 Northern California wildfires.

During the year ended June 30, 2020, **we recognized an impairment of inventory of approximately $3.9 million** associated with inventory damage caused by Northern

California fires. In December 2020, we entered into a settlement agreement for $4.8 million in connection with the damaged inventory.

87.     The statements identified in ¶ 86 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company had not taken significant measures to remediate the material weakness concerning inventory balances; (ii) due to the mismanagement of inventory, Vintage Wine's reported inventory did not reflect the value of inventory that was damaged and/or destroyed; and (iii) as a result, its inventory balances were overstated.

88.     Defendants Roney and DeVillers each signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") that were attached as exhibits to the 2021 10-K. In the SOX Certifications, Roney and DeVillers certified that "*the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.*"

89.     The statements identified in ¶ 88 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company had not taken significant measures to remediate the material weakness concerning inventory balances; (ii) due to the mismanagement of inventory, Vintage Wine's reported inventory did not reflect the value of inventory that was damaged and/or destroyed; and (iii) as a result, its inventory balances were overstated.

90.     On November 15, 2021, Vintage Wine filed its Form 10-Q for the period ended September 30, 2021 ("1Q22 10-Q"), which Defendants Roney and DeVillers signed. The 1Q22 10-Q stated that the previously disclosed material weakness had not been remediated. The 1Q22 10-Q also reported the following about inventory:

A summary of inventory at September 30, 2021 and June 30, 2021 is as follows:

| (in thousands) | September 30, 2021 | June 30, 2021 |
|---|---|---|
| Bulk wine and spirits | $ 103,857 | $ 119,333 |
| Bottled wine and spirits | 106,482 | 90,083 |
| Bottling and packaging supplies | 13,991 | 10,482 |
| Nonwine inventory | 1,486 | 1,247 |
| Total inventories | $ 225,816 | $ 221,145 |

24

For the three months ended September 30, 2021 and 2020, the Company **_did not recognize any impairment of inventory._**

91.     The statements identified in ¶ 90 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company had not taken significant measures to remediate the material weakness concerning inventory balances; (ii) due to the mismanagement of inventory, Vintage Wine's reported inventory did not reflect the value of inventory that was damaged and/or destroyed; and (iii) as a result, its inventory balances were overstated.

92.     Defendants Roney and DeVillers each signed SOX Certifications that were attached as exhibits to the 1Q22 10-Q. The SOX Certifications stated that "**_the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company_**."

93.     The statements identified in ¶ 92 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company had not taken significant measures to remediate the material weakness concerning inventory balances; (ii) due to the mismanagement of inventory, Vintage Wine's reported inventory did not reflect the value of inventory that was damaged and/or destroyed; and (iii) as a result, its inventory balances were overstated.

94.     On February 14, 2022, Vintage Wine filed its Form 10-Q for the period ended December 31, 2021 ("2Q22 10-Q"), which Defendants Roney and DeVillers signed. The 2Q22 10-Q stated that the previously disclosed material weakness had not been remediated. The 2Q22 10-Q further reported the following about inventory:

Inventory consists of the following:

| (in thousands) | December 31, 2021 | | June 30, 2021 | |
|---|---|---|---|---|
| Bulk wine, spirits and cider | $ | 110,202 | $ | 119,333 |
| Bottled wine, spirits and cider | | 102,740 | | 90,083 |
| Bottling and packaging supplies | | 7,751 | | 10,482 |
| Nonwine inventory | | 1,648 | | 1,247 |
| Total inventories | $ | 222,341 | $ | 221,145 |

For the three months ended December 31, 2021 and 2020, respectively, the Company recognized impairment of inventory of zero and $3.3 million. **_For the six months_**

*ended December 31, 2021 and 2020, respectively, the Company recognized impairment of inventory of zero and $3.3 million.*

95.    The statements identified in ¶ 94 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company had not taken significant measures to remediate the material weakness concerning inventory balances; (ii) due to the mismanagement of inventory, Vintage Wine's reported inventory did not reflect the value of inventory that was damaged and/or destroyed; and (iii) as a result, its inventory balances were overstated.

96.    Defendants Roney and DeVillers each signed SOX Certifications that were attached as exhibits to the 2Q22 10-Q. The SOX Certifications stated that "*the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company*."

97.    The statements identified in ¶ 96 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company had not taken significant measures to remediate the material weakness concerning inventory balances; (ii) due to the mismanagement of inventory, Vintage Wine's reported inventory did not reflect the value of inventory that was damaged and/or destroyed; and (iii) as a result, its inventory balances were overstated.

98.    On May 16, 2022, Vintage Wine filed its Form 10-Q for the period ended March 31, 2022 ("3Q22 10-Q"), which Defendants Roney and Johnston signed. The 3Q22 10-Q stated that the previously disclosed material weakness had not been remediated. The 3Q22 10-Q further reported the following about inventory:

Inventory consists of the following:

| (in thousands) | March 31, 2022 | | June 30, 2021 | |
|---|---|---|---|---|
| Bulk wine, spirits and cider | $ | 109,408 | $ | 119,333 |
| Bottled wine, spirits and cider | | 89,808 | | 90,083 |
| Bottling and packaging supplies | | 20,526 | | 10,482 |
| Nonwine inventory | | 1,522 | | 1,247 |
| Total inventories | $ | 221,264 | $ | 221,145 |

For the three months ended March 31, 2022 and 2021, respectively, the Company recognized no impairment of inventory. **For the nine months ended March 31, 2022**

26

***and 2021, respectively, the Company recognized impairment of inventory of zero and $3.3 million.***

99.     The statements identified in ¶ 98 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company had not taken significant measures to remediate the material weakness concerning inventory balances; (ii) due to the mismanagement of inventory, Vintage Wine's reported inventory did not reflect the value of inventory that was damaged and/or destroyed; and (iii) as a result, its inventory balances were overstated.

100.     Defendants Roney and Johnston each signed SOX Certifications that were attached as exhibits to the 3Q22 10-Q. The SOX Certifications stated that "***the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.***"

101.     The statements identified in ¶ 100 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company had not taken significant measures to remediate the material weakness concerning inventory balances; (ii) due to the mismanagement of inventory, Vintage Wine's reported inventory did not reflect the value of inventory that was damaged and/or destroyed; and (iii) as a result, its inventory balances were overstated.

102.     On November 9, 2022, Vintage Wine filed its Form 10-Q for the period ended September 30, 2022 ("1Q23 10-Q"), which Defendants Roney and Johnston signed. The 1Q23 10-Q reported the following regarding net revenue, cost of revenue, and net income:

| | Three Months Ended September 30, | |
| | 2022 | 2021 |
|---|---|---|
| **Net revenues** | | |
| Wine, spirits and cider | $ 52,052 | $ 36,287 |
| Nonwine | 25,810 | 19,400 |
| | 77,862 | 55,687 |
| **Cost of revenues** | | |
| Wine, spirits and cider | 34,522 | 20,588 |
| Nonwine | 13,192 | 11,662 |
| | 47,714 | 32,250 |
| **Net income** | 634 | 2,779 |
| Net loss attributable to the noncontrolling interests | (343) | (25) |
| **Net income attributable to Vintage Wine Estates, Inc.** | 977 | 2,804 |
| Accretion on redeemable Series B stock | - | - |
| **Net income allocable to common stockholders** | $ 977 | $ 2,804 |

103.    The statements identified in ¶ 102 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company had an accounting error relating to the classification of certain assets and the classification and timing of recording certain costs and (ii) that as a result, the Company's cost of goods sold and net revenue were understated and its expenses was overstated, resulting in an overstatement in net income.

104.    Defendants Roney and Johnston each signed SOX Certifications that were attached as exhibits to the 1Q23 10-Q. The SOX Certifications stated that "***the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company***."

105.    The statements identified in ¶ 104 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company had an accounting error relating to the classification of certain assets and the classification and timing of recording certain costs and (ii) that as a result, the Company's cost of goods sold and net revenue were understated and its expenses was overstated, resulting in an overstatement in net income.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

106.    As alleged herein, Defendants acted with scienter because they knew that the public documents and statements issued or disseminated in the name of Vintage Wine were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

107.    As alleged herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Vintage Wine, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading misstatements and/or their associations with Vintage Wine which made them privy to confidential proprietary information concerning Vintage Wine, participated in the fraudulent scheme alleged herein.

28

1

2

      **1.**     **The Individual Defendants Were Actively Involved In Running The Business And Were Certainly Aware Of The Facts That Were Central To Vintage Wine's Business**

3       108.    The Individual Defendants intimately involved in the day-to-day operations of the

4  Company. The Company's public filings, including an amended Form 10-K filed on October 28,

5  2021, describe Roney as "hands-on in every aspect of the wine and spirits business" and former

6  employees described Roney as intervening in the day-to-day management of Vintage Wine's

7  business. FE 3 even described Roney as knowledgeable about the details of the Company and "well-

8  informed about everything all the time."

9       109.    The Individual Defendants' participation in and control over the minutiae of Vintage

10  Wine's business supports the inference that each knew or should have known the nature and the

11  scope of the issues affecting the Company's inventory management system and accounting

12  practices—especially given the former employees' statements suggesting that those issues were

13  repeatedly raised with the Company's other executives. The Company's sole business purpose is

14  the production and sale of wine (which certainly includes the associated costs and value of stored

15  inventory), supporting a strong inference that they knew or should have known the truth concerning

16  the financial statements later acknowledged to be materially false.  Certainly, the Company's

17  executives would have been aware, or were reckless in not knowing, the amount of wine sold and

18  in stock at a wine selling business.

19

20

      **2.**     **The Fact That The Individual Defendants Were Aware Of Weaknesses In The Company's Internal Control Further Supports Their Scienter**

21       110.    Before the start of the Class Period, on September 29, 2021, the Company

22  acknowledged that it had internal control issues.  Specifically, the Company disclosed that, "During

23  its financial close process, the Company identified a material weakness in its internal control over

24  financial reporting relating to the process and controls surrounding inventory. Specifically, the

25  Company did not have effective business processes and controls to perform reconciliations of certain

26  inventory-related account balances." Vintage Wine further disclosed that it had discussed these

27  issues with the Audit Committee of its Board and was working with its registered public accounting

28  firm to remedy the control issues.

111. Even though the Company and the Individual Defendants were aware of the internal control issues, which they were purporting to be working with their auditor to remedy, Defendants still failed to properly account for the Company's financials. This continued failure supports the inference that they acted with reckless disregard for the truth of the Company's financial disclosures during the Class Period.

112. In other words, both issues underlying the September 13, 2022 and February 8, 2023 disclosures directly related to the Company's known material weaknesses with respect to internal controls regarding accounting and specifically to difficulties with accurately calculating the cost of goods sold—issues that the Individual Defendants had been aware of before and throughout the Class Period. The Individual Defendants' protracted failure to correct known material weaknesses, which contributed to the issuance of financial statements they later acknowledged to be materially inaccurate, supports a strong inference of scienter.

### 3. The Full Truth Was Only Revealed After Long-Standing Management Of Vintage Wine Were Removed From Their Positions

113. Defendant DeVillers served as Vintage Wine's CFO from August 2018 until March 2022 and then served as the Company's Executive Vice President of Acquisition Integrations until her resignation on January 27, 2023. Roney was the Company's founder and CEO. He served as the Company's CEO from its founding in 2009, through its acquisition and throughout the Class Period. Yet, at the end of the Class Period, on February 8, 2023, the Company announced that it had removed Roney as Vintage Wine's CEO since "It was critical that the Board make the necessary leadership changes to find the right talent to continue to execute our strategy...."

114. The most logical inference from the departure of Vintage Wine's management that had been overseeing the Company and its accounting is that they had knowledge of, or were reckless in not knowing, the accounting and internal control issues, and the Board of Directors wanted to bring in new management to ensure that such a debacle could not occur again.

### 4. Defendants' Violations Of Basic Accounting Guidelines Further Support Scienter

115. As discussed above, Vintage Wine must comply with GAAP, which are those principles recognized by the accounting profession as the conventions, rules, and procedures

necessary to define accepted accounting practice at a particular time. Specifically, SEC Regulation S-X requires that interim financial statements as filed with the SEC be prepared in accordance with GAAP. (17 C.F.R. § 210.10-01(a)). Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. § 210.4- 01(a)(1).

116.    Furthermore, the fact that Vintage Wine stated that its financial statements should not be relied upon is an admission that they were false and misleading when originally issued. (Accounting Principles Board Opinion ("APB") No. 20 at ¶¶ 7-13; Financial Accounting Standards Board Statement No. 154 at ¶ 25).

117.    GAAP rules and regulations regarding inventory, revenue, net income and assets are fundamental for publicly traded companies. As such, brazen violation of these basic and well-known rules, as Vintage Wine admittedly did, further demonstrates intent, or at least severe recklessness.

### 5.    Corporate Scienter And *Respondeat Superior*

118.    Each of the Individual Defendants was a high-ranking management-level employee that either (i) made the false or misleading statements alleged herein; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or issuance of the false or misleading statements alleged herein. In so doing, each was acting in his/her role as an executive employee and representative of Vintage Wine. The scienter of each of these individuals and all other management-level employees of Vintage Wine, is therefore imputed to Defendant Vintage Wine.

## VII.    LOSS CAUSATION

119.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Vintage Wine's stock price throughout the Class Period until Defendants began to disclose the truth regarding the Company's financial results to the market.

120.    The truth regarding the Company's financial results was partially revealed, and/or the concealed risks materialized, on or about September 13, 2022 and February 8, 2023.

121.    On September 13, 2022, after the close of trading, Vintage Wine disclosed, amongst other things, that it had recorded $19.1 million in inventory adjustments and that its fourth quarter

1   2022 results included $6.8 million in overhead burden related to the first and second quarter of 2022.

2   On this news, on September 14, 2022, the price of Vintage Wine stock, fell from the prior day's

3   close of $5.53 per share to close at $3.30 per share, a drop of 40.3%.

4          122.    On February 8, 2023, after the close of trading, the Company disclosed that

5   Defendant Roney was no longer going to serve as CEO, that the filing of the Company's next

6   Quarterly Report would be delayed because management had identified impairment indicators, and

7   that certain previously issued financial statements should no longer be relied upon and should be

8   restated as a result of an accounting error related to the classification and timing of recording certain

9   costs.  On this news, on February 9, 2023, Vintage Wine's stock price fell from the prior day's close

10  of $2.79 per share to close at $2.02 per share, a drop of 27.6%.

11         123.    During the Class Period, Plaintiffs and the Class purchased Vintage Wine's securities

12  at artificially inflated prices and were damaged thereby.  The price of the Company's securities

13  significantly declined when the misrepresentations made to the market, and/or the information

14  alleged herein to have been concealed from the market, and/or the effects thereof, were revealed,

15  causing investors' losses.

16  **VIII.   CLASS ACTION ALLEGATIONS**

17         124.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

18  Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased

19  or otherwise acquired Vintage Wine common stock between October 13, 2021 and February 8, 2023,

20  inclusive, and who were damaged thereby ("Class"). Excluded from the Class are Defendants, the

21  officers and directors of the Company, at all relevant times, members of their immediate families

22  and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants

23  have or had a controlling interest.

24         125.    The members of the Class are so numerous that joinder of all members is

25  impracticable. Throughout the Class Period, Vintage Wine's shares actively traded on the

26  NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can

27  be ascertained only through appropriate discovery, Plaintiffs believe that there are at least hundreds

28  or thousands of members in the proposed Class. Millions of Vintage Wine shares were traded

publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Vintage Wine or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

126.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

127.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

128.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts as alleged here;

b.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Vintage Wine; and

c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

129.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    FRAUD ON THE MARKET

130.    Plaintiffs will rely on the presumption of reliance established by the fraud-on-the-market doctrine. Among other things:

1    a.    Defendants made public misrepresentations or failed to disclose material facts during
2 the Class Period;

3    b.    These omissions and material misrepresentations were material;

4    c.    Vintage Wine common stock traded in an efficient market throughout the Class
5 Period;

6    d.    The misrepresentations alleged would tend to induce a reasonable investor to
7 misjudge the value of Vintage Wine common stock; and

8    e.    Plaintiffs and other members of the Class purchased Vintage Wine common stock
9 between the time Defendants misrepresented or failed to disclose material facts and the time the
10 facts were disclosed, without knowledge of the misrepresented or omitted facts.

11    131.   At all relevant times, the market for Vintage Wine common stock was efficient, as:

12    a.    Vintage Wine filed periodic public reports with the SEC as a regulated issuer; and

13    b.    Vintage Wine regularly communicated with public investors via established
14 communications mechanisms, including through the regular dissemination of press releases on
15 major news wire services, communications through the financial press, securities analysts, the
16 internet, and other similar reporting services.

17    132.   As a result of the foregoing, the market for Vintage Wine's securities promptly
18 digested current information about Vintage Wine from publicly available sources and reflected such
19 information in Vintage Wine's securities price(s).  Under these circumstances, all persons and
20 entities who or which purchased or otherwise acquired Vintage Wine's common stock during the
21 Class Period suffered similar injuries through their purchase of Vintage Wine shares at artificially
22 inflated prices and thus the presumption of reliance applies.

23    133.   To the extent that the Defendants concealed or improperly failed to disclose material
24 facts with respect to VWE's business, Plaintiffs are entitled to a presumption of reliance in
25 accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

26 **X.   NO SAFE HARBOR**

27    134.   The statutory safe harbor provided by the PSLRA for forward-looking statements
28 under certain circumstances does not apply to any of the materially false and misleading statements

34

alleged in this Amended Complaint.  First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions.  Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

135.    To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

136.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.  To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested.

137.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Vintage Wine who knew that the statement was false when made.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants)**

138.    Plaintiffs  repeat and re-allege each and every allegation contained about as if fully set forth herein.

139.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

140.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Vintage Wine's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

141.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Vintage Wine's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

142.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Vintage Wine's financial well-being and prospects, as specified herein.

143.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Vintage Wine's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Vintage Wine and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

144.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or

directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

145.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Vintage Wine's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

146.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Vintage Wine's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during

the Class Period, Plaintiffs and the other members of the Class acquired Vintage Wine's securities during the Class Period at artificially high prices and were damaged thereby.

147.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Vintage Wine was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Vintage Wine securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

148.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

149.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that Vintage Wine had been disseminating misrepresented financial statements to the public.

## COUNT II

**(For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

150.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

151.    During the Class Period, the Individual Defendants participated in the operation and management of Vintage Wine, and conducted and participated, directly and indirectly, in the conduct of Vintage Wine's business affairs. Because of their senior positions, they knew the adverse non-public information about Vintage Wine's false financial statements.

152.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Vintage Wine's financial condition and results of operations, and to correct promptly any public statements issued by Vintage Wine which had become materially false or misleading.

153.    Individual Defendants acted as controlling persons of Vintage Wine within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

154.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

155.    As set forth above, Vintage Wine and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**XI.    PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this Action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

b.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this Action, including counsel fees and expert fees; and

d.     Awarding such other and further relief as the Court may deem just and proper.

## XII.   DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury.

Dated:  May 1, 2023

By:  */s/ Andrew R. Muehlbauer*
ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
andrew@mlolegal.com

*Liaison Counsel for Lead Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Casey E. Sadler
Charles H. Linehan (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
csadler@glancylaw.com
clinehan@glancylaw.com

*Lead Counsel for Lead Plaintiffs*

**BLOCK & LEVITON LLP**
Jeffrey C. Block (*pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jeff@blockleviton.com

*Counsel for Additional Plaintiff Michael F. Salbenblatt*

**<u>PROOF OF SERVICE</u>**

I hereby certify that on this 1st day of May 2023, a true and correct copy of the foregoing

document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>*s/ Andrew R. Muehlbauer*   </u>
Andrew R. Muehlbauer