ANDREW R. MUEHLBAUER,
Nevada Bar No. 10161
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
andrew@mlolegal.com

Casey E. Sadler
Charles H. Linehan (*pro hac vice*)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
csadler@glancylaw.com
clinehan@glancylaw.com

*Lead Counsel for Lead Plaintiffs*

*(Additional counsel on the signature page)*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| MARILYN EZZES, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:22-cv-01915-GMN-DJA |
| Plaintiff, | **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| VINTAGE WINE ESTATES, INC., PATRICK RONEY, KATHERINE DEVILLERS, and KRISTINA JOHNSTON, | |
| Defendants. | |

# TABLE OF CONTENTS

I.  STATEMENT OF FACTS ................................................................................................ 3

    A.  Bespoke Capital, A SPAC Focused On The Cannabis Industries, Rushes Into A Transaction Taking Vintage Wine Public ................................................................ 3

    B.  The Company Admits That Its Financial Statements Were Overstated ............................. 3

    C.  After Removing Its Founder And Long-Serving CEO, The Company Finally Discloses That It Is Restating Its Financial Statements And That It Was Delaying Its Financial Results Due To Previously Undisclosed Impairment Indicators ......................................... 4

    D.  Former Employees Confirm That Vintage Wine's Management Was Well Aware Of The Mismanagement Of Inventory And Improper Accounting Practices .................................. 5

        1.  Defendants Failed To Maintain Accurate Records Of Its Inventory As Its Accounting Department Was Not Robust Enough To Manage The Scale And Complexity Of Its Business ................................................................................................................ 5

        2.  The Company's Management Were Aware That The Company Did Not Accurately Record Costs Of Goods Sold .................................................................................... 6

    E.  Defendants Violated GAAP During The Class Period ......................................................... 8

II.  THE COMPLAINT SUFFICIENTLY PLEADS THAT DEFENDANTS' COMMITTED SECURITIES FRAUD .................................................................................................. 9

    A.  Applicable Standards Do Not Favor Defendants' Motion .................................................. 9

    B.  Plaintiffs Allege A Strong Inference Of Scienter ............................................................... 10

        1.  Former Employees Confirm Defendants' Recklessness ................................................ 11

        2.  The Core Operations Doctrine Supports A Strong Inference Of Scienter ..................... 15

        3.  The Timing Of The "Resignations" Of The Individual Defendants Further Supports An Inference Of Scienter ............................................................................................... 17

        4.  Defendants' Accounting Violations And Ignoring Red Flags Further Demonstrates Scienter ...................................................................................................................... 18

            a)  The GAAP Provisions Were Simple And Straightforward ....................................... 19

            b)  The Magnitude And Impact Of Defendants' GAAP Violations ............................... 19

            c)  Vintage Wine Lacked Effective Internal Controls ................................................... 20

            d)  The False SOX Certifications Further Support Scienter .......................................... 20

i

5.    When Viewed Collectively, The Allegations Of Defendants' Scienter Is Overwhelming While Defendants' Counter Narrative Is Neither Sensical Or Compelling ................... 21

C.    All Of Defendants' Statements, Including SOX Certifications, Were Materially False And Misleading .......................................................................................................... 23

D.    The Complaint Adequately Alleges Control Person Liability ........................................... 24

III.    CONCLUSION ......................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................................9, 10

*Backe v. Novatel Wireless, Inc.*,
642 F.Supp.2d 1169 (S.D. Cal. 2009) ........................................................................ 19

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) ......................................................... 19, 20

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................ 9

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)..................................................................................... 10, 15

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019) ....................................................................... 12

*Bruce v. Suntech Power Holdings Co.*,
2013 WL 6843610 (N.D. Cal. Dec. 26, 2013) ........................................................... 24

*Bruce v. Suntech Power Holdings Co.*,
64 F. Supp. 3d 1365 (N.D. Cal. 2014) ...................................................................... 10

*Commtouch Software Ltd. Sec. Litig.*,
2002 WL 31417998 (N.D. Cal. July 24, 2002) ......................................................... 20

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003)............................................................................... 10, 24

*Glazer Cap. Mgmt, L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023)................................................................................. 11, 14

*Glazer Cap. Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008)................................................................................. 15, 20

*Goldman v. Vigilant Ins.*,
632 F. Supp. 3d 1188 (D. Nev. 2022) ....................................................................... 23

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) .............................................................................................. 10

*Hollinger v. Titan Cap. Corp.*,
914 F.2d 1564 (9th Cir. 1990)................................................................................... 13

*In re Adaptive Broadband Sec. Litig.*,
2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ................................................................................... 18

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ............................................................................... 11

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ......................................................................................... 17

*In re Cabletron Syst., Inc.*,
311 F.3d 11 (1st Cir. 2002) .......................................................................................................... 14

*In re China Educ. Alliance Sec. Litig.*,
2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) .............................................................................. 10

*In re Daou Sys., Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) ..................................................................................................... 10

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ..................................................................................................... 10

*In re Immune Response Securities Litigation*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ......................................................................................... 11

*In re MGM Mirage Sec. Litig.*,
2013 WL 5435832 (D. Nev. Sept. 26, 2013) ................................................................................. 2

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) .......................................................................................... 19

*In re Molycorp, Inc. Sec. Litig.*,
2015 WL 1540523 (D. Colo. Mar. 31, 2015) .............................................................................. 24

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ....................................................................................... 20

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 619 (S.D.N.Y. 2014) ........................................................................................... 14

*In re Paysign, Inc. Sec. Litig.*,
2023 WL 1868476 (D. Nev. Feb. 9, 2023) .................................................................................. 24

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ..................................................................................................... 11

*In re Ramp Networks, Inc. Sec.*,
201 F. Supp. 2d 1051 (N.D. Cal. 2002) ...................................................................................... 19

*In re Scottish Re Group Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007) .................................................................................. 17

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ......................................................................... 24

*In re Sipex Corp. Sec. Litig.*,
2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) ...................................................................... 18

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................................. 17

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ............................................................................................... 20

*Jackson v. Microchip Tech. Inc.*,
2020 WL 1170843 (D. Ariz. Mar. 11, 2020) ....................................................................... 13

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................................................. 1

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d. 1190 (N.D. Cal. 2012) ........................................................................ 13, 24

*Limantour v. Cray Inc.*,
432 F. Supp. 2d 1129 (W.D. Wash. 2006) ........................................................................... 24

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ............................................................................................. 14

*Luna v. Marvell Tech. Grp. Ltd*,
2016 WL 5930655 (N.D. Cal. Oct. 12, 2016) ...................................................................... 15

*Mizzaro v. Home Depot, Inc.*,
544 F.3d 1230 (11th Cir. 2008). .......................................................................................... 22

*Mulderrig v. Amyris, Inc*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................................. 23

*No. 84 Employer–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ............................................................................................... 21

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ............................................................................................. 11

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ............................................................................................. 10

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014)............................................................................................... 15, 17

*Robb v. Fitbit Inc.*,
2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ............................................................................ 13

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008)..................................................................................................... 15

*Sanders v. Sodexo, Inc.*,
2015 WL 4477697 (D. Nev. July 20, 2015)............................................................................. 23

*SEC v. Mozilo*,
2010 WL 3656068 (C.D. Cal. Sept. 16, 2010)......................................................................... 21

*Stocke v. Shuffle Master, Inc.*,
615 F. Supp. 2d 1180 (D. Nev. 2009) ...................................................................................... 20

*Tellabs, Inc v. Makor Issues & Rts., Ltd*,
551 U.S. 308 (2007) ...................................................................................................... 10-11, 21

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) .............................................................................. 19, 22

*Webb v. Solarcity Corp.*,
884 F.3d 844 (9th Cir. 2018)..................................................................................................... 15

*Weiss v. Amkor Tech., Inc.*,
527 F. Supp. 2d 938 (D. Ariz. 2007)......................................................................................... 21

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009).............................................................................................. 11, 14

**Statutes**

15 U.S.C. § 7241 ...................................................................................................................... 23

This is a straightforward case of securities fraud.  Soon after Vintage Wine Estates, Inc. ("Vintage Wine" or the "Company")[1] went public through a special purpose acquisition company ("SPAC") transaction, it acknowledged that it had "identified a material weakness in our internal control over financial reporting" that "relates to our process and controls regarding the tracking of costs through the various stages of inventory accounting, particularly as they pertain to bulk wine and spirits" but claimed it was remedying these internal control deficiencies.  Unbeknownst to investors, however, even though the Company was claiming to be remedying these deficiencies, Vintage Wine could not maintain accurate records of its inventory or properly track and record its costs of goods sold.  These failures occurred because its accounting department was understaffed and lacked adequate procedures to manage the scale and complexity of its business.  These facts have been confirmed both by the Company itself and many of its former employees.

It was not until the Company was forced to admit that it had recorded $19.1 million in inventory adjustments, and that its financial statements should no longer be relied on since they were materially false, that the public learned about Defendants' fraud.  When the truth was ultimately disclosed, the stock price of the Company completely tanked by 40.3% and 27.6%, decimating shareholders' investments in Vintage Wine.

---

[1]  Citations in the form "¶__" refer to the Consolidated Amended Class Action Complaint ("Complaint," Dkt. No. 36). Citations in the form "Def. Br. __" refer to Defendants' Notice of Motion and Motion to Dismiss Amended Class Action Complaint ("Motion" or "MTD," Dkt. No. 39).  Capitalized terms not otherwise defined here have the same meanings ascribed to them in the Complaint, and unless otherwise noted, all emphasis in this brief has been added, and all internal citations, quotation marks, and alterations have been removed.

Defendants request the Court consider the content of certain corporate filings. *See* Def. Br. at 4 n.1; Dkt. No. 40.  To the extent Defendants rely on these documents to draw inferences in their favor in an attempt to defeat Plaintiffs' claims, such attempts are improper. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1003 (9th Cir. 2018) (recognizing a "concerning pattern in securities cases" where defendants attempt to exploit judicial notice "improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage[,]" and noting that "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint.").

Defendants admit, as they must since they informed the public that their financial results were no longer to be relied upon, that they made materially false statements during the Class Period.[2] They also concede that all other elements of Plaintiffs' claims are satisfied except for scienter.

Their scienter argument is straightforward: Vintage Wines executives' "mismanagement, poor judgment, or even incompetence" does not constitute fraud. This argument is belied by the facts, however, as their conduct was, at a minimum, severely reckless. Demonstrating the weakness of their position, even though this Court has held that it is improper for defendants to "scrutinize individual allegations of scienter in isolation [] while ignoring the main allegations dealing with scienter,"[3] this is exactly what Defendants try to do here. *See* Def. Br. at 21 ("A failure to follow GAAP, ***without more***, does not establish scienter"); ("the ***mere publication*** of a restatement is not enough to create a strong inference of scienter"). Yet, the Complaint outlines many facts that support a finding of scienter here. These include, *inter alia*:

- Former employees establish that Vintage Wine in general, and high-level executives specifically, knew or should have known of significant problems with inventory management and cost of goods accounting;

- The false and misleading statements were about Vintage Wine's failure to take significant measures to remediate the material weakness concerning inventory balances, which was a core operation for a wine distribution business;

- The founder and CEO of the Company was removed as CEO at the time of the restatement and its former CFO, who had admittedly no public company experience before being hired as CFO and had already been demoted from the position, "resigned" from her lesser position just weeks before the restatement was issued;

- The accounting guidelines that were violated were basic and straight-forward. In fact, accounting for inventory is the most basic and fundamental accounting process for a wine distribution company; and

---

[2] Defendants claim in a footnote in their Statement of Facts that their admittedly materially false and misleading Sarbanes-Oxley Certifications are not actionable as a matter of law. This is wrong.

[3] *In re MGM Mirage Sec. Litig.*, 2013 WL 5435832, at *9 (D. Nev. Sept. 26, 2013).

- The Company admitted that it lacked adequate internal control over its financial reporting both before and during the entire Class Period, yet the Individual Defendants still certified the Company's internal controls as sufficient at all times.

Taking all the allegations collectively and assuming them true, as the Court must on a motion to dismiss, the inference of scienter is cogent and compelling. As such, Defendants' motion should be denied in its entirety.

## I.    STATEMENT OF FACTS

### A.    Bespoke Capital, A SPAC Focused On The Cannabis Industries, Rushes Into A Transaction Taking Vintage Wine Public

A special purpose acquisition company, or "SPAC," is a publicly traded company with no business activities of its own that is formed for the specific purpose of acquiring an existing, privately owned company and taking it public. ¶29. SPAC transactions by their nature, however, give rise to potential conflicts of interest. ¶¶30, 34. This is because if a SPAC acquires a target company, the SPAC's founders and managers can profit greatly; yet if a SPAC does not complete an acquisition before the deadline, the SPAC is dissolved, and the funds held in trust are returned to the SPAC's investors, *with no compensation paid to the SPAC's founders and managers*. ¶30

Bespoke Capital, a SPAC originally focused on acquiring a Canadian cannabis company, needed to initiate a reverse merger with a suitable target company before February 15, 2021, or else wind down and return its investment capital to shareholders. ¶35. While Bespoke Capital entered into agreements-in-principle with four separate cannabis companies, none of these resulted in binding merger agreements. *Id.* Just two weeks before it would have been forced to wind up operations, it signed an agreement with Vintage Wine to take the company public through a reverse merger. ¶36. Soon after, the SPAC transaction occurred and on June 8, 2021, Vintage Wine's common stock began trading under the new ticker symbol "VWE" on the Nasdaq. ¶37.

### B.    The Company Admits That Its Financial Statements Were Overstated

On September 13, 2022, after the close of trading, Vintage Wine disclosed that it had recorded $19.1 million in inventory adjustments. As the Company, in relevant part, disclosed:[4]

---

[4] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

3

*[T]he Company recorded $19.1 million in non-cash inventory adjustments identified through efforts t[o] improve and strengthen inventory management, processes and reporting.* This included physical inventory count adjustments of $12.4 million, $3.7 million related to the establishment of inventory reserves and $3.0 million related to the impact of additional remediation efforts. *In addition, the quarter included approximately $6.8 million in overhead burden that was related to the first and second quarter of fiscal 2022, but not material to the respective periods….*

Kristina Johnston, Chief Financial Officer, commented, "… *We are now diligently applying this focus and intensity in our financial processes in order to remediate our material weakness.… The implementation of more stringent processes drove the adjustments in inventory, but we expect this will also drive greater transparency and better future results for the Company*."

¶68.  Additionally, that same day, Vintage Wine filed a Form 10-K for the fiscal year ended June 30, 2022 that revealed the degree to which Vintage Wine's inventory mismanagement impacted its financials by reducing profit and increasing its losses from operations. ¶69.

On this news, Vintage Wine common stock fell $2.23, or 40.3%. ¶70.

**C.　After Removing Its Founder And Long-Serving CEO, The Company Finally Discloses That It Is Restating Its Financial Statements And That It Was Delaying Its Financial Results Due To Previously Undisclosed Impairment Indicators**

On February 8, 2023, after the close of trading, the Company disclosed that Defendant Roney was no longer going to serve as CEO.  ¶71. As the Company elaborated in a press release, Roney "has elected to transition from Chief Executive Officer to Executive Chairman of the Board of Directors." ¶74. The Company also explained that its Board appointed independent director Jon Moramarco as interim CEO with immediate effect.  *Id.*  Paul Walsh, the newly appointed Lead Independent Director, added:

Pat [Roney] successfully grew VWE over the last 20 plus years and we have greatly appreciated his contributions as we advanced VWE as a public company. *We have mutually determined that his role as CEO has changed significantly since our IPO, adding a complex dimension to his responsibilities, and taking him from what he has truly enjoyed. It was critical that the Board make the necessary leadership changes to find the right talent to continue to execute our strategy while maintaining the years of institutional knowledge and industry relationships that Pat has to offer.* As a result, we have implemented our succession plan and have begun a search for a new CEO.  [¶74.]

The Company further stated that previously issued financial statements should no longer be relied on and should be restated as a result of an accounting error related to the classification and timing of recording certain costs:

4

> The restatement results from an accounting error relating to the classification of certain assets and the classification and timing of recording certain costs for the Subject Period. Accordingly, investors should no longer rely on the Company's previously issued financial statements, earnings release or similar communications relating to the Subject Period.  [¶71.]

Moreover, the Company also explained that the filing of the Company's next Quarterly Report would be delayed because management had identified impairment indicators:

> On February 8, 2023, the Company issued a press release announcing, among other things, that *the filing of the Company's Quarterly Report on Form 10-Q for the quarterly period ended December 31, 2022 and the announcement of the related financial results will be delayed due to management identifying impairment indicators, which require additional analysis, late in the financial reporting and closing process.*  [¶72.]

In response to the news that day, the price of Vintage Wine common stock fell $0.77, or 27.6%, to close at $2.02 per share on February 9, 2023, on unusually high trading volume.  ¶72.

**D.     Former Employees Confirm That Vintage Wine's Management Was Well Aware Of The Mismanagement Of Inventory And Improper Accounting Practices**

Vintage Wine sells wine and spirits and reportedly has over 60 wine and spirits brands totaling around 3 million cases annually, making it the 14th largest domestic wine producer. ¶38. Its growth strategy was based on acquisitions but while acquisitions created the appearance of growth, in reality, Vintage Wine failed to integrate its new brands into the Company's infrastructure and the brands typically struggled after Vintage Wine acquired them.  ¶¶39-40.  As FE 3 put it, a brand's "death march would slowly start" just after it was acquired by Vintage Wine. ¶40.

**1.     Defendants Failed To Maintain Accurate Records Of Its Inventory As Its Accounting Department Was Not Robust Enough To Manage The Scale And Complexity Of Its Business**

Former employees confirm that Vintage Wine's executives, including the Individual Defendants, were well aware of the issues with the Company's inventory management.  Former employees described the Company's inventory as "mismanaged" and believed there was a "general consensus" that there was "dysfunction" at the Company's major warehouse in Santa Rosa, California. ¶41. The former employees also describe many problems, including a lack of training with inventory management, a failure to properly use electronic scanners or update the Company's inventory management system, and ad hoc storage within the facility. ¶41.

The Company misplaced, spoiled, or otherwise diminished the value of its inventory because of mismanagement.  ¶42.  According to FE 1, Vintage Wine's main warehouse in Santa Rosa, California was a constant source of inventory mismanagement since "[t]he warehouse was a mess. . . things were stacked so far back, and not organized with any rhyme or reason. They'd just put things where there was space."  *Id.*  FE 1 added that complicating the storage problems, the warehouse kept paper records, resisting the implementation of a scan gun procedure when inventory arrived until the Chief Technology Officer ("CTO"), Chris Saylor, insisted on its use and made repeated in-person trips to ensure that inventory was being scanned properly.   ¶43.  Even after "[Saylor] became de facto warehouse manager," the Company's inventory counts remained consistently unreliable. *Id.*

As numerous former employees recalled, these archaic methods led to misreporting of inventory, frustrating marketing efforts and complicating the Company's ability to maintain product quality. ¶¶44-55.  Indeed, these former employees corroborate that senior management knew about these inventory management problems.  ¶54.  FE 1's understanding is that Vintage Wine's upper management, including the Individual Defendants, were "hyper aware" of the problems with its inventory management before taking the Company public. *Id.*  In fact, according to FE 1, the warehouse manager's longstanding personal relationship with Defendant Roney insulated him from any accountability. *Id.* Likewise, Former Employee 2 had many discussions with his supervisors about these inventory problems. *Id.* The supervisors whom he made aware of the inventory issues included Jason Strobbe, Mike Gilboy, and Terry Wheatley.  *Id*.  FE 2 blamed the problems on "lack of good leadership from Roney on down." *Id.*

### 2.   The Company's Management Were Aware That The Company Did Not Accurately Record Costs Of Goods Sold

According to FE 1, Vintage Wine's internal calculations of accrued costs on inventory "were screwed up." ¶56.  Accrued costs largely represented the price of storing and maintaining wine in stock, yet Vintage Wine's internal calculations of those costs in the Company's inventory management software were wrong.  *Id.*  In fact, the Company's formulas for calculating internal costs "racked up costs incorrectly," which impaired the ability of the Company to both sell its

6

products profitably and get an accurate sense of the value of its inventory. *Id.*

Vintage Wine relied on Microsoft Navision (or "Microsoft NAV") as its primary inventory management system during the Class Period.  ¶57. The program used formulas written by employees to calculate both the cost-of-goods for units of inventory, and volumes, sales prices and estimated margins based on the unique characteristics of each product. *Id.*  According to FE 1, the system was not set up properly and did not integrate well with other systems used by Vintage Wine's recent acquisitions. FE 1 stated that Defendant DeVillers received internal blame for the apparent shortcomings with Vintage Wine's calculations in Microsoft NAV during the Class Period, with one colleague stating simply "Kathy's numbers are screwed up."  ¶¶57, 61.[5] Other executives, including the President, Terry Wheatley, and Zach Long, one of the three COOs during the Class Period, were aware of the issues and acknowledged the problems with the calculations in Microsoft NAV during multiple weekly production meetings, and directed the personnel responsible for marketing the affected wines to sell the product for "what they could." ¶58.

Other former employees confirmed that the Company did not have an organized way of tracking the costs that went into making a stock keeping unit ("SKU") and instead, each winemaker was expected to track this information for his or her brands without being given any standardized method of organizing it.  ¶63. For this to occur, FE 3 had to obtain the approval for significant expenditures by emailing Defendant DeVillers and Chief Winemaker DiGuilio. ¶64. FE 3 provided the example of asking to acquire 42,000 gallons of chardonnay from another winemaker who did not need it by sending DeVillers and DiGuilio an email about costs and how the product would be used, and DeVillers had authority to approve or deny the request.  *Id.*

In September 2022, when Johnston was CFO, the Company began tracking the cost of producing SKUs through a "communal spreadsheet" that was accessible through Microsoft Teams to all winemakers and finance employees, including FE 3, Johnston, DiGuilio, and Long. ¶65.  When FE 3 wanted to make a new blend, they plugged in the costs they would incur into the spreadsheet. The spreadsheet also auto-populated additional expected costs that would accrue before a product

---

[5] Other former employees confirm FE 1's recollections.  *See* ¶66.

was sold such as the costs of glass, cork, dry goods, storage, and taxes. *Id.* Once the spreadsheet was in effect, FE 3 began obtaining approval for large expenditures through the spreadsheet and the Company used the spreadsheet to evaluate profitability and the cost of goods sold. *Id.*

Vintage Wine's operations and accounting departments were further plagued by frequent turnover, short staffing, and inadequate training. ¶67. Between June 2021 and February 2023, Vintage Wine went through three Chief Operating Officers. *Id.* Similarly, there was high turnover in the Accounting Department—with multiple new hires leaving after only a few days or weeks. Former employees reported that short staffing led to delays in correcting errors and that the high turnover and understaffing caused the Company to pay distributors' invoices late. *Id.* Vintage Wine's difficulties with staffing its Accounting Department during the Class Period reportedly made it difficult to correct mistakes and even pay vendor invoices promptly, as there simply were not enough staff to get the work done. *Id.*

### E.    Defendants Violated GAAP During The Class Period

Compliance with generally accepted accounting principles ("GAAP") is a fundamental obligation of publicly traded companies such as Vintage Wine.  ¶77. At all times throughout the Class Period, Vintage Wine asserted in its SEC filings that the Company's financial statements complied with GAAP. ¶78. Contrary to these statements, the restatement was an admission that the Company's historical financial statements violated GAAP. *Id.*

Vintage Wine's financial statements included in its Class Period SEC filings were not prepared in accordance with GAAP. ¶79. The Company violated ASC 330-10-35-1B, which states:

> Inventory measured using any method other than LIFO or the retail inventory method (for example, inventory measured using first-in, first-out (FIFO) or average cost) shall be measured at the lower of cost and net realizable value. ***When evidence exists that the net realizable value of inventory is lower than its cost, the difference shall be recognized as a loss in earnings in the period in which it occurs. That loss may be required, for example, due to damage, physical deterioration, obsolescence, changes in price levels, or other causes.*** [¶79.]

For companies that measure inventory using the FIFO method (as Vintage Wine purports to do), inventory is measured by comparing the net realizable value (*i.e.* the sale price of a bottle of wine) minus the price of getting the goods to market (such as storage, materials, shipping costs etc.). ¶80. Accordingly, where the evidence shows that the inventory is worth less than the associated

8

costs of selling it, because of, for example, damage or deterioration, a company must recognize that difference as a loss *during the time period* when that damage or deterioration occurs. *Id.*

Here, Vintage Wine recognized a $19.1 million write-down of the value of its inventory, which included $12.4 million in "physical inventory count adjustments." ¶81. FE 1 states that the Company's 2022 physical inventory count took place in June 2022. But the Company's problems with missing, spoiled, or improperly priced inventory all substantially pre-dated the period covered by the 2022 10-K. *Id.* Indeed, based on the information provided by former employees and the Company's own SEC disclosures, those problems were endemic throughout the Class Period and well-known to the Company's senior management, including the Individual Defendants. *Id.*

The Company's September 13, 2022 press release states that "[t]he implementation of more stringent processes drove the adjustments in inventory" and states that, going forward, the Company would employ "more rigorous procedures with inventory management, expand[] and upgrad[e] the accounting and finance team, and measurably increase[] training throughout the organization regarding inventory, reporting and reconciliation procedures." ¶82. As such, based on Vintage Wine's own explanations of how it accounted for the value of its inventory and why the Company reduced that estimate by $19.1 million in September 2022, every previous earnings disclosure during the Class Period was materially incorrect for reasons well-known to the Individual Defendants—the inadequacies of its inventory management system and the shortcomings of its accounting team. ¶83.

## II. THE COMPLAINT SUFFICIENTLY PLEADS THAT DEFENDANTS COMMITTED SECURITIES FRAUD

### A. Applicable Standards Do Not Favor Defendants' Motion

On a motion to dismiss, a complaint need only "contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the Private Securities Litigation Reform Act ("PSLRA") raised the pleading standards for certain elements of a securities fraud claim, on a motion to dismiss a court still must "accept the plaintiffs' allegations as true and construe them in the light

9

most favorable to the plaintiffs." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1013 (9th Cir. 2005). As such, "it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6)." *In re China Educ. Alliance Sec. Litig.*, 2011 WL 4978483, at *3 (C.D. Cal. Oct. 11, 2011). This is because "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

To state a claim for securities fraud, a complaint must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014). Defendants only contest scienter, waiving arguments as to the other elements.[6]

### B.     Plaintiffs Allege A Strong Inference Of Scienter

To plead scienter, a plaintiff must allege facts that defendants acted with the intent to deceive, knowledge of falsity, or "deliberate recklessness." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). A defendant is reckless if "he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Bruce v. Suntech Power Holdings Co.*, 64 F. Supp. 3d 1365, 1371 (N.D. Cal. 2014). Scienter "can be established by direct or circumstantial evidence." *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996).

"There is no bright-line rule" as to when "an inference of deliberate recklessness is *sufficiently strong*." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). An inference of scienter is "strong" when it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc v. Makor Issues & Rts., Ltd*, 551 U.S.

---

[6] In a footnote in their Statement of Facts, Defendants claim that the Sarbanes-Oxley Certifications cannot be false statements as a matter of law.  MTD at 6 n.2.  As addressed below, this is wrong. Regardless, Defendants do not contest that the Complaint identifies the Company's false and misleading financial statements (and the reasons they are false and misleading) with the particularity required by the PSLRA and Rule 9(b).

10

308, 324 (2007). Under this standard, a "tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at \*8 (C.D. Cal. Aug. 4, 2014). The inference "need not be irrefutable . . . or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. Further a court must review "all the allegations holistically" since the relevant inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 310, 326.

### 1.     Former Employees Confirm Defendants' Recklessness

Courts routinely find a strong inference of scienter where, as here, defendants omit material negative information that they knew, or should have known, rendered favorable statements misleading. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). Knowledge of facts suggesting that statements were "inaccurate or misleadingly incomplete" is "classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005).

The allegations of four former Vintage Wine employees support the strong inference Defendants were at least deliberately reckless in failing to disclose the Company's accounting and inventory mismanagement. Confidential witness statements must satisfy a two-part test: "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). The first hurdle is cleared so long as the complaint describes the confidential witnesses "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017).  The court considers "the level of detail provided by the confidential witnesses, the plausibility of the allegations, the number of sources, the reliability of the sources, corroborating facts, and similar indicia of reliability." *Glazer Cap. Mgmt, L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 767 (9th Cir. 2023).

The Complaint pleads ample facts showing that each confidential witness acquired personal knowledge of the matters they alleged during their duties at Vintage Wine. FE 1, for example, was

a direct-to-consumer brand manager who oversaw "the sourcing, compliance, promotion, and marketing" of wines and interacted directly with Vintage Wine's President Terry Wheatley. ¶25. The Complaint alleges that FE 1 participated in weekly production calls with Wheatley and COO Zach Long, who acknowledged that Defendants DeVillers's formula in Vintage Wine's inventory tracking system for the cost of goods sold was "screwed up" and that employees should sell product for "what they could." ¶¶56–61. Similarly, FE 2 was a regional sales manager in charge of facilitating wine sales, which required knowledge of Vintage Wine's inventory. ¶26. FE 2 learned that some of the wine brands he was attempting to sell "were not in stock" or even appeared "created out of thin air," angering customers and distributors. ¶¶45–47. FE 3 was a Senior Winemaker who reported to Long, who in turn reported to Wheatley and Roney. ¶27. FE 3 explained that for much of the Class Period, Vintage Wine "did not have an organized way of tracking the costs" of making a wine and that DeVillers personally approved or denied significant expenditures. ¶63. He also used Microsoft NAV, the inventory tracking system, and became familiar with its inadequacies. ¶66. Finally, the Complaint establishes that FE 4 ran direct-to-consumer marketing campaigns for 23 wine brands. ¶28. He described the frustration he felt after personally "seeing products identified in the inventory management system," building marketing campaigns for those products, and being unable to fulfill the resulting sales because of "issues with finding the wine" or "situations where we would not have [the inventory] we thought we did." ¶¶49–50.

All these examples show that the confidential witnesses learned of the facts underlying their statements while executing their job functions, which are described in detail. Their reliability is further "bolster[ed]" because the former employees corroborated each other in several ways. *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1260 (D. Nev. 2019). For example, FE 1, FE 2, and FE 4 each described selling wine to customers only to learn that the wine was unavailable in Vintage Wine's warehouses for sale. ¶¶44, 47, 49, 50. FE 1 and FE 3 also both reported observing inaccuracies with Microsoft NAV. ¶¶ 57, 66. Thus, the former employee statements are sufficiently reliable and based on personal knowledge.

The former employee allegations also support a strong inference of scienter. It is well-accepted that "[u]nder the principles of *respondeat superior*, a plaintiff may establish scienter of the

corporation through the scienter of its corporate officers or directors." *Jackson v. Microchip Tech. Inc.*, 2020 WL 1170843, at \*11 (D. Ariz. Mar. 11, 2020); *see also Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1576-78 (9th Cir. 1990) (as amended) (en banc) (affirming that principles of corporate agency law and *respondeat superior* apply in Section 10(b) cases); *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d. 1190, 1204–05 (N.D. Cal. 2012) (collecting cases and imputing scienter of company vice president to company). Confidential witness statements may support an inference of scienter even when the confidential witnesses did not directly interact with the individual defendants. *See Jackson*, 2020 WL 1170843, at \*11 ("detailed factual allegations regarding the CWs' interactions with Microchip management," supported an inference of scienter even though confidential witnesses did not interact with individual defendants); *Robb v. Fitbit Inc.*, 2017 WL 219673, at \*5 (N.D. Cal. Jan. 19, 2017) (finding scienter where confidential witnesses "reported their findings up the chain within the company" despite lacking "direct access to the individual defendants.").

The former employee statements establish that Vintage Wine in general, and high-level executives specifically, knew or should have known of significant problems with inventory management and cost of goods accounting yet recklessly continued to report false inventory metrics. FE 2 reported his experiences with inventory problems, which included being tasked to sell wines that did not exist, to managers up to and including President Wheatley. ¶54. FE 1 blamed the warehouse's disorganization on the manager's personal relationship with Roney. *See id.* Meanwhile, FE 1 also alleged that Wheatley and Long (President and COO, respectively) expressed their awareness of inaccurate cost-of-goods-sold numbers in Microsoft NAV yet directed him to sell product for "what they could" and that the company would "settle the numbers issues on the back end." ¶¶57–60. DeVillers also knew of the cost of goods problems: per FE 1, she was responsible for the cost of goods calculations. ¶¶57, 61. FE 3 added that CFO DeVillers personally approved significant expenditures. ¶63. That responsibility shifted to Defendant Johnston in September 2022, who oversaw the creation of a spreadsheet to track and approve expenditures. ¶65. All these allegations support the inference that high-level executives (and by extension, the Company itself) knew facts that cast doubt on the reliability of the inventory reporting. The confidential witness

13

("CW") statements in the Complaint, when combined with additional allegations, thus raise a strong inference of scienter.

Defendants' attempts to waive away the former employees' statements as "hearsay" are unpersuasive for two reasons. First, contrary to Defendants' assertions, as set out above, each of the FEs possesses personal knowledge of the allegations made and those allegations are entirely consistent both with one another and with the broader narrative of what the Company has since publicly acknowledged with respect to its inventory and accounting misstatements. The Court may reasonably rely on allegations grounded on such statements. *See In re Cabletron Syst., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002) (evaluating confidential witness statements based on, in part, the corroborative nature of the other facts alleged from other sources, the number sources, and their reliability).

Second, the Ninth Circuit has rejected the imposition of precisely the kind of narrow requirements for CW statements recommended by Defendants. *See Glazer*, 63 F.4th at 771-72 (finding even if CWs might not have known about corporate-level trends individually, "their statements combine to tell a plausible story about Forescout's pipeline" and noting that the court may consider CW "estimates" that support "a reasonably plausible story about Forescout's state of affairs."). Simply put, there is no requirement that a plaintiff in a securities fraud case predicate its allegations on statements that would be admissible under the rules of evidence. *See, e.g., Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (confidential witness reporting hearsay did not "disqualify his statement from consideration in the scienter calculus"); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014) (plaintiff may base allegations on even unproven third-party statements).

In sum, Defendants' makeweight argument that CW statements incorporate hearsay is both incorrect and irrelevant. Common sense weighs heavily against Defendants' claim that the CWs' statements are "not in any way connected" to the Complaint's allegations of inventory and accounting-related fraud, as though sales and marketing personnel repeatedly encountering unexplained shortfalls with the Company's inventory, ¶¶44, 47, 50, and statements from high-level executives acknowledging the inaccuracies of internal calculations of the Company's cost of goods,

¶¶57–60, were somehow not *directly* related to the Company's misconduct with respect to inventory and accounting. The CW statements support a strong inference of scienter.

### 2. The Core Operations Doctrine Supports A Strong Inference Of Scienter

Courts can impute scienter to individual defendants "based on the inference that key officers have knowledge of the 'core operations' of the company." *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014). Allegations about management's role in the company and "the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008); *Reese*, 747 F.3d at 575 (scienter adequately alleged where "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter"); *see also Berson*, 527 F.3d at 989.

Defendants' argument against the application of the core operations doctrine hinges on undermining Plaintiffs' allegations as to Defendant Roney—disregarding that two other executive officers are alleged to have involvement and knowledge of the internal controls deficiencies.[7]  Here, the false and misleading statements were about Vintage Wine's failure to "take[] significant measures to remediate the material weakness concerning inventory balances." *See, e.g.*, ¶¶85, 87, 89, 91, 93, 95, 97, 99, 101.   As the Complaint explains (and Defendants ultimately admitted to),

---

[7] Regardless, the allegations against Roney are not even of the generalized variety the Defendants claim.  Here, the Company held Roney out in its public filings as being "hands-on in every aspect of the wine and spirits business" and former employees confirmed this. ¶108.  Defendants cannot represent to the public one thing repeatedly and then credibly claim here that it is not true.  This argument is even more tenuous as Defendants are claiming that their disclosures of the internal control issues during the Class Period undermines scienter.  "Every aspect of the wine and spirits business" certainly includes the Company's disclosed internal control and accounting deficiencies and reported remedial efforts.  And Defendants' cited cases did not involve situations where the Company and the executive held himself out as being intimately involved or actually support a finding of scienter here.  *Luna v. Marvell Tech. Grp. Ltd*, 2016 WL 5930655, at *12 (N.D. Cal. Oct. 12, 2016) ("**Plaintiff alleges** that Dr. Sutardja was a 'micro manager and had his fingers in everything'"); *Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) ("**Webb has alleged** that Defendants–Appellees had a hands-on style and general accounting acumen…"; *see also Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 746 (9th Cir. 2008) ("specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter.").

because its accounting department was understaffed and lacked adequate procedures to manage the scale and complexity of its business, the Company could not maintain accurate records of its inventory or properly track and record its costs of goods sold, which resulted in the incorrect financial statements. *See, e.g.*, ¶¶5, 41. The Individual Defendants had access to information about the lack of adequate staff and procedures that prevented accurate reporting of its financial results.[8] For example, when Defendant Johnston was CFO, the Company began tracking the cost of producing SKUs through a "communal spreadsheet" that was accessible through Microsoft Teams to all winemakers and finance employees, including FE 3, Johnston, DiGuilio, and Long. ¶65. Likewise, when Defendant DeVillers was CFO, she had to approve all requests for significant expenditures and was sent an email about costs. ¶64.[9] Additionally, Vintage Wine's operations and accounting departments were plagued by frequent turnover, short staffing, and inadequate training—problems that gradually rose to the level of crisis after the Company went public. ¶67.

As such, Defendants claim that "the Amended Complaint lacks any detailed allegation that the Individual Defendants ever had actual access to the disputed information" lacks merit and thus the cases cited by Defendants for the proposition that a "general allegation is not enough" does not apply. *See* Def. Br. at 17-18. Further, as Defendants tout throughout their motion, the Company was making public statements about its remedial process. It would be "absurd," and reckless, for the Company to be making representations about its internal control and accounting remediation process without its executives being knowledgeable about the massive and fundamental issues plaguing the Company. *See Reese*, 747 F.3d at 575. In fact, courts have held that the inference of

---

[8] Defendants obfuscate the issue, claiming that a former employee's claim that costs of goods sold were inaccurate does not precisely support Plaintiffs' allegations. But Plaintiffs' allegation is simple: the internal procedures to record issues as basic as costs of goods sold and inventory were inaccurate and unreliable, which caused the Company to misreport its financials. Defendants' focus on the direction of the inaccuracy does not change this. *See* Def. Br. at 18-19 (claiming that the former employee "undermines [Plaintiffs] argument that it would have been 'absurd' for the Individual Defendants not to have known about a discrepancy in the cost of goods sold."). Notably, Defendants do not deny that the costs of goods sold was inaccurate or that the former employees testimony that the systems in place were faulty and he was told that Company would "settle the numbers issues on the back end." *See id.*; *see also* ¶60.

[9] This eviscerates Defendants' claim "there is no reason to believe that top officials of the company would have had particular insight into the movements and booking of inventory." Def. Br. at 18.

16

scienter is strengthened in such situations. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (defendant's repeated statements "weigh strongly in favor of the inference that" he "paid special attention" to the subject of the fraud "or, at the least, was reckless in not doing so while continuing to publicly tout improvements").

### 3. The Timing Of The "Resignations" Of The Individual Defendants Further Supports An Inference Of Scienter

The abrupt removal of Defendant Roney as CEO at the time of the restatement and the "resignation" of DeVillers just weeks before the restatement was issued bolsters an inference of scienter. *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) (defendants' terminations and resignations, occurring at the same time as company's restatement, "add one more piece to the scienter puzzle."). Defendants' claims that the timing of these removals was not suspicious strains credulity.

DeVillers had been demoted a year *before the restatement* and she was removed from *her new position* just before the restatement and the disclosures about inadequate internal controls was issued. Defendants claim that since DeVillers was demoted a year before the restatement and was retained in a lesser position this "undermines an inference of scienter." Def. Br. 20. To begin with, that she was demoted does support an inference that the Company was aware of the internal control issues, as they knew she could not handle the job. Regardless, the fact that she was then removed from the lesser position right before the restatement and need for remedial actions was disclosed, which Defendants fail to address, is highly suspicious; a non-officer accounting executive would not need to be removed if they were not responsible. *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) ("highly unusual and suspicious" resignations "lend further support to the inference of scienter").

Likewise, Defendants' story about Roney's departure is not credible and does not counter the most reasonable conclusion from the events, which was that he was removed from his position. Defendants claim that being CEO of Vintage Wine, which was now publicly held, took "him from

what he has truly enjoyed" so he quit.[10]  *See* Def. Br. at 20.  Defendants' argument is not credible. The notion that a founder who built a small company into one of the largest wine distributers in the country over twenty years, was then able to take that company public, and then run the company for almost two years after going public just to conveniently lose his "joy" at the exact time the Company announced the restatement and internal control deficiencies strains all credulity.  In fact, it is not even supported by the Company's own disclosure about the resignation, where it says the Board and Roney "mutually determined that his role as CEO has changed significantly…[and] It was critical that the Board make the necessary leadership changes to find the right talent to continue to execute our strategy."  ¶74. That the Board "decided" that it was "critical that the Board make the necessary leadership changes" contradicts Defendants' argument that it was Roney's decision alone and supports an inference of scienter as to Roney. *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (corporate reshuffling while company was restating financials added to "scienter puzzle").

By far the most logical inference is that the Board lost trust in the CEO whose leadership resulted in an admittance that the Company's financial results were false for almost its entire public history, massive remedial measures were needed to fix the internal control issues that knowingly occurred under his watch, and that the filing of the Company's next financial report would be delayed because management had identified impairment indicators.  *See, e.g.*, *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) (various remedial measures, including terminations and segregation of duties, combined with restatement, established "strong inference that the company itself believes that fraud led to materially misleading financials").

**4.    Defendants' Accounting Violations And Ignoring Red Flags Further Demonstrates Scienter**

"At the pleading stage, courts have recognized that allegations of [GAAP] violations,

[10] This defense does not align with their other argument that Roney's continued employment undermines an inference of scienter.  If he was so miserable that he quit the company he had built over more than twenty years, it does not make sense that he would then stay on.  It is more logical that the founder and large shareholder would only agree to "resign" if he was given a face-saving position like "Executive Chairman."

18

coupled with allegations that significant red flags were ignored, can suffice to withstand a motion to dismiss." *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *17 (C.D. Cal. July 1, 2008). Here, there is no dispute that the Company violated GAAP. These violations, coupled with additional red flags, including those already discussed, further support scienter.[11]

### a) The GAAP Provisions Were Simple And Straightforward

"[T]he simplicity of the accounting principles violated" supports an inference that Defendants acted with scienter that is at least "just as likely … as an inference of innocent and unknowing behavior." *See Backe v. Novatel Wireless, Inc.*, 642 F.Supp.2d 1169, 1186 (S.D. Cal. 2009). As described in Section I.E., *supra*, the accounting guidelines at issue are basic and straight-forward. Indeed, accounting for inventory is the most basic and fundamental accounting process for a wine distribution company. This further supports Defendants' scienter. *See, e.g.*, *Backe*, 642 F. Supp. 2d at 1186 (finding defendants acted with scienter, in part, because of "the simplicity of the accounting principles violated"); *see also In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) ("if the GAAP rules and . . . accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard").[12]

### b) The Magnitude And Impact Of Defendants' GAAP Violations

Accounting violations "that have a significant impact on core business operations can lead to a strong[] inference" of scienter. *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp.

---

[11] Defendants claim that "failure to follow GAAP, without more" or "the mere publication of a restatement is not enough to create a strong inference of scienter." Def. Br. at 21. Plaintiffs are not alleging (nor have alleged) that either of these things alone demonstrate scienter. In reality, as set out in the Complaint and in this Opposition, these are just two of many pieces of evidence that demonstrate that Defendants acted with scienter.

[12] Defendants seek protection in the fact that "Plaintiffs do not allege that Vintage Wine's external auditors counseled against its practices." Def. Br. at 21. Due to the discovery stay, Plaintiffs are unable to determine what auditors told Defendants about its GAAP violations or if the Company withheld information from its auditors. This is why courts find that a clean audit opinion alone cannot negate scienter. *See In re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d 1051, 1074 n.6 (N.D. Cal. 2002) (rejecting argument that scienter cannot be shown in the face of a clean audit opinion).

19

3d 1029, 1042 (N.D. Cal. 2016) (violations that impacted income and profits supported scienter). Here, the inventory mismanagement impacted Vintage Wine's financials by reducing profit and increasing its losses from operations. ¶69.  In fact, the market found violations of such magnitude that the Company's stock declined by 40.3% and 27.6% upon its disclosure and the need for the restatement.  ¶¶121-22.  *See Commtouch Software Ltd. Sec. Litig.*, 2002 WL 31417998, at *9 (N.D. Cal. July 24, 2002) ("size and character of the restatement" supported scienter); *Batwin*, 2008 WL 267364, at *6 (understating net loss by 9% supported scienter).

### c)    Vintage Wine Lacked Effective Internal Controls

Vintage Wine has conceded that it lacked adequate internal control over its financial reporting for the entire Class Period. In fact, it even touts that it disclosed it had internal control issues before the Class Period throughout its motion. Because of Defendants' undisputed awareness of Vintage Wine's history of ineffective internal controls, the inference of scienter as to statements about the Company's financial results ***and its statements about having then adequate internal controls***, "is at least as compelling as inferring that [Defendants] were simply unaware of [Vintage Wine]'s practices when the statements were made, or taken by surprise when the market took an unexpected turn for the worse." *See In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008) (defendant's "prior knowledge of problems with internal controls" supported scienter); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (defendant's acknowledgment that "internal control deficiencies still existed, and among other things, that [defendant] lacked adequate resources in their accounting and finance departments" supported scienter).

### d)    The False SOX Certifications Further Support Scienter

While the Ninth Circuit has held that the issuance of false Sarbanes-Oxley ("SOX") certification, standing alone, does not establish a strong inference of scienter, it also has held that a SOX certification may be probative of scienter if specific facts show that the defendant was severely reckless in executing the certification. *See Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 707-09 (9th Cir. 2012). Here, the Individual Defendants knew that the Company had internal control deficiencies before the Class Period and was also aware of the mismanagement of inventory and improper accounting

20

practices during the Class Period.  *See* Section I.D., *supra*.  Despite this, the Company's executives still certified the Company's internal controls as sufficient.  In fact, Defendants even admit that the Company's CFO apparently had no prior experience with public companies because she came from a "private wine producer" and that this led to her being demoted.  Def. Br. at 20-21. Yet even though the Company must have internally acknowledged that DeVillers could not handle the job, which is why (as Defendants tout) it hired a CFO that had "prior experience with *public* company internal controls and accounting processes," *Id.* at 21 (emphasis in original), the Company's executives still blindly certified its SOX compliance.  Having a CFO that is admittedly not qualified for the position because she does not have the public company internal control and accounting processes needed is severely reckless.[13]  Moreover, as discussed in Section II.B.1., *supra*, DeVillers and Johnston were aware of the deficiencies in mismanagement of inventory and improper accounting practices at the time SOX certifications were signed.  *See Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 950 (D. Ariz. 2007) (SOX certifications support scienter where allegations defendants had knowledge or were deliberately reckless in issuing such statements).

**5.    When Viewed Collectively, The Allegations Of Defendants' Scienter Is Overwhelming While Defendants' Counter Narrative Is Neither Sensical Or Compelling**

Taken collectively, Defendants' own admissions, the FE's statements about employees' knowledge, the context of the GAAP violations, the core operations inference, and Defendants' resignations at the same time as restatements all give rise to a strong inference of scienter. *See Tellabs*, 551 U.S. at 325. Faced with these overwhelming allegations, Defendants claim that there are "numerous facts" that undercut an inference of scienter.  But the three facts Defendants point to do not provide the support that Defendants claim.

First, Defendants argue that the absence of insider stock sales negates scienter. Def. Br. at 23-24. But motive is not required to plead scienter. *See Tellabs, Inc*., 551 U.S. at 325. "Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Employer–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,

---

[13] It is even more so when the Company already had admitted a lack of internal controls.

320 F.3d 920, 944 (9th Cir. 2003); *see also SEC v. Mozilo*, 2010 WL 3656068, at *19 (C.D. Cal. Sept. 16, 2010) (lack of stock sales "does not negate scienter as a matter of law") (collecting cases). "Indeed, there are several explanations for why an individual defendant would not sell stock even if she knew about false financial statements, such as a desire to avoid drawing the market's attention to the problem. Further, even if an individual who *knows* of company misstatements may on the whole be less likely to keep her stock, the same cannot be said of an individual who is merely deliberately reckless in failing to be aware of such misstatements." *Thomas*, 167 F. Supp. 3d at 1044.

Second, Defendants suggest that the Company had reported a material weakness before the Class Period to claim that the most compelling inference is that they were disclosing the truth as they learned of it because a "CEO and CFO intent on deceiving investors would not identify, disclose, investigate and seek to remediate accounting problems." Def. Br. at 22-23. But Defendants' argument brushes aside that severe recklessness constitutes scienter. Since the Individual Defendants were aware the Company could not maintain accurate records of its inventory or properly track and record its costs of goods sold *for years*, due to its accounting department being understaffed and lacked adequate procedures to manage the scale and complexity of its business, their failure to disclose these facts, while also claiming that they had adequate internal controls in place, was severely reckless. Just because Defendants were publicly stating that they were working on fixing internal control issues, that does not negate that they were reckless stating that there were not then-existing known control issues that were not being disclosed.

Third, the fact that Plaintiffs do not cite any direct communications from the Individual Defendants directing subordinates to "intentionally misstate vintage Wine's financial statements" does not weigh against scienter. There is no requirement that Plaintiffs, without the benefit of discovery, meet this incredibly high bar, even under the heightened pleading standard. As such, it is not surprising that Defendants cite no decisions from this Circuit requiring such evidence or finding a lack of scienter where such evidence was not provided.[14]

---

[14] Defendants' lone cited case for this proposition is entirely distinguishable. In *Mizzaro v. Home Depot, Inc.*, "the fraud alleged [] was very simple: store employees simply told vendors that perfectly good merchandise was damaged. Because vendors with destroy-in-field provisions in their

In sum, Defendants counter-narrative that they were disclosing the internal control issues as learned, including that the accounting department was understaffed and lacked adequate procedures to manage the scale and complexity of its business, is simply not supported by the facts here.

### C. All Of Defendants' Statements, Including SOX Certifications, Were Materially False And Misleading

While Defendants do not contest that Plaintiffs have sufficiently alleged the falsity of the Company's financial statements (nor could they, since a restatement is an admission that the statements were materially false and misleading), they claim in a footnote in the Statement of Facts section of their brief that the Sarbanes-Oxley ("SOX") certifications signed by the Individual Defendants during the Class Period are not false. Def. Br. at 6 n.2. The sole basis for this argument is their claim that "false SOX certifications are not independently actionable." *Id.*

As an initial matter, this argument should not be considered, as arguments raised in footnotes are generally found waived. *Goldman v. Vigilant Ins.*, 632 F. Supp. 3d 1188, 1197 (D. Nev. 2022) ("Arguments raised only in footnotes, or only on reply, are generally deemed waived and need not be considered"); *accord Sanders v. Sodexo, Inc.*, 2015 WL 4477697, at *5 (D. Nev. July 20, 2015). Indeed, Defendants concede elsewhere in their Motion that they are not actually contesting falsity. *See* Def. Br. at 24 ("because Plaintiffs have not pled a predicate section 10(b) claim (due to their failure to sufficiently allege scienter)…"); *Id.* at 6 n.2 ("Motion focuses on the element of scienter.").

Regardless, the false SOX certifications are actionable. SOX certifications require a company's officers to attest that the company's financial reports are accurate and its internal controls are effective. 15 U.S.C. § 7241. As Defendants concede, the Company lacked effective internal controls and its financial reports were inaccurate. *See, e.g.*, ¶¶71-72. Thus, the SOX certifications are actionable since Plaintiffs allege a connection between the statements therein and the underlying

contracts did not check these claims, the alleged fraud required no elaborate cover-up or fancy accounting tricks." 544 F.3d 1230, 1249–50 (11th Cir. 2008). As such, "[t]he simplicity of the fraud and the fact that it could be completed without the involvement of any upper management officials tend to undermine the inference that it must have originated with senior Home Depot officials, rather than with store-level employees. *Id.* at 1250. Therefore, the court found that there was no evidence of higher-ups directed lower-level employees to engage in the fraud provided evidence against an inference of scienter. The situation here is the opposite; the securities fraud necessarily involved "upper management officials," who were aware of the internal control and accounting issues.

23

conduct. *See, e.g.*, *Mulderrig v. Amyris, Inc*, 492 F. Supp. 3d 999, 1024 (N.D. Cal. 2020) (SOX misleading where executives omitted, but "were aware of pre-existing material weaknesses as well as additional, then-existing material weaknesses in Amyris's internal control over financial reporting"); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1160 (W.D. Wash. 2006) (SOX certifications from 2002 through 2004 misleading "based on the disclosure in 2005 that there were material weaknesses in Cray's internal controls").

In contrast, Defendants' cited cases are irrelevant as they involved situations where there were not other actionable false statements outside the SOX certification. *See In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1540523, at \*15 (D. Colo. Mar. 31, 2015) ("the Court finds that Plaintiffs fail to plead with the requisite specificity a material misrepresentation or omission"); *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007 WL 760535, at \*17 (N.D. Cal. Mar. 9, 2007) (similar); *see also Bruce v. Suntech Power Holdings Co.*, 2013 WL 6843610, at \*4 (N.D. Cal. Dec. 26, 2013) ("As discussed above, the later statement [SOX certification] is not actionable as the failure to detect fraud does not itself render false standard certifications about the adequacy of internal controls."). Certainty, none of these cases involved restatements where the company admitted their financial results were false and the Company lacked adequate internal controls during the Class Period.

### D.     The Complaint Adequately Alleges Control Person Liability

"Section 20(a) provides derivative liability for those who control others found to be primarily liable under the [Exchange] Act." *Kyung Cho.*, 890 F. Supp. 2d at 1205. Defendants' sole argument against §20(a) liability is that Plaintiffs fail to plead an underlying primary violation.  Def. Br. at 24. Since a primary violation has been alleged so too has a §20(a) violation.

### III.   CONCLUSION

Defendants' motion should be denied in its entirety. In the alternative, should the Court grant any portion of the Motion, Plaintiffs respectfully request leave to amend, as amendment would not be futile.  *In re Paysign, Inc. Sec. Litig.*, 2023 WL 1868476, at \*6 (D. Nev. Feb. 9, 2023) ("[l]eave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by amendment"); *Eminence Capital,* 316 F.3d at 1052-53 (court abused its discretion in granting motion with prejudice, noting amendment should be granted with liberality in PSLRA cases).

24

Dated:  August 14, 2023                    By: */s/ Andrew R. Muehlbauer*

ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
andrew@mlolegal.com

*Liaison Counsel for Lead Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Casey E. Sadler
Charles H. Linehan (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
csadler@glancylaw.com
clinehan@glancylaw.com

*Lead Counsel for Lead Plaintiffs*

**BLOCK & LEVITON LLP**
Jeffrey C. Block (*pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jeff@blockleviton.com

*Counsel for Additional Plaintiff Michael F. Salbenblatt*

25