# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| MARILYN EZZES, *et. al.*,       ) | |
|                   ) | |
|         Plaintiffs,      ) | Case No.: 2:22-cv-01915-GMN-DJA |
|     vs.                    ) | |
|                   ) | **ORDER GRANTING MOTION TO** |
| VINTAGE WINE ESTATES, INC., *et al.*, ) | **DISMISS** |
|                   ) | |
|         Defendants.     ) | |
|                   ) | |

Pending before the Court is the Motion to Dismiss, (ECF No. 39), filed by Defendants Vintage Wine Estates, Inc., Patrick Roney, Katherine DeVillers, and Kristina Johnston. Plaintiffs Marilyn Ezzes, Michael Salbenblatt, and Jeffrey Davies filed a Response, (ECF No. 43), to which Defendants filed a Reply, (ECF No. 44).  For the following reasons, the Court **GRANTS** Defendants' Motion to Dismiss.

## I.       <u>BACKGROUND</u>[1]

This case arises from Defendants' alleged securities fraud which caused its Vintage Wine's common stock value to decline. (*See generally* First Am. Compl. ("FAC"), ECF No. 36).  The Lead Plaintiffs are stockholders who bring this class action against Vintage Wine and three of its executives, on behalf of persons and entities who acquired Vintage Wine common stock between October 31, 2021, and February 8, 2023, (the "Class Period"). (*Id.* ¶ 1–2). Defendant Roney founded Vintage Wine and served as CEO during the relevant time period, until February 8, 2023, at which time he transitioned to Executive Chairman of the Board of Directors. (*Id.* ¶ 21, 74).  Defendant DeVillers served as CFO from August 2018 until March 7,

---

[1] For purposes of analyzing a Motion to Dismiss, a Court must accept all factual allegations as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

2022, and then served as Executive Vice President until her resignation on January 27, 2023. (*Id.* ¶ 22).  Defendant Johnston took over as CFO on March 7, 2022. (*Id.* ¶ 23).

Vintage Wine acquired 15 beverage entities between 2017 and 2022. (*Id.* ¶ 38–39).  Due to this increase in scale and inventory, Plaintiffs allege that Vintage Wine "struggled to maintain accurate records" due to its small accounting department, lack of training, paper record keeping, turnover, and ad hoc storage. (*Id.* ¶¶ 41–43, 67).  These factors contributed to incorrect internal inventory cost calculations. (*Id.* ¶ 56).

### A. Vintage Wine's Initial Acknowledgements

Vintage Wine went public in June 2021. (*Id.* ¶ 2).  A few months later, it announced that, as of June 30, 2021, it had "identified a material weakness in our internal control over financial reporting" relating to inventory. (*Id.* ¶ 84).  The weakness related to Vintage Wine's "process and controls regarding the tracking of costs through the various stages of inventory accounting, particularly as they pertain to bulk wine and spirits." (*Id.*).  Moreover, it informed the public that it "did not have effective business processes and controls to perform reconciliations of certain account balances related to inventory, and the received not invoiced and cellar accruals, on a regular basis." (*Id.*).  The Company reported that it was working to remedy these identified deficiencies, had discussed the weakness with the Board's Audit Committee, and had "engaged third party consultants to assist with business processes and control activities related to inventory and account reconciliations." (*Id.* ¶ 84, 110).  Plaintiffs allege that the statements made in this disclosure were materially false and misleading because they did not disclose material facts "that the Company had not taken significant measures to remediate the material weakness concerning inventory balances." (*Id.* ¶¶ 84–85).

### B. Form 10-Q Disclosures between October 2021 and November 2022

Following the initial announcement, Defendants filed Form 10-Q Disclosures updating investors about the status of the financial reporting weakness.  The first, filed November 15,

2021, for the quarter ending September 30, 2021, announced that the disclosed weakness had not yet been remediated, but that the Company had recruited additional finance staff with expertise in wine industry inventory costs and assessed long-term staffing needs. (*Id.* ¶ 90); (Nov. 10-Q Report at 26, Ex. 1 to Tang Decl., ECF No. 40-1).[2]  The second report, filed February 14, 2022, again announced that the material weakness had not yet been remediated, but that Vintage Wine had hired a Chief Information Officer and four more permanent finance employees with wine industry experience. (*Id.* ¶ 94); (Feb. 10-Q Report at 32, Ex. 2 to Tang Decl., ECF No. 40-2).  Similarly, the third 10-Q filed May 16, 2022, announced that the material weakness had still not been remedied, but that the Company had now hired nine finance employees with relevant experience and appointed a new CFO, Defendant Johnston, who had more experience with public company internal controls and accounting than the previous CFO. (*Id.* ¶ 98); (May 10-Q Report at 34–35, Ex. 3 to Tang Decl., ECF No. 40-3).  A fourth 10-Q was filed November 9, 2022, for the period ending September 30, 2022. (FAC ¶ 102).

All reports included attached SOX Certifications signed by Defendants Roney and DeVillers stating that "the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company." (*Id.* ¶¶ 88–104).  Plaintiffs allege that the statements in the first three reports were materially false and misleading because Vintage Wine failed to disclose that: (1) it had not taken significant measures to remediate the incorrect inventory balance, (2) because of the mismanaged inventory, its inventory balance did not reflect the damaged inventory, and (3) its inventory balances were therefore overstated. (*Id.* ¶¶ 84–101).  Separate from the allegations relating to overstated inventory, Plaintiffs allege that the Form 10-Q filed on November 9, 2022, contained

---

[2] The Court considers the entirety of the Form 10-Qs provided by Defendants under the incorporation by reference doctrine. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).  Plaintiffs' FAC refers extensively to the Form 10-Qs and the documents form the basis of Plaintiffs' claims. *See id.*; (FAC ¶¶ 69, 84, 90, 94, 98).

materially false and misleading statements because it did not disclose that the Company had an accounting error relating to the classification of costs, resulting in an overstatement in net income. (*Id.* ¶¶ 102–103).

### C. Form 10-K Announcement of Inventory Write-Down

On September 13, 2022, Vintage Wine disclosed in a press release and Form 10-K that it "recorded $19.1 million in non-cash inventory adjustments identified through efforts t[o] improve and strengthen inventory management, processes, and reporting" and had an additional $6.8 million in overhead. (*Id.* ¶¶ 68–69). The $19.1 million adjustment broke down into $12.4 million for physical inventory count adjustments, $3.7 million to establish inventory reserves, and $3.0 million for additional remediation efforts. (*Id.* ¶ 69). CFO Johnston stated in the press release that Vintage Wine "instituted improved accountability metrics, updated assumptions for overhead absorption processes better reflecting current business and created greater discipline around timeliness in reporting throughout the organization." (*Id.* ¶ 68). She further explained that the implementation of these new processes was the reason for the inventory adjustments, but that the company expected the processes to increase transparency. (*Id.*). The next day, the price of Vintage Wine stock fell from $5.53 per share to $3.30 per share, a 40.3% decline. (*Id.* ¶ 70).

Plaintiffs allege that this disclosure did not reveal the extent of Vintage Wine's problems because it did not disclose that "the Company had an accounting error relating to the classification of certain assets and the classification and timing of recording certain costs," and that as a result, Vintage Wine's net income was overstated. (*Id.* ¶ 9). Plaintiffs further claim that Vintage Wine violated generally accepted accounting principles ("GAAP") because companies must recognize inventory damage or deterioration as a loss during the time period in which it occurs, and here, Vintage Wine's problems with missing and spoiled inventory pre-dated the period covered by the 2022 10-K. (*Id.* ¶¶ 77–81).

**D. Announcement of Cost Accounting Error**

At the end of the next reporting cycle, on February 8, 2023, Vintage Wine disclosed that the Audit Committee of the Board of Directors had determined that the Company's previously issued financial statements for the three months ending September 30, 2022, should no longer be relied upon, and instead be restated due to an accounting error. (*Id.* ¶ 71).  The adjustments "did not involve any misconduct with respect to the Company, its management or employees." (*Id.*).  The restatement would result in an approximately $800,000 decrease in net income, reducing earnings per share allocable to common stockholders from $0.02 to $0.00. (*Id.*).  Vintage Wine also disclosed that the next quarterly report for the period ending December 31, 2022, would be "delayed due to management identifying impairment indicators, which require additional analysis, late in the financial reporting and closing process." (*Id.* ¶ 72).  And in an attached press release, the Company announced that Defendant Roney elected to transition from CEO to Executive Chairman of the Board of Directors. (*Id.* ¶ 74).  The stock price declined the following day, dropping 27.6%. (*Id.* ¶ 75).

Plaintiffs bring two claims: 1) violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; and 2) violations of Section 20(a) of the Exchange Act against the Individual Defendants. (*Id.* ¶¶ 138–155).  Defendants filed the instant Motion to Dismiss on the grounds that the amended complaint fails to plead a claim for securities fraud because Plaintiffs did not allege facts sufficient for a finding of scienter. (*See generally* Mot. Dismiss, ECF No. 39).

**II.      LEGAL STANDARD**

Dismissal is appropriate under Rule 12(b)(6) where a pleader fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  A pleading must give fair notice of a legally cognizable claim and the grounds on which it rests, and although a court must take all factual allegations as true, legal conclusions couched as factual allegations are insufficient. *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Accordingly, Rule 12(b)(6) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Beyond meeting the demands of Rule 12(b)(6), a plaintiff asserting securities fraud claims must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–24 (2007). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) requires that claims of fraud be accompanied by the "who, what, when, where, and how" of the conduct charged. *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). In other words, the complaint "must include 'an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (quoting *Swartz v. KPMG, LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam)) (internal quotations omitted).

Rule 9(b)'s particularity requirement ensures that defendants are on "notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Vess*, 317 F.3d at 1106. Where several defendants are alleged to be part of the fraud, "Rule 9(b) 'does not allow a complaint to . . . lump multiple defendants

together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant.'" *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011).

### III.        DISCUSSION

Plaintiffs allege that Defendant Vintage Wine, and its three named executives, acted with knowledge or deliberate recklessness when they failed to ascertain or disclose facts to the public relating to the overstated inventory numbers and understated costs in reports published during the Class Period. (*See generally* FAC).  More specifically, Plaintiffs allege that Defendants' initial October 2021 disclosure regarding Vintage Wine's discovery of a material weakness in financial reporting was misleading because the Company did not disclose that they had not taken significant measures to remediate the weakness or that its inventory balances were overstated. (*Id.* ¶¶ 85, 87).  Plaintiffs further allege that the reports filed between October 2021 and May 2022 were false or misleading for the same reasons. (*Id.* ¶¶ 91–101).  Next, Plaintiffs argue that Defendants should have disclosed in the November 2022 10-Q that the accounting error resulted in an overstatement in net income. (*Id.* ¶ 103).  And lastly, when Defendants disclosed the inventory write-down of $19.1 million in September 2022, Plaintiffs allege Defendants should have disclosed that their net income was overstated due to accounting issues. (*Id.* ¶ 9).

Defendants argue that the FAC should be dismissed for failure to allege scienter under the higher PSLRA pleading standard. (*See generally* Mot. Dismiss).  Defendants claim that scienter has not been alleged because the anonymous former employees making conclusory allegations do not shed light on Defendants' improper state of mind, the allegations are insufficient under the "core operations" doctrine, and the disclosure of a material weakness undermines an inference of scienter, among other reasons. (*Id.*).

To avoid dismissal of a claim for relief under Section 10(b), a plaintiff must allege six elements: (1) Defendants made a material misrepresentation or omission, (2) with scienter or

intent to defraud, (3) in connection with the purchase or sale of a security, (4) Plaintiffs relied on that misrepresentation, (5) Plaintiffs suffered economic loss, and (6) that loss was caused by the misrepresentation or omission. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).  To plead scienter, a plaintiff must "'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).  Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety." *Tellabs, Inc.*, 551 U.S. at 322.  "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23.  Scienter is adequately alleged when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Plaintiffs allege that Defendants acted with, at least, a level of deliberate recklessness. (Resp. 11:13–15).  To allege a strong inference of deliberate recklessness, a plaintiff must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity. *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002).  "To meet this pleading requirement, the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (internal quotation marks and citation omitted).

**A. Statements of Anonymous Former Employees**

To allege scienter, Plaintiffs rely heavily on the statements of anonymous former employees.  According to Plaintiffs, statements by these former employees demonstrate that "senior management" and Defendants were aware of Vintage Wine's inventory management

and accounting problems and were "at least deliberately reckless in failing to disclose the Company's accounting and inventory mismanagement." (FAC ¶¶ 54, 58, 106); (Resp. 11:13–15).

Scienter may be pled based on allegations attributed to confidential witnesses if two conditions are met: 'First, the confidential witnesses . . . must be described with sufficient particularity to establish their reliability and personal knowledge.  Second, those statements which are reported . . . must themselves be indicative of scienter.'" *Cutler v. Kirchner*, 696 F. App'x 809, 815 (9th Cir. 2017).  "[G]eneral allegations about management's role in a corporate structure and the importance of the corporate information about which management made . . . misleading statements" is not enough to satisfy the PSLRA if the allegations are not supplemented by "detailed and specific allegations about management's exposure to factual information within the company." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009).  And "generalized claims about corporate knowledge are not sufficient to create a strong inference of scienter, since they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state." *Id.* at 998.

When analyzing the first prong, a court must "look to 'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Id.* at 995.  To Plaintiffs' credit, they provide a brief description of each witness's role and job responsibilities in the Company, often including who they interacted with or reported to.  Nevertheless, the statements fail to include details establishing reliable personal knowledge of the Defendants' state of mind.

### 1.  Former Employee No. 1

Former Employee No. 1 ("FE 1") was a brand manager at Vintage Wine responsible for the sourcing, compliance, and promotion of wine from February 2018 to September 2022.

(FAC ¶ 25).  He interacted with senior corporate officers several times, including with the Company's President, Terry Wheatley. (*Id.*).  FE 1 stated that the Santa Rosa warehouse was a mess because "things were stacked so far back, and not organized with any rhyme or reason." (*Id.* ¶ 42).  For example, FE 1"heard" that a certain chardonnay was in stock, so he sold the chardonnay to customers, only to find out that the warehouse did not have the wine. (*Id.* ¶ 44). FE 1 also "learned" that five pallets of chardonnay were found in the warehouse after going missing for years. (*Id.*).  When FE 1 identified wines to use in marketing efforts, someone referred to as "they" would look in the warehouse and find that "the wine wasn't actually there." (*Id.* ¶ 48).  FE 1 also stated that in 2021, 2,600 cases of wine were improperly stored and went bad. (*Id.* ¶ 52).  And FE 1 "understood" that Vintage Wine's upper management were "hyper aware" of inventory problems before taking the Company public. (*Id.* ¶ 54).  When the company went public, inventory counts were conducted in June, rather than December, and FE 1 said it was "routine" for miscounts to surface. (*Id.* ¶ 55).  Corrections were asked for, but there was no follow up on whether corrections were made. (*Id.*).

FE 1's allegations regarding inventory mismanagement are insufficiently reliable for them to be credited on their own.  As a brand manager responsible for promoting wine, his job responsibilities do not clearly relate to having personal knowledge about warehouse organization.  FE 1 does not allege that he has ever personally seen the warehouse, as Defendants point out; rather, he had only "heard" or "learned" that wine had gone missing or been improperly stored. *See, e.g.*, *Zucco Partners*, 552 F.3d at 997 n.4 ("[A] hearsay statement, while not automatically precluded from consideration to support allegations of scienter, may indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to warrant further consideration under *Daou*.").  When FE 1 chose to promote a type of wine, another "they" would look in the warehouse for the wine.  But FE 1 does not clarify who "they" is, or whether FE 1 ever personally looked in the warehouse himself.

Even if the statements had established FE 1's reliability and personal knowledge of inventory mismanagement, the allegations fail to provide sufficient detail supporting a conclusion that FE 1 had knowledge of Defendants' state of mind. *See Zucco Partners*, 552 F.3d at 995. FE 1 does not allege how he came to understand that upper management were "hyper aware" of inventory problems, when he made this observation, or which upper management he is referring to. In fact, none of the allegations link FE 1 to a single named Defendant. FE 1 had multiple conversations with Vintage Wine President Terry Wheatley, but the FAC does not describe what these conversations were about or when they occurred. Moreover, President Wheatley is not a named Defendant. Thus, these allegations are insufficient to attribute scienter to Defendants.

FE 1 also made statements relating to the accuracy of Vintage Wine's cost reporting. According to FE 1, the internal calculations used to calculate cost in Vintage Wine's inventory management software were wrong. (FAC ¶ 56). A colleague in the accounting department reportedly told FE 1 that the costs were "racked up" incorrectly. (*Id.*). FE 1 explained that the fair market value of wine was incorrect in the system, leading to either a reduced market or reduced profitability. (*Id.*). FE 1 further stated that Vintage Wine relied on Microsoft NAV, which used formulas written by Vintage Wine employees. (*Id.* ¶ 57). And according to FE 1, Defendant CFO DeVillers "received internal blame for the apparent shortcomings with Vintage Wine's calculations, "with one colleague stating simply, 'Kathy's numbers are screwed up.'" (*Id.*). President Wheatley and COO Long acknowledged the problems with the calculations in NAV during multiple weekly meetings and directed marketing employees to sell the wine for "what they could." (*Id.* ¶ 58). And FE 1 provided examples of wines in which the cost listed in the system was incorrect. (*Id.* ¶¶ 59–61). Thus, Plaintiffs conclude, "Vintage Wine's top managers acknowledged that the estimated costs included in Vintage Wine's inventory management software were inaccurate," and the incorrect numbers were then given to the

accounting department and used to calculate the Company's inventory in SEC filings. (*Id.* ¶ 63).

Unlike FE 1's statements regarding the disorganized warehouse, his statements regarding inaccurate wine cost in the inventory system are provided with more detail and it is plausible that a brand manager responsible for sourcing and promoting wines would have discussions with managers about how to price the bottles.  Nonetheless, FE 1's hearsay statement by an anonymous colleague stating, "Kathy's numbers are screwed up," is not sufficiently reliable.  The statement made by his accounting colleague has a higher indicia of reliability because that colleague would be in a position to know the accuracy of the internal formulas, but FE 1 provides no other information about this conversation or whether the colleague reported this issue to Defendants.

Moving to the next prong, the Court does not find the statements indicative of Defendants' scienter as to the inaccuracy or misleading nature of the SEC filings.  Even if non-defendant managers or executives found the calculations to be incorrect, none of FE 1's statements indicate that these complaints were relayed to CFO DeVillers.  The closest allegation is that DeVillers "received the blame" for the incorrect numbers, but the allegations stop short of describing whether this blame merely consisted of grumblings among lower ranked employees or were presented to her as information that the company's costs were incorrect. *See In re Intel Corp. Sec. Litig.*, No. 5:20-CV-05194-EJD, 2023 WL 2767779, at *23 (N.D. Cal. Mar. 31, 2023) (finding that an allegation did not support scienter when there was no indication that the allegation "made its way" to any individual defendant).

Importantly, FE 1 gives no context as to the timing or detail of conversations involving Vintage Wine executives.  Defendant DeVillers was CFO until March 2022, so her scienter would be relevant to the October 2021 disclosure, which Plaintiff alleges contained overstated inventory balances. (FAC ¶¶ 85, 87).  FE 1's statements lack sufficient detail to demonstrate

that at the time the Company disclosed its material accounting weakness to the public, DeVillers had the requisite state of mind to intentionally overstate the inventory.  The SEC filing admitted that the Company had a material weakness in inventory accounting, but FE 1's statements do not lead the Court to conclude that DeVillers had access to information demonstrating the true inventory numbers but intentionally ignored it and submitted incorrect numbers instead.

### 2.  Former Employee No. 2

Former Employee No. 2 ("FE 2") was a regional sales manager at Vintage Wine from October 2018 until March 2022 who managed inventory and relationships with distributors. (*Id.* ¶ 26).  FE 2 reported to the Vice Presidents for the Midwest and West, each of whom reported to the Senior Vice President of Sales, Mike Gilboy. (*Id.*).  Gilboy reported to President Wheatley. (*Id.*).  FE 2 reported that brands "that were supposed to be in stock were not in stock," and inventory was routinely unavailable for sale. (*Id.* ¶ 45).  FE 2 was also given goals to sell wine that was not physically available to be sold. (*Id.* ¶¶ 46–47).  FE 2 had discussions with his supervisors about the inventory problems, including Gilroy and Wheatley. (*Id.* ¶ 54). FE 2 blamed the problems on "lack of good leadership from Roney on down." (*Id.*).

While these allegations establish FE 2's personal knowledge of certain wines missing from inventory, they do not establish his personal knowledge of the issues with the inventory management system itself.  Moreover, the allegations do not demonstrate knowledge or deceit on the part of the Defendants.  FE 2 does not allege that Gilroy and Wheatley shared his concerns with the Defendants and does not provide any factual detail on what these conversations consisted of or when they occurred.  Even assuming Gilroy and Wheatley told Defendants that certain wines were missing from the warehouse, this knowledge is not enough to demonstrate that Defendants intentionally overstated inventory numbers.  Lastly, criticisms of an executive's leadership skills by a confidential witness do not provide a basis for fraud.

1   *See In re Impac Mortg. Holdings, Inc. Securities Litigation*, 554 F.Supp.2d 1083, 1101 (S.D.

2   Cal. 2008) (finding that "calling executives bad managers" does not plead fraud and "[f]ederal

3   securities laws do not create a cause of action for corporate mismanagement that is not

4   accompanied by deception.").

5   **3.  Former Employee No. 3**

6       Former Employee No. 3 ("FE 3") worked for Vintage Wine from until March 2023 as a

7   winemaker. (FAC ¶ 27).  FE 3 reported to the COO Zach Long, who reported up to President

8   Wheatley and CEO Roney. (*Id.*).  FE 3 opined that Roney was a "very hands-on CEO" who

9   was "well-informed about everything all the time." (*Id.*).  FE 3 personally kept track of the

10  costs required to make a unit of product, but until September 2022, the Company did not have

11  an organized way to track these costs. (*Id.* ¶ 63).  FE 3 emailed CFO DeVillers for approval of

12  significant expenditures, including acquiring new wine. (*Id.* ¶ 64).  Beginning in September

13  2022, under CFO Johnston, the Company tracked costs through a "communal spreadsheet." (*Id.*

14  ¶ 65).  FE 3 began using the spreadsheet to obtain approval for large expenditures, and the

15  Company used the spreadsheet to evaluate profitability. (*Id.*).  FE 3 also states that he is

16  familiar with the issues stemming from the Microsoft NAV system used by the Company to

17  track inventory and provided examples of his experiences. (*Id.* ¶ 66).

18      FE 3 has sufficient personal knowledge over aspects of Vintage Wine's inventory

19  management and cost recording.  Like the statements made by the first two FE's, however, FE

20  3's statements are not indicative of Defendants' scienter.  FE 3 states that CFO DeVillers

21  approved his requests for significant expenditures, so Plaintiffs argue that she was exposed to

22  factual information relating to cost of goods sold. (*See* Resp. 11:27–12:13).  But a plaintiff

23  must state facts that come closer to demonstrating intent, as opposed to mere motive and

24  opportunity. *See DSAM Glob.*, 288 F.3d at 389.  FE 3 provides no relevant details about the

25  emails, nor explains how the content of these emails would lead to DeVillers' knowledge that

the cost of goods sold was incorrect.  Similarly, if the internal spreadsheet created by Johnston was used to determine the Company's profitability, Plaintiffs would need to demonstrate something more to infer that she not only had access to it, but knew it was incorrect or was deliberately reckless in not knowing.  The CFO's knowledge of the Company's profitability and costs, alone, is not enough to demonstrate an intent to deceive or deliberately fail to investigate whether the costs were understated.

### 4.  Former Employee No. 4

Former Employee No. 4 ("FE 4") worked on direct-to-consumer email marketing campaigns from March 2019 to April 2022. (FAC ¶ 28).  FE 4 described Vintage Wine as a "very hierarchical company" in which CEO Roney "set the tone" and "everything came from the top." (*Id.*).  FE 4 further testified as to the frustration that occurred when they constructed promotional marketing campaigns around wines, only to learn that the wine's availability in the system was incorrect. (*Id.* ¶ 49).  These instances happened as early as fall 2019, before the beginning of the Class Period. (*Id.* ¶ 50).  FE 4 further stated there was a "general consensus" that the inventory process was dysfunctional. (*Id.* ¶ 51).  FE 4 "understood" there was a lack of training for employees who managed inventory. (*Id.*).  FE 4 also said that Vintage Wine performed a manual examination each year to ensure that the physical inventory matched the Company's records. (*Id.*).  FE 4 "learned" that colleagues would find out that the Company had "lost pallets of wine" and that they blamed the Company's "haphazard" storage facilities. (*Id.*).

While FE 4's statements as to their experience in marketing are reliable, their statements regarding training, inventory counting, and colleague's complaints are based on hearsay, rumor, or speculation.  FE 4 did not allege that he was involved in the inventory counting or training processes.  So while the allegations regarding FE 4's frustration with the inability to find particular wines are reliable, they do not clearly relate to FE 4's assessments regarding training or inventory management. *See Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 751 (D.

Ariz. 2022).  And even if the statements were credited as reliable, the statements of FE 4's frustration regarding wine being unavailable does not lead to a finding of scienter on the part of the Defendants, who were not alleged to have been informed.

### 5.  Evaluating the Statements Together

The Court must conduct a "holistic" review of the statements to determine whether the insufficient allegations combine to create a strong inference of scienter. *See Zucco Partners*, 552 F.2d at 992.  Evaluating all statements together, however, they "do not convey information sufficient to support the strong inference that the PLSRA requires." *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1069 n.13 (9th Cir. 2008).  Although the statements may support a finding of negligence in the way Vintage Wine manages and tracks its inventory, these statements do not imply that Defendants acted intentionally, or were deliberately reckless in not investigating overstated inventory numbers and understated costs. *See Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 954 (D. Ariz. 2007) (finding that confidential witness statements failed to meet the pleading standards mandated by the PSLRA when they "merely reflect[ed] matters that companies deal with on a daily basis.").  The statements made by all four FEs lacked pertinent details about the employees' conversation with management, including when they occurred and what was said.  Without reliable personal knowledge of the Defendants' mental states, the former employees' statements do not create a strong inference of scienter. *See Zucco Partners*, 552 F.3d at 998.

Defendants cite two out-of-circuit cases the Court finds instructive in this case.  In the first, *In re Molycorp, Inc. v. Securities Litigation*, the court found that confidential witness allegations about "inadequate storage, inventory, and oversight fail to demonstrate that any Defendant knew or had reason to know, or were reckless in not knowing, that the numbers in the original 10-Q were incorrect." No. 13 Civ. 5967(PAC), 2015 WL 1097355, at *15 (S.D.N.Y. Mar. 12, 2015).  The defendant company restated financials after realizing it had

inaccurately reported inventory, and plaintiffs alleged that even though defendants were aware of the work environment and inventory problems, they still published statements that were likely incomplete or inaccurate. *Id.* at *6–7.  The court found that the statements were insufficient allegations of scienter and pointed out that the "mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter." *Id.*; *see also City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472–73 (S.D.N.Y. 2008) (explaining that while confidential witnesses asserted a "widespread" knowledge of weakness in the accounting department, "not a single informant offers any information from which one could infer that . . . individual defendants knew or had reason to know . . . except by virtue of their purported status as 'hands on' senior executives.").

The court in the second case cited by Defendants, *In re Crocs, Inc. Securities Litigation*, came to a similar conclusion. 774 F. Supp. 2d 1122, 1152 (D. Colo. 2011).  When the plaintiffs attempted to use confidential informants' allegations to support a finding of scienter, the court determined that the allegations supported an inference of mismanagement, but not fraud. *Id.* at 1148.  Even when specific defendants were allegedly told of the inventory problems, the allegations from the witnesses merely stated that the "executives" were told about inventory problems without explanation as to why the informants, given their roles in the company, would have had contact with executives at all. *Id.* at 1149.  The court found that because the complaint contained no specific allegations of the defendant's knowledge regarding the company's inventory problems, but relied instead on general allegations about all executives, it failed to support a strong inference of scienter. *Id.* at 1152.

The reasoning applied in *In re Molycorp* and *In re Crocs* is persuasive in this case, due to the similarity of facts and allegations by former Vintage Wine employees.  Like the witness statements regarding general inventory mismanagement in those two cases, the allegations in this case do not support an inference of fraud.  Beyond general allegations that the CEO was

"hands on" and that the CFOs approved expenditures and created financial tracking spreadsheets, the statements lack any specific allegations regarding Defendants' knowledge of the Company's true inventory count or financials, or when they obtained this knowledge.

Plaintiffs respond that the FEs do not need to directly interact with individual Defendants because the FEs reported their findings up the chain of command. (Resp. 12:27–13:13). FE 2 reported his frustrations with inventory problems to managers and President Wheatley, and FE 1 alleged that the President and COO expressed their awareness of inaccurate numbers in the program but directed him to sell wine for what he could. (*Id.* 13:17–23). And, Plaintiffs claim, CFO DeVillers knew of the cost of goods problems because she approved the expenditures, and CFO Johnston knew because she oversaw the creation of a spreadsheet to track expenses. (*Id.* 13:23–26).

In support of this argument, Plaintiffs cite two district court cases. In *Jackson v. Microchip Technology Inc.*, the court determined that because the confidential witnesses relied on first-hand knowledge and provided detailed factual allegations about their interactions with management, the court drew "some inference of scienter." No. CV-18-02914-PHX-JJT, 2020 WL 1170843, at *11 (D. Ariz. Mar. 11, 2020). The court does not explain what detailed factual allegations were provided, however, and this Court does not find the factual allegations provided by Plaintiff to be "detailed." Plaintiff merely alleges, "FE 2 had many discussions with his supervisors about these inventory problems. The supervisors whom he made aware of the inventory issues included Jason Strobbe, Mike Gilboy, and Terry Wheatley." (FAC ¶ 54). These two sentences leave out the extremely pertinent details of what FE 2 said in these discussions, and whether FE 2 had first-hand knowledge of the information he reported to them. And the statement that the non-defendant President and COO stated that DeVillers' formula was "screwed up," does not explain why the numbers were incorrect, or even what numbers in the formula they are referring to. (*See id.* ¶ 61). This lack of detail prevents the

Court from drawing an inference of scienter, even though FE 2 discussed the problems with his supervisors.

In the second case Plaintiffs cite, *Robb v. Fitbit Inc.*, the court found that confidential witnesses who were hired to test the accuracy of a report, and then reported those findings up the chain, contributed to a finding of scienter. No. 16-CV-00151-SI, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017). The *Robb* court explained that although the Ninth Circuit found that "allegations may independently satisfy the PSLRA when they are particular and suggest that defendants had actual access to the disputed information," the *Robb* court rested its findings on a holistic view of the allegations under a core operations theory. *Id.*

Helpfully, the *Robb* court differentiated its confidential witnesses from the witnesses in the Ninth Circuit case *Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*, because the witnesses in *Intuitive Surgical* "lacked direct access to the executives but claim[ed] that the executives were involved with Intuitive's day-to-day operations and were familiar with the contents of . . . software-generated reports" that "contain[ed] undisclosed sales data . . . ." *Id.* (quoting 759 F.3d 1051, 1062–63 (9th Cir. 2014). The witness statements in *Intuitive Surgical* lacked foundation because they did not give detail about the reports the executives supposedly accessed, "the statements provide[d] only snippets of information, not a view of the company's overall health; and the witnesses lack[ed] first-hand knowledge regarding what the individual defendants knew or did not know about Intuitive's financial health." The Ninth Circuit found no allegations linking the reports or witnesses to the executives, and that "[m]ere access to reports containing undisclosed sales data is insufficient" standing alone or under the core operations theory. *Id.*

The statements made by the FEs in this case are more like the statements in *Intuitive Surgical*, which the Ninth Circuit found to be insufficient. The FEs lacked direct access to the Defendant Executives but opined that the Executives were familiar with internal reports and

1  sales data. (FAC ¶ 64–65).  The statements did not provide detail about the reports, and instead,
2  gave only "snippets of information," such as particular wines incorrectly stored or missing from
3  the inventory. (*Id.* ¶ 44–53).  The FEs lack firsthand knowledge regarding what the Defendant
4  Executives knew, or didn't know, about Vintage Wine's financial health.  Further, the FEs in
5  this case are distinguishable from the witnesses in *Robb* who were specifically hired to test the
6  accuracy of the company's report.  For those reasons, the statements by the FEs are insufficient
7  standing alone, as well as under the core operations theory, as explained below.

8  **B.  GAAP Violations**

9       Plaintiffs also claim that Vintage Wine's restatement was an admission that the
10  Company's financial statements did not comply with GAAP, the accepted SEC accounting
11  standard. (*Id.* ¶ 77–78).  "[T]o rely on defendants' purported violation of GAAP principles to
12  prove scienter, plaintiffs must plead facts demonstrating that defendants knew of the relevant
13  principles and knew how the company was interpreting them." *Oklahoma Firefighters Pension*
14  *& Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1361 (C.D. Cal. 2014); *see also In re Medicis Pharm.*
15  *Corp. Sec. Litig.*, No. CV-08-1821-PHX-GMS, 2010 WL 3154863, at *5 (D. Ariz. Aug. 9,
16  2010) (explaining that once the plaintiff presents facts demonstrating that the defendant knew
17  how the GAAP principle was being interpreted, they "must then plead facts explaining how the
18  defendant's incorrect interpretation was so unreasonable or obviously wrong that it should give
19  rise to an inference of deliberate wrongdoing.") (citing *Zucco Partners*, 552 F.3d at 1000; *South*
20  *Ferry LP, No. 2 v. Killinger*, 552 F.3d 776, 785 (9th Cir. 2008)).  "In general, the mere
21  publication of a restatement is not enough to create a strong inference of scienter." *Zucco*
22  *Partners*, 552 F.3d at 1000; *see also DSAM Global Value Fund*, 288 F.3d at 390 ("[S]cienter
23  requires more than a misapplication of accounting principles").

24       Plaintiffs cite an applicable GAAP principle, ASC 330-10-35-1B, but do not plead facts
25  demonstrating that Defendants knew of this principle or knew it was being incorrectly applied.

The principle requires that, "[w]hen evidence exists that the net realizable value of inventory is lower than its cost, the difference shall be recognized as a loss in earnings in the period in which it occurs." (FAC ¶ 79). In the Company's restatement, $12.4 million of the write-down included "physical inventory count adjustments." (*Id.*). Plaintiffs appear to allege GAAP was violated because the Company's inventory problems pre-dated the period covered by the 2022 10-K write-down. (*Id.* ¶¶ 81–82). They argue that "every previous earnings disclosure during the Class Period was materially incorrect for reasons well-known to the Individual Defendants-the inadequacies of its inventory management system and shortcomings of its accounting team." (*Id.* ¶ 83).

But these conclusory assertions are not enough on their own. *See In re Taleo Corp. Sec. Litig.*, No. C 09-00151 JSW, 2010 WL 597987, at *8 (N.D. Cal. Feb. 17, 2010) (explaining that a plaintiff "must allege facts to show that 'the defendants knew specific facts at the time that rendered their accounting determinations fraudulent.'"). Even if the Court were to assume Defendants knew of this accounting principle, the principle requires the existence of evidence demonstrating that the net realizable value of inventory is lower than its cost. Plaintiffs do not put forward facts demonstrating that Defendants had such evidence or knew the principle was being incorrectly applied.

Despite this, Plaintiffs argue that several factors, when considered together, support an inference of scienter. Namely, Plaintiffs note that the GAAP provisions were simple and straightforward, the violation had a significant impact on core business operations, and Vintage Wine lacked effective internal controls. (Resp. 18:22–20:20). Plaintiffs are correct that the court takes these factors into consideration when evaluating scienter. *See Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008) ("The sizable impact on Accredited's reported earnings of these alleged violations of GAAP . . . supports an inference of scienter."); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1273

(N.D. Cal. 2000) ("When significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves.").  But as explained below, the application of these factors to this case does not add up to a strong inference of scienter.

Defendants argue that multiple courts have found that decisions around inventory write-downs "are *not* straightforward, because they 'involve the exercise of subjective judgments that do not lend themselves to allegations of securities fraud.'" (Reply 10:7–14) (citing *In re Crocs*, 774 F. Supp. 2d at 1150–51 (collecting cases)).  Defendants have the case law on their side. Indeed, while the general factors cited by Plaintiffs are applicable to the Court's determination, Plaintiffs did not cite any cases involving inventory write-down.  And the Court agrees with the reasoning of the *Crocs* court: For plaintiffs to support their claim of scienter regarding an inventory write-down, they "would have to provide detailed allegations concerning when [the Company] knew" that the net realizable value of its inventory was lower than its cost. *See id*.

Here, however, Plaintiffs argue generally that "based on the information provided by former employees and the Company's own SEC disclosure," the inventory problems were "endemic throughout the Class period and well-known to the Company's senior management." (FAC ¶ 81).  These allegations are not sufficiently detailed and lack specific allegations concerning when the Company knew its net realizable value was lower than its cost. *See also In re PetSmart Sec. Litig.*, 61 F. Supp. 2d 982, 993 (D. Ariz. 1999) ("The pleading must provide some particularized support regarding inventory levels, the defendants' knowledge, and approximately when plaintiffs think the write-down should have occurred."); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 314 (D. Mass. 2006) ("[P]laintiffs cannot plead a GAAP violation merely by claiming that a write-off for obsolete inventory that was taken in one quarter should have been taken in an earlier quarter").  Plaintiffs' additional arguments relating

to the scale of the write-down, internal control deficiencies, and SOX certifications, do not change the outcome.

## C. Core Operations Doctrine

Plaintiffs also argue that under the core operations theory, this Court can impute scienter to the individual Defendants based on their knowledge of the core operations of Vintage Wine. (Reply 15:3–17:4).  The core operations theory of scienter relies on the principle that "corporate officers have knowledge of the critical core operation of their companies." *Intuitive Surgical, Inc.*, 759 F.3d at 1062.  Generally, a complaint is inadequate if plaintiffs merely allege that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers." *Zucco Partners*, 552 F.3d at 1000.  But there are two exceptions to this rule: When the falsity is combined with particular allegations suggesting that the defendant's management role demonstrates they had "'actual access to the disputed information,' and where 'the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter.'" *Id.*  The FAC's allegations in this case do not meet either exception.

### 1. Defendants' Access to Disputed Information

The first exception allows for allegations around "'management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements' to create a strong inference of scienter when these allegations are buttressed with 'detailed and specific allegations about management's exposure to factual information within the company.'" *Id.*  Plaintiffs must include "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database" or other "details about the defendants' access to information within the company." *Id.*  Allegations that management had access to manipulated

accounting numbers, or even that management analyzed the numbers closely, "do not support the inference that management was in a position to know that such data was being manipulated." *Id.* at 1000–01.

The allegations in the FAC lack the required details to meet the first exception.  The FAC does not contain statements by the Defendants themselves, nor are the allegations "buttressed with detailed and specific allegations" about Defendants' access to Company information.  Plaintiffs allege that scienter can be inferred because the FEs claim that Defendant Executives were "intimately involved in the day-to-day operations of the company," and CEO Roney was a "hands-on" CEO who was "well-informed about everything all the time." (FAC ¶¶ 108–09).  Another FE stated Roney "set the tone" and "everything came from the top." (*Id.* ¶ 28).  Defendants argue that these statements are not enough because the Ninth Circuit, and other courts in this circuit, have rejected an inference of scienter under similar allegations. *See, e.g.*, *Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018); *see also Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 746 (9th Cir. 2008) (finding that allegations of a "hands-on" management style were not sufficient to create inference of scienter); *Luna v. Marvell Tech. Grp. Ltd.*, 2016 WL 5930655, at *12 (N.D. Cal. Oct. 12, 2016) (determining that an allegation that the defendant was a "micro manager and had his fingers in everything" was insufficient to establish scienter); *Jones ex rel. CSK Auto Corp. v. Jenkins*, 503 F. Supp. 2d 1325, 1337 (D. Ariz. 2007) (observing "[i]t would be difficult to find a more general or conclusory pleading than director liability based on failing to set a proper 'tone at the top'").  Plaintiffs point out that these cases do not involve admissions of involvement from the Company itself but do not proffer any authority demonstrating that this distinction matters. (*See* Resp. 15:13–15 n.7).  Defendants' case law implies it does not. (*See* Reply 7:8–15).

Plaintiffs also argue that Defendants had access to information contradicting the SEC filings because (1) Defendant CFO Johnston created the communal spreadsheet, (2) Defendant

CFO DeVillers approved requests for significant expenditures, and (3) all Defendants had access to information about the lack of adequate staff and procedures that prevented accurate reporting of its financial results. (Resp. 15:13–16:12).  But these are the type of general allegations found insufficient in *Zucco Partners*; namely, that management had access to the manipulated accounting numbers.  To the extent that Plaintiffs argue Defendants intentionally, or with deliberate recklessness, misstated the inventory and cost numbers reported in the SEC filings, Plaintiffs have not put forward facts demonstrating that the CFOs knew their reports conflicted with the SEC filing.  Defendants' access to the company's financial records, and awareness of factors that led to the inaccuracies in the reporting, do not "constitute 'a strong circumstantial case of deliberate recklessness or conscious misconduct.'" *See In re Dothill Sys. Corp. Sec. Litig.*, No. 06-CV-228 JLS (WMC), 2009 WL 734296, at *5 (S.D. Cal. Mar. 18, 2009).  Therefore, the FAC's allegations do not qualify to meet the first exception of the core operations doctrine.

### 2.  Prominence that makes a lack of knowledge absurd

Under the second exception, when "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," the information's falsity must have been "obvious from the operations of the company." *Zucco Partners*, 552 F.3d at 1001.  *Berson v. Applied Signal Technology., Inc*. demonstrates this exception. 527 F.3d at 987–89.  The executives in *Berson* made optimistic statements about their corporation's health but failed to state that several of their largest clients, representing 80 percent of their revenue, recently issued stop-work orders.  *Id.*  The Ninth Circuit concluded that it was "absurd to suggest" that the executives were unaware of the stop-work orders because the orders had a "devastating effect on the corporation's revenue" by stopping $8 million of work, reassigning between 50 to 75 employees, and completing "massive volumes of paperwork." *Id.* at 987–88.  In another case evaluating this exception, *South Ferry*, the Ninth

Circuit explained that a misstatement, without more, gives rise to an inference of scienter only in "exceedingly rare" circumstances where the facts that defendants are alleged to have known had a "devastating effect" on the company's operations and future prospects. *See* 542 F.3d at 785 n. 3.

Plaintiffs claim it would be "absurd" for Vintage Wine to make statements about its accounting remediation processes without its executives being knowledgeable about the Company's issues. (Resp. 16:13–17:4) (citing *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014)).  But the issue is not whether Defendants had *any* knowledge about the accounting issues as disclosed at the start of the class period; Defendants disclosed that they *had* discovered an accounting problem.  The issue is whether Defendants acted intentionally or with deliberate recklessness when they allegedly overstated inventory balances and failed to disclose that they had not taken significant measures to remediate the discovered material weakness. But other than broad allegations about staffing shortages, inventory mismanagement, and the Executives' access to internal accounting reports, Plaintiffs do not provide detailed allegations about what conflicting knowledge Defendants supposedly had, that would demonstrate intentionality.  On the contrary, Defendants told investors that it had identified a material weakness in the Company's accounting and warned investors that it anticipated incorrect inventory numbers because it "did not have effective business processes and controls to perform reconciliations of certain account balances related to inventory. . . . " (*Id.* ¶ 84). Vintage Wine's disclosure, without specific allegations demonstrating Defendants' intentionality, are not enough for a finding of scienter. *See Karpov v. Insight Enterprises, Inc.*, No. CV09–856–PHX–SRB, 2010 WL 2105448, at *10 (D. Ariz. Apr. 30, 2010) ("Allegations that [defendant] had material weaknesses in its internal controls do not, standing alone, give rise to a strong inference of scienter on the part of the company or its executives.").

Plaintiffs cite two cases to support their argument that the absurdity exception is met in this case.  In the first, *Reese v. Malone*, the Ninth Circuit concluded that it was absurd to believe that an oil executive did not have knowledge contradicting her statements about the condition of the company's pipelines when (1) the corrective action order from regulators was addressed to her, (2) she was responsible for reporting the oil spill incident to BP leadership, and (3) she talked to the press about the condition of the pipelines. 747 F.3d at 576.  Plaintiffs also cite *In re BP p.l.c. Securities Litigation*, in which a Texas District Court found that the plaintiffs adequately alleged scienter when the CEO stated what his job entailed, communicated his responsibility for BP's safety process, and was the key individual tracking the process. 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012).  The FAC in this case lacks similar detailed allegations as to the job responsibilities of, or statements made by, Defendant Executives.

In their Reply, Defendants argue that the most plausible inference is that Vintage Wine was instead in a game of "catch up," "acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more." (Reply 8:14–26). They aver that while this pattern may lead to an inference of poor accounting management, it would not support a finding of fraud. *Id.* (citing *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 297–98 (S.D.N.Y. 2014)).

The Court finds the *In re Magnum* court's reasoning to be instructive in this case.  In *In re Magnum*, the plaintiffs alleged that the defendant company knew or recklessly disregarded the inaccuracy of their public statements because the company knew about issues with its internal controls before the issues were disclosed in October 2012. *Id.*  The company disclosed certain internal weaknesses and told investors that it was implementing remedial measures. *Id.* But plaintiffs alleged that the company did not identify how many problems existed or how pervasive the problems were until seven months later. *Id.*  The court disagreed with plaintiffs. *Id.*  It found that even though the defendant "clearly made numerous accounting errors and

revealed internal control weaknesses in dribs and drabs, as it were, over the relevant period, plaintiffs do not allege specific facts allowing for a 'strong inference' that defendants acted recklessly in their statements to the public." *Id.* at 297.  First, the court explained that a restatement of financials alone cannot support an inference of scienter sufficient to maintain a fraud claim. *Id.* at 298.  Second, the defendant company continued to disclose the ongoing weakness, and the weaknesses disclosed in the first filings were the same weaknesses identified at the end. *Id.*  The court explained that even if the company's "statements failed to identify every weakness, that alone is insufficient to support an adequate inference of scienter." *Id.*  The fact that the company dismissed its first auditor and hired another accounting firm, who successfully filed a Form 10-K, also cut against a strong inference of scienter. *Id.*  Further, the court noted that plaintiffs never alleged they had discovered weaknesses that the company had not previously reported. *Id.*

The parties in this case make very similar arguments to the parties in *In re Magnum*. Like the plaintiffs in *In re Magnum*, Plaintiffs here argue that the inventory problems existed before Vintage Wine's public announcement, and when it finally disclosed the material weakness, it did not disclose the full extent of the problem. (*See* FAC ¶¶ 6, 50, 54, 112).  And like the defendants in *In re Magnum*, who continued to disclose the ongoing material weakness and eventually restated, Vintage Wine did the same. (*Id.* ¶¶ 10, 90, 94, 98).  Defendants also retained third-party firms to assist with the filings and ensure accuracy.  So, this Court agrees with the reasoning of the *In re Magnum* court and finds it more likely that Defendants were in a game of "catch up," rather than acting with deliberate recklessness or intentionality.  Therefore, for the reasons discussed above, the FAC's allegations do not fit into either exception of the core operations doctrine.

///

///

### D.  Executive Departure

Lastly, Plaintiffs aver that additional factors contributing to an inference of scienter include Defendant Roney's job transition and Defendant DeVillers demotion and resignation. Specifically, Plaintiffs point to Defendant Roney's transition from CEO to Executive Chairman of the Board of Directors when Vintage Wine announced it would restate its financials in February 2023, as well as Defendant DeVillers' transition from CFO to Executive Vice President, and ultimate resignation in January 2023. (FAC ¶¶ 74, 113).  Plaintiffs argue that the "most logical inference from the departure of Vintage Wine's management that had been overseeing the Company and its accounting is that they had knowledge of, or were reckless in not knowing, the accounting and internal control issues," and that the Board of Directors brought in new management to ensure these problems would not be reoccurring. (*Id.* ¶ 114).

Defendants argue that Plaintiffs failed to provide facts to refute the inference that Defendant Roney transitioned to a new position because of the reason the Company stated: "that operating a recently-public company had altered his responsibilities in a way that took 'him from what he has truly enjoyed.'" (Mot. Dismiss 20:17–19) (*citing* FAC ¶ 74).  They further claim that the fact that both Defendants served in new capacities at Vintage Wine undermines an inference of scienter, as does the fact that Defendant DeVillers was replaced with a new CFO who had prior experience with public company controls and processes. (*Id.* 20:19–21:10).

Employee resignations only support an inference of scienter when "the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances." *Zucco Partners*, 552 F.3d at 1002.  Otherwise, "the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for

unrelated personal or business reasons." *Id.*  "Mere conclusory allegations that a financial manager resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter." *Id.*  Additionally, when the individual remains an employee for a period of time, that fact further diminishes an inference of scienter based on resignation. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017); *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (declining an inference of scienter in part because two of the three employees remained employed with the defendant company in an advisory role).

Defendant Roney's transition from CEO to Executive Chairman of the Board of Directors does not lead to a cogent or compelling inference of scienter.  Plaintiffs lack allegations that this role change was uncharacteristic for Vintage Wine.  And while Plaintiffs argue that the transition occurred on the same day as the suspicious circumstances of the Company's restatement announcement, this is the type of "mere conclusory allegation" that the *Zucco Partners* court held was insufficient. *See Zucco Partners*, 552 F.3d at 1002; *see also City of Dearborn Heights*, 856 F.3d at 622 (explaining that an executive's resignation coinciding with the suspicious circumstances of an announcement of a $11.9 million goodwill impairment was a "mere conclusory allegation" that could not, without more, support an inference of scienter).  Moreover, Roney transitioned to an advisory role in the Company; he did not resign. His decision to stay on in a major advisory role further diminishes the inference of scienter.

Defendant DeVillers' transition and ultimate departure also fail to lead to an inference of scienter.  A year before the restatement, DeVillers stepped down from CFO and took on a new role as Executive Vice President. (FAC ¶ 113).  She resigned the month before the restatement announcement. (*Id.*).  Plaintiffs argue that her demotion supports an inference of the Company's knowledge of the control issues because "a non-officer accounting executive would

not need to be removed if they were not responsible." (Resp. 17:16–22).  But Plaintiffs do not clearly link this argument to their argument for scienter.  The parties do not appear to contest that Defendants had knowledge of the control issues; in fact, the Company announced in October 2021 that it had identified a material weakness in their internal controls. (FAC ¶ 4). The Company also acknowledged in subsequent filing that the weakness was ongoing but that it was remedying the situation, in part, by bringing on a CFO with public accounting experience. (*Id.* ¶ 98); (May 10-Q Report at 34–35, Ex. 3 to Tang Decl., ECF No. 40-3).  If the Company was intentionally overstating inventory balances, as Plaintiffs allege, the fact that the Company moved DeVillers to a different position and brought in a more experienced public company CFO cuts against the inference of scienter.  And like Roney, DeVillers stayed with the Company for another year in her new role before her ultimate resignation. (*Id.* ¶ 113).

**E.  Holistic Review**

Even when a court determines that the individual allegations of scienter do not give rise to a "strong inference" of knowledge or deliberate recklessness, the court must further conduct a holistic review of the allegations to determine whether they combine to create a strong inference. *Zucco Partners*, 552 F.3d at 991–92.  "Vague or ambiguous allegations are . . . considered as a part of [the] holistic review . . . [because] the federal courts . . . need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *South Ferry*, 542 F.3d at 784.  Nevertheless, "if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco Partners*, 552 F.3d at 1006; *see also Tellabs*, 551 U.S. at 310 ("To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff").

Although the entire set of allegations in this case are certainly greater than the sum of their parts, the facts pled in the FAC fail to provide a "strong inference" of scienter at least as compelling as the alternative innocent explanation.  Plaintiffs' allegations tell the story of a newly public company attempting quick growth via an acquisition strategy that is simply unable to keep up with the procedural demands of their achieved growth.  Only a few short months after going public, the company disclosed its material internal control failures and then set on a path to make things right by bringing in a CFO with public company experience and hiring more accounting staff.  Without particularized allegations that any single Defendant was intentionally fabricating the accounting misstatements, knew it was violating GAAP principles, or was deliberately reckless in not investigating inventory numbers further, the facts alleged are more indicative of the interpretation that Vintage Wine simply misreported its inventory numbers and costs of goods sold.  The fact that Vintage Wine's incorrect numbers and material accounting weakness led to a restatement does not change this conclusion.  Therefore, Plaintiffs' claim for violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants is dismissed.

### F.  Control Person Liability

Plaintiffs additionally allege violations of Section 20(a) of the Exchange Act against the Individual Defendants because they "acted as controlling persons of Vintage Wine within the meaning of Section 20(a) of the Exchange Act." (FAC ¶ 153).  Control person liability under Section 20(a) will hold a defendant employee jointly and severally liable to the plaintiff if "the plaintiff demonstrates 'a primary violation of federal securities law'" and "the defendant exercised actual power or control over the primary violator." *Zucco Partners*, 552 F.3d at 990. For the reasons explained in the preceding sections, Plaintiffs have not sufficiently alleged a primary violation of securities law.  Without "a primary violation of federal securities law," Plaintiffs cannot maintain a claim for control person liability. *Id.*

### G. Leave to Amend

If the court grants a motion to dismiss for failure to state a claim, leave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by amendment. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). Pursuant to Rule 15(a), the court should "freely" give leave to amend "when justice so requires," and in the absence of a reason such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Because this is the Court's first dismissal, and Plaintiffs may be able to plead additional facts to support scienter, the Court GRANTS Plaintiffs leave to file an amended complaint within 21 days of the date of this Order.

## V.    <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, (ECF No. 39), is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs shall have 21 days from the date of this Order to file an amended complaint. Failure to file an amended complaint by the required date will result in the Court dismissing Plaintiffs' claims with prejudice.

**DATED** this ___1___ day of March, 2024.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT