Andrew R. Muehlbauer
Nevada Bar No. 10161
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
andrew@mlolegal.com

Casey E. Sadler
Charles H. Linehan (*pro hac vice*)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
csadler@glancylaw.com
clinehan@glancylaw.com

*Lead Counsel for Lead Plaintiffs*

*(Additional counsel on the signature page)*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| MARILYN EZZES, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:22-cv-01915-GMN-DJA |
| Plaintiff, | **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| VINTAGE WINE ESTATES, INC., PATRICK RONEY, KATHERINE DEVILLERS, and KRISTINA JOHNSTON, | |
| Defendants. | |

**TABLE OF CONTENTS**

I.      STATEMENT OF FACTS.................................................................................................. 4

        A.      The Company Admits That Its Financial Statements Were Overstated.................... 4

        B .     After Removing Its Founder And Long-Serving CEO, The Company Finally
                Discloses That It Is Restating Its Financial Statements And That It Was Delaying
                Its Financial Results Due To Previously Undisclosed Impairment Indicators.......... 4

        C.      Former Employees Confirm That Vintage Wine's Management Knew About The
                Mismanagement Of Inventory And Improper Accounting Practices........................ 5

                1.      The Individual Defendants Knew The Company Did Not Accurately Record
                        Costs Of Goods Sold ................................................................................ 5

                2.      Defendants Knew That The Inventory Process Was Inaccurate ................... 9

II.     THE COMPLAINT SUFFICIENTLY PLEADS THAT DEFENDANTS COMMITTED
        SECURITIES FRAUD................................................................................................ 13

        A.      Applicable Standards Do Not Favor Defendants' Motion ..................................... 13

        B.      Plaintiffs Allege A Strong Inference Of Scienter.................................................... 13

                1.      The Confidential Witnesses Confirm Defendants' Were Deliberately
                        Reckless Issuing Financial Statements While Knowing Of Significant
                        Inventory Management Issues That Undermined The Financial Results ... 14

                2.      The Core Operations Doctrine Supports A Strong Inference Of Scienter .. 18

                        a)      It Is Absurd To Suggest Roney And Devillers Were Ignorant Of The
                                Inventory Problems .......................................................................... 19

                        b)      Defendants Had Access To Disputed Information........................... 20

                3.      The Timing Of The "Resignations" Of The Individual Defendants Further
                        Supports An Inference Of Scienter ............................................................ 22

                4.      Defendants' Accounting Violations And Ignoring Red Flags Support An
                        Inference of Scienter ................................................................................. 22

        C.      The Complaint Adequately Alleges Control Person Liability ............................... 24

III.    CONCLUSION ......................................................................................................... 24

i

# TABLE OF AUTHORITIES

CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 13

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................ 13

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................ 13-14, 19

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019) .............................................................................. 15

*Bruce v. Suntech Power Holdings Co.*,
64 F. Supp. 3d 1365 (N.D. Cal. 2014) ............................................................................. 14

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ..................................................................................... *passim*

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .................................................................................... 14, 24

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir.2001) ............................................................................................ 23

*Glazer Cap. Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ........................................................................................... 21

*Glazer Cap. Mgmt, L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ............................................................................................ 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) .................................................................................................... 13

*Hollinger v. Titan Cap. Corp.*,
914 F.2d 1564 (9th Cir. 1990) ......................................................................................... 15

*In re Adaptive Broadband Sec. Litig.*,
2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ..................................................................... 22

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ................................................................. 14

*In re BioMarin Pharm. Inc. Sec. Litig.*,
 2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ................................................................. 24

*In re BP p.l.c. Sec. Litig.*,
 843 F. Supp. 2d 712 (S.D. Tex. 2012) ....................................................................... 19

*In re China Educ. Alliance, Inc. Sec. Litig.*,
 2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ............................................................. 13

*In re Commtouch Software Ltd. Sec. Litig.*,
 2002 WL 31417998 (N.D. Cal. July 24, 2002) ........................................................... 23

*In re Crocs, Inc. Sec. Litig.*,
 774 F. Supp. 2d 1122 (D. Colo. 2011) ....................................................................... 18

*In re Daou Sys., Inc., Sec. Litig.*,
 411 F.3d 1006 (9th Cir. 2005) .................................................................................... 13

*In re Finisar Corp. Sec. Litig.*,
 646 F. App'x 506 (9th Cir. 2016) ............................................................................... 17

*In re Finisar Corp. Sec. Litig.*,
 2017 WL 1549485 (N.D. Cal. May 1, 2017) .............................................................. 17

*In re Gilead Scis. Sec. Litig.*,
 536 F.3d 1049 (9th Cir. 2008) .................................................................................... 13

*In re Immune Response Sec. Litig.*,
 375 F. Supp. 2d 983 (S.D. Cal. 2005) ........................................................................ 14

*In re LDK Solar Sec. Litig.*,
 584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..................................................................... 19

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
 26 F. Supp. 3d 278 (S.D.N.Y. 2014) .......................................................................... 20

*In re Mckesson HBOC, Inc., Sec. Litig.*,
 126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................................................... 22

*In re MicroStrategy, Inc. Sec. Litig.*,
 115 F. Supp. 2d 620 (E.D. Va. 2000) ......................................................................... 23

*In re Molycorp, Inc. Securities Litigation*,
 2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) ............................................................ 18

*In re Paysign, Inc. Sec. Litig.*,
 2023 WL 1868476 (D. Nev. Feb. 9, 2023) ................................................................. 24

iii

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ................................................................................................ 16

*In re Sipex Corp. Sec. Litig.*,
  2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) ......................................................................... 22

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ..................................................................................... 22

*In re Veeco Instruments, Inc. Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) .............................................................................................. 23

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ....................................................................................... 17, 21, 23

*Jackson v. Microchip Tech. Inc.*,
  2020 WL 1170843 (D. Ariz. Mar. 11, 2020) ..................................................................... 15, 16

*Kyung Cho v. UCBH Holdings, Inc.*,
  890 F. Supp. 2d. 1190 (N.D. Cal. 2012) ........................................................................... 15, 24

*Luna v. Marvell Tech. Grp. Ltd*,
  2016 WL 5930655 (N.D. Cal. Oct. 12, 2016) ......................................................................... 21

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ............................................................................................... 17

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .............................................................................................. 20, 23

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ................................................................................................. 14

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ............................................................................................. 18, 19

*Robb v. Fitbit Inc.*,
  2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ........................................................................... 16

*Rubinstein v. Collins*,
  20 F.3d 160 (5th Cir. 1994) ....................................................................................................... 4

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ................................................................................................... 19

*Sanchez v. Crocs, Inc.*,
  667 F. App'x 710 (10th Cir. 2016) .......................................................................................... 23

*Stocke v. Shuffle Master, Inc.*,
   615 F. Supp. 2d 1180 (D. Nev. 2009) ........................................................................ 24

*Tellabs, Inc v. Makor Issues & Rights., Ltd*,
   551 U.S. 308 (2007) ................................................................................ 14, 21, 24

*Webb v. Solarcity Corp.*,
   884 F.3d 844 (9th Cir. 2018) ................................................................................ 21

*Weiss v. Amkor Tech., Inc.*,
   527 F. Supp. 2d 938 (D. Ariz. 2007) ........................................................................ 17

Plaintiffs[1] allege the Individual Defendants were aware of information that demonstrated their inventory figures were likely inaccurate, yet they still issued inventory results without disclosing this fact. Former employees confirm the Individual Defendants were aware of both the endemic issues with Vintage Wine's inventory management systems and the Company's inability to maintain accurate records of its inventory – the direct result of which was the restatement of the Company's financial results. As one former employee even recounted: "Inventory was a shitshow." These problems were ongoing throughout the Class Period and are exactly the reasons why the Company's alleged misstatements were admittedly materially false.[2] Indeed, the Company's failure to disclose the full extent of its known inventory management issues and their potential effect on the financial statements while reporting purportedly accurate inventory results constitutes "deliberate recklessness." As such, scienter has been sufficiently alleged, and Defendants' Motion should be denied.

The Court's Order identified certain deficiencies in the previous complaint, including that the testimony of former employees "lacked firsthand knowledge regarding what the Defendant Executives knew, or didn't know, about Vintage Wine's financial health." Order at 20. The new testimony from former employees cures this deficiency by confirming that the Individual Defendants were aware of the material issues with the Company's ability to accurately calculate its inventory. For example:

- A former inventory management analyst for Vintage Wine (FE 5) from August 2020 until July 2023, recounts that there were issues with the syncing of the two software systems that the Company used to manage inventory – the enterprise resource program software Microsoft NAV and the CoreSense warehouse management software – and provides direct testimony that the Individual Defendants were aware of these problems as "he participated in periodic conference calls with these executives in which the inventory problems and discrepancies with Microsoft NAV/CoreSense were discussed." ¶¶64-65 ("Pat [Roney] was on those calls sometimes, Kathy [DeVillers] was on those calls sometimes."). Moreover, FE 5 states that Roney, DeVillers and other high-ranking

[1] Citations in the form "¶__" refer to the Second Consolidated Amended Class Action Complaint ("SAC," Dkt. No. 48). Citations in the form "Def. Br." refer to Defendants' Notice of Motion and Motion to Dismiss Second Amended Class Action Complaint ("Motion" or "MTD," Dkt. No. 50) and citations to "Order" refer to the "Order Granting Motion to Dismiss" (the "Order," Dkt. No. 45). Capitalized terms not otherwise defined here have the same meanings ascribed to them in the SAC, and unless otherwise noted, all emphasis in this brief has been added, and all internal citations, quotation marks, and alterations have been removed.

[2] The Class Period statements were false because (i) the Company had not taken significant measures to remediate the material weakness concerning inventory balances; (ii) due to the mismanagement of inventory, Vintage Wine's reported inventory did not reflect the value of inventory that was damaged and/or destroyed; and (iii) as a result, its inventory balances were overstated. *See, e.g.*, ¶99.

1

executives were routinely copied on various emails in which inventory problems were discussed as "[t]here were a lot of emails that were sent out about these kinds of issues." ¶66.[3] In fact, FE 5 recalled that DeVillers had direct access to Microsoft NAV as he was occasionally copied on emails sent by her related to discussions about inaccurate inventory data in Microsoft NAV in which she pasted screenshots from Microsoft NAV. *Id.* Likewise, Roney historically received reports from the inventory management systems. ¶73. That DeVillers received reports and information about the problems with the inventory management system is unsurprising as "there was a lot of turnover in the [accounting] department so a lot of the time it was just her and 1-2 other people." ¶72.

This testimony is sufficient to find that the Individual Defendants acted with deliberate recklessness in issuing inventory results when they were aware of the issues with the inventory management system that ultimately undermined the Company's financial results. Other testimony confirms the depths of these issues, as well as Defendants' inability to remedy them:

- According to FE 5, despite repeated complaints about the system problems from the staff, the senior executives at the Company failed to adequately address the problems and overhaul the inventory systems. ¶67. As FE 5 states, "[w]e're having these issues," and "[w]e're bringing it to their attention, but nobody's fixing it or trying to find a resolution." *Id.* Likewise, FE 2 had many discussions with his supervisors about these inventory problems. According to FE 2, the problems were the result of a "lack of good leadership from Roney on down." ¶59. Specifically, FE 2 complained about the issues regarding brands that were supposed to be in stock that were not in stock, inventory routinely unavailable until months after their launch dates, and receiving received sales goals to sell wine that was not physically available to Jason Strobbe, Mike Gilboy, and Terry Wheatley. ¶59. Moreover, FE 6 noted that the vice president of operations who oversaw the Ray's Station warehouse, Aaron Niderost, regularly complained to his superiors in Santa Rosa that the facility was understaffed and under-resourced. ¶60. Niderost often remarked that he was "fighting" to get more resources for the warehouse, but "was not getting traction" from corporate. *Id.*

- FE 1 now provides additional evidence regarding how endemic the inventory management situation was at Vintage Wines. As he states, when FE 1 inspected the warehouse in 2018, "[i]t was a disaster. OSHA hazard. Pallets of compostable inserts stacked so high they were leaning, open on the floor not racked." ¶44. FE 1 further explained that "[t]he racks were 3 deep per rack, you could see 3 sets of pallets all the way back, but no rhyme or reason to the organization. I was asked for a map to our products, but was informed that there was no map. This warehouse was a disaster. Lack of technology, lack of staffing, high turnover rate." *Id.*

- Likewise, FE 4 confirms the massive extent of the issues with calculating inventory. FE 4 says that employees that worked on the inventory counts recounted that there was "pallets of wine missing that could not be accounted for," or that "[w]e found a pallet of 'x' wine that we did not know we had." ¶55. According to FE 4, the sentiment among the employees who had helped with inventory and those with whom they discussed the

---

[3] FE 3 confirms Roney previously received the NAV reports. According to FE 3, for the first ten years of his tenure (until approximately 2018), various reports that were generated from NAV or similar software that detailed "all the active inventory" for Vintage Wine Estates were circulated to FE 3. ¶73.

2

results, including FE 4, was that "it was normal" that inventory was not accurate at Vintage Wine. Indeed, FE 4 bluntly recounted that "[i]nventory was a shitshow." *Id.*

- A new former employee (FE 6), who was a production logistics coordinator, an IT support specialist and an assistant warehouse supervisor, confirms that employees "were not properly posting shipments or posting movements of goods" to the inventory system. ¶46. FE 6 attributed this to lack of training and staff turnover; "[p]eople were shown the ropes the first day and then thrown to the wolves." *Id.* For example, FE 6 recalled that the staff frequently made mistakes – and production was posted incorrectly to the inventory system – because the employees were not following the correct process. *Id.*

- New testimony from FE 4 confirms FE 6's recollection, stating that inventory was "mismanaged" at Vintage Wine and there was a "general consensus" that there was "dysfunction" around the inventory process. ¶47. Just as with FE 6, FE 4 understood that there was a lack of training for employees who were responsible for managing inventory. His basis for this statement was that employees from various departments throughout the Company were called on to work on inventory management during his employment. As he explained, "[t]hey pulled anybody in to do inventory," "[t]hey were just employees," "[t]hey were not trained to do inventory," and they were not part of any inventory management team and were "not specially trained to do inventory." *Id.*

These particularized allegations demonstrate that Defendants either knew they lacked a sound basis for reporting the inventory figures they did or were "deliberately reckless" in doing so, given that ongoing issues made it impossible for inventory to be accurately determined. Because Plaintiffs' allegations demonstrate that Defendants knew or should have known of these issues, the complaint satisfies the standard set out by the Court's prior Order. *See* Order at 18 (finding a lack of scienter because "the statements lack any specific allegations regarding Defendants' knowledge of the Company's true inventory count or financials, or when they obtained this knowledge.").

Faced with the evidence of the Company's issues calculating inventory and that the Individual Defendants were aware of them, Defendants downplay this testimony and say that even more is needed for scienter be shown. For example, Defendants claim that Plaintiffs must show that Defendants "had access to contradictory inventory and costs data" and "disregarded that contradictory information" (Def. Br. at 1-2). But, this ignores relevant precedent on recklessness. Again, it is sufficient for Plaintiffs to allege that the Individual Defendants were aware of information that demonstrated that their inventory figures were likely inaccurate, yet they still issued inventory results without disclosing this fact.

Likewise, Defendants claim that there can be no scienter because this is simply a case of gross mismanagement and they disclosed what they knew as they learned it, including that the Company had

3

material internal control weaknesses.[4] But, to quote the Fifth Circuit in *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994), "[t]o warn that the untoward may occur when event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." Even more, if Defendants' logic was accepted, all companies could just say they have internal control issues and provide inaccurate financial results with impunity. The law does not allow such a perverse result. There is a line where ignoring known issues turns mismanagement into recklessness—Defendants crossed it.

## I.    STATEMENT OF FACTS

### A.    The Company Admits That Its Financial Statements Were Overstated

On September 13, 2022, after the close of trading, Vintage Wine disclosed that it had recorded $19.1 million in inventory adjustments. ¶80. As the Company disclosed:

> *[T]he Company recorded $19.1 million in non-cash inventory adjustments identified through efforts t[o] improve and strengthen inventory management, processes and reporting.* This included physical inventory count adjustments of $12.4 million, $3.7 million related to the establishment of inventory reserves and $3.0 million related to the impact of additional remediation efforts. *In addition, the quarter included approximately $6.8 million in overhead burden that was related to the first and second quarter of fiscal 2022, but not material to the respective periods….*

> Kristina Johnston, Chief Financial Officer, commented, "… *We are now diligently applying this focus and intensity in our financial processes in order to remediate our material weakness.… The implementation of more stringent processes drove the adjustments in inventory, but we expect this will also drive greater transparency and better future results for the Company*."

¶80. Additionally, that same day, Vintage Wine filed an annual report that revealed the degree to which Vintage Wine's inventory mismanagement impacted its financials by reducing profit and increasing its losses from operations. ¶81. On this news, Vintage Wine common stock fell $2.23, or 40.3%. ¶82.

### B.    After Removing Its Founder And Long-Serving CEO, The Company Finally Discloses That It Is Restating Its Financial Statements And That It Was Delaying Its Financial Results Due To Previously Undisclosed Impairment Indicators

On February 8, 2023, the Company disclosed that Defendant Roney was no longer going to serve as CEO and was being immediately replaced by a Board member. ¶86. As the Company elaborated:

---

[4] The Company's financial misstatements were uniformly beneficial to Vintage Wine, severely undermining Defendants' defense of simple incompetence or mismanagement. If the mistakes were truly innocent in nature, it would be unlikely they would only and always be to Defendants' benefit.

Pat [Roney] successfully grew VWE over the last 20 plus years and we have greatly appreciated his contributions as we advanced VWE as a public company. ***We have mutually determined that his role as CEO has changed significantly since our IPO, adding a complex dimension to his responsibilities, and taking him from what he has truly enjoyed. It was critical that the Board make the necessary leadership changes to find the right talent to continue to execute our strategy while maintaining the years of institutional knowledge and industry relationships that Pat has to offer.*** As a result, we have implemented our succession plan and have begun a search for a new CEO. [¶86.]

The Company further stated previously issued financial statements should no longer be relied on and should be restated because of an accounting error related to the classification and timing of recording certain costs. ¶83. The Company also stated the filing of its next quarterly report would be delayed because management had identified impairment indicators. ¶84. The price of the Company's stock fell $0.77, or 27.6%, to close at $2.02 per share on February 9, 2023, on unusually high volume. ¶87.

### C. Former Employees Confirm That Vintage Wine's Management Knew About The Mismanagement Of Inventory And Improper Accounting Practices

Vintage Wine sells wine and spirits and reportedly has over 60 wine and spirits brands totaling around 3 million cases annually, making it the 14th largest domestic wine producer. ¶40. Its growth strategy was based on acquisitions but while acquisitions created the appearance of growth, in reality, Vintage Wine failed to integrate its new brands into the Company's infrastructure and the brands typically struggled after Vintage Wine acquired them. ¶¶41-42. As FE 3 put it, a brand's "death march would slowly start" just after it was acquired by Vintage Wine. ¶42.

### 1. The Individual Defendants Knew The Company Did Not Accurately Record Costs Of Goods Sold

For Vintage Wine's inventory, accrued costs largely represented the price of storing and maintaining wine in stock. Vintage Wine's internal calculations of those costs in the Company's inventory management software were wrong. ¶62. A colleague in the Accounting Department reportedly confirmed to FE 1 that the Company's formulas for calculating internal costs "racked up costs incorrectly." ¶62. This impaired the ability of the Company to both sell its products profitably and get an accurate sense of the value of its inventory. *Id.* FE 1 explained, for example, that a bottle of sauvignon blanc from Napa might have been fair value $30 per gallon, but Vintage Wine's inaccurate internal cost calculations generated a recommend price of $68 per gallon—either substantially reducing the likely market for the bottle or reducing the profitability of its sale at a lower price, and, in either event, affecting

the accuracy of the Company's estimates of the value of its inventory. *Id.*

According to FE 1, Vintage Wine relied on Microsoft Navision (or "Microsoft NAV") as its primary inventory management system during the Class Period. ¶63. The program used formulas written by Vintage Wine employees to calculate both the cost-of-goods for units of inventory, and volumes, sales prices and estimated margins based on the unique characteristics of each product. *Id.* According to FE 1, the system was not set up properly and did not integrate well with other systems used by Vintage Wine's recent acquisitions for which Defendant DeVillers received internal blame for the apparent shortcomings with one colleague stating simply, "Kathy's numbers are screwed up." *Id.*

FE 5 explained that there were issues with the syncing of the two software systems that the Company used to manage inventory – the enterprise resource program software Microsoft NAV and the CoreSense warehouse management software. ¶64. As he explained, Microsoft NAV was the Company's "system of record" that had accounting and finance functionality, whereas CoreSense helped the Company manage inventory in shipping and warehouses, and also helped manage direct-to-consumer channels such as website sales. *Id.* Throughout FE 5's tenure, "there were always problems with those two programs synching," and "there were a lot of timing issues with [Microsoft NAV and CoreSense] being in synch," requiring frequent manual adjustments to make the two systems match up appropriately. *Id.* According to FE 5, "[t]here were a lot of problems" with the two systems "not talking," which resulted in inventory regularly being "overstated and understated." *Id.* Due to these synching problems, on various occasions Microsoft NAV contained data indicating that the Company had inventory for a brand that was not actually in stock. On other occasions, Microsoft NAV did not account for obsolete inventory. FE 5 recounted that there was inventory listed in Microsoft NAV "that we shouldn't be using" because it was obsolete, but the system did not recognize it as obsolete. *Id.*[5]

FE 5 frequently discussed these inventory software problems with his managers and managers

---

[5] FE 3 confirmed the issues with Microsoft NAV system the Company used to track inventory and the problems it caused. ¶78. He provided the example of dividing a California cabernet between three brands under the supervision of three winemakers. If one winemaker used his or her portion of the cabernet but did not update Microsoft NAV, the system would not reflect that only two-thirds of the blend was available. *Id.* FE 3 also recounted that he would spend considerable time trying to requisition wine only to later learn that the wine was available in stock even though NAV did not reflect its availability. *Id.*

of other departments – such as sales and marketing – who were vexed that the inventory they believed existed was not actually in stock. ¶65. FE 5 was also positive that the Company's senior management, including CEO Patrick Roney and CFO Katherine DeVillers, knew about the problems as they were "were always informed with what was going on. It wasn't a secret." *Id.* According to FE 5, Roney, DeVillers and Johnston were aware of the inventory and software problems because he participated in periodic conference calls with these executives in which the inventory problems and discrepancies with Microsoft NAV/CoreSense were discussed. *Id.* FE 5 recounted that there was "constant triage" on the software systems in order to get them to match and ensure they were in sync, which resulted in periodic conference calls to address the problems. *Id.* The senior executives of the Company attended these conference calls, which were "one-off" conference calls that were scheduled to address specific matters (unlike regularly scheduled staff meetings), on various occasions; "Pat [Roney] was on those calls sometimes, Kathy [DeVillers] was on those calls sometimes." President Terry Wheatley also participated in some of these conference calls. *Id.*

Moreover, FE 5 was positive that the Roney, DeVillers and Wheatley were routinely copied on various emails in which inventory problems were discussed as "[t]here were a lot of emails that were sent out about these kinds of issues." ¶66. In fact, FE 5 recalled that DeVillers had direct access to Microsoft NAV as FE 5 was copied on emails sent by DeVillers related to discussions about inaccurate inventory data in Microsoft NAV in which she pasted screenshots from Microsoft NAV. *Id.* This is unsurprising as DeVillers was highly knowledgeable about the cost of goods sold and the value of Vintage Wine's inventory, according to FE 3. ¶76. FE 3 learned this because he had to obtain the approval for significant expenditures by emailing CFO Katherine DeVillers and Chief Winemaker Marco DiGuilio. ¶76. For example, if FE 3 secured a bulk wine price for a product, he needed DeVillers to approve the deal to make the purchase. According to FE 3, due to DeVillers knowledge of the cost of goods sold and inventory value, they "had to go through [DeVillers]" and DeVillers would periodically refuse to approve expenditures for certain products because "there was not enough margin to make the product to be profitable for the company." *Id.*

Despite repeated complaints about the system problems from the staff, the senior executives at the Company failed to adequately address the problems and overhaul the inventory systems. As FE 5

7

states, "[w]e're having these issues," and "[w]e're bringing it to their attention, but nobody's fixing it or trying to find a resolution." ¶67. Other senior executives knew of the issues. For example, Vintage Wine's President, Terry Wheatley, and Zach Long, one of the three COOs during the Class Period, acknowledged the problems with the calculations in Microsoft NAV during multiple weekly production meetings, and directed the personnel responsible for marketing the affected wines to sell the product for "what they could." ¶68. Yet, this was hampered by cost-of-goods-sold ("COGS") issues associated with inventory systems. ¶¶69-71. As FE 1 explained, the "COGS numbers were wrong" and there was "never an internal wine we purchased that did not have [a COGS] issue." ¶71. According to FE 1, it was the "same thing every time. We'd say COGS were through the roof…we were told it was inaccurate. By Terry [Wheatley], Zach [Long], they told us Kathy [DeVillers'] formula is screwed up." *Id.*

In short, several times, Vintage Wine's top managers acknowledged that the estimated costs included in the inventory management software were inaccurate. Those same numbers were provided to the accounting department and ultimately used to calculate the value of the Company's inventory in SEC filings. ¶74.[6] The Individual Defendants had access to these figures for which they knew there was issues. As FE 5 recalled, DeVillers had direct access to Microsoft NAV and FE 5 was occasionally copied on emails sent by DeVillers related to discussions about inaccurate inventory data in Microsoft NAV in which she pasted screenshots from Microsoft NAV. ¶66 Likewise, Roney historically received reports from the inventory management systems. ¶73. That DeVillers received reports and information about the problems with the inventory management system is unsurprising as "there was a lot of turnover in the [accounting] department so a lot of the time it was just her and 1-2 other people." ¶72.

This turnover in staff caused short staffing and inadequate training—problems that gradually rose to the level of crisis after the Company went public. ¶79. FE 1 reported that short staffing led to delays in correcting errors and FE 2 stated that the high turnover and understaffing caused the Company to pay distributors' invoices late. *Id.* Vintage Wine's difficulties with staffing its Accounting

---

[6] FE 3 explained that his expenditures were closely monitored, and that he needed to keep track of all the costs that went into making a stock keeping unit ("SKU"), or product. But until September 2022, the Company did not have an organized way of tracking the costs that went into making an SKU. Instead, each winemaker was expected to track this information for his or her brands without being given any standardized method of organizing it. ¶75.

Department during the Class Period reportedly made it difficult to correct mistakes and even pay vendor invoices promptly, as there simply were not enough staff to get the work done. The Company's executives knew of this turnover in these departments. In fact, FE 1 recounted that a lot of the turnover was specifically because of DeVillers' management. *Id.*

### 2.    Defendants Knew That The Inventory Process Was Inaccurate

The Company struggled to maintain accurate records of its inventory. ¶43. Several former employees described the inventory as "mismanaged," and believed there was a "general consensus" that there was "dysfunction" at the major warehouse in Santa Rosa, California. *Id.* The problems were myriad: lack of training with inventory management, a failure to properly use electronic scanners or update the Company's inventory management system, and ad hoc storage within the facility. *Id*

Former employees described several instances of the Company misplacing, spoiling, or otherwise diminishing the value of inventory because of mismanagement. ¶44. According to FE 1, Vintage Wine's main warehouse in Santa Rosa, California was a constant source of inventory mismanagement: "[t]he warehouse was a mess. . . things were stacked so far back, and not organized with any rhyme or reason. They'd just put things where there was space." In fact, when FE 1 inspected the warehouse in 2018, "[i]t was a disaster. OSHA hazard. Pallets of compostable inserts stacked so high they were leaning, open on the floor not racked." *Id.* FE 1 further explained that "[t]he racks were 3 deep per rack, you could see 3 sets of pallets all the way back, but no rhyme or reason to the organization. I was asked for a map to our products, but was informed that there was no map. This warehouse was a disaster. Lack of technology, lack of staffing, high turnover rate." *Id.* Throughout his tenure, the Company's inventory counts were consistently unreliable. ¶45

FE 6, who was a production logistics coordinator, IT support specialist, and assistant warehouse supervisor (¶30), confirmed the unreliability of inventory counts. FE 6 recounted that employees "were not properly posting shipments or posting movements of goods" to the inventory system. ¶46. FE 6 attributed this to lack of training and staff turnover; "[p]eople were shown the ropes the first day and then thrown to the wolves." *Id.* For example, FE 6 recalled that on the bottling line, forklift drivers were trained to use hand-held scanners to "post the production as it was coming off the bottling line" and

move it to where it was to be warehoused. *Id.* But the staff frequently made mistakes – and production was posted incorrectly to the inventory system – due to not following the correct process. *Id.*

FE 4 confirmed FE 6's recollection, stating that inventory was "mismanaged" at Vintage Wine and there was a "general consensus" that there was "dysfunction" around the inventory process. ¶47. Just as with FE 6, FE 4 understood that there was a lack of training for employees who were responsible for managing inventory. *Id.* His basis for this statement was that employees from various departments throughout the Company were called on to work on inventory management during his employment. As he explained, "[t]hey pulled anybody in to do inventory," "[t]hey were just employees," and they were not part of any inventory management team and were "not specially trained to do inventory." *Id.* In fact, FE 4 recounted that employees from marketing, brand managers and even tasting room operations were tasked with helping physical inventory counts. *Id.* FE 4 learned that colleagues tasked with locating wine would find that the Company had "lost multiple pallets of wine—they would not be able to find them." ¶55. According to FE 4, employees blamed the haphazard way wine was stored "all over the place" in the storage facilities. *Id.* FE 4 described that it was "amazing" that the Company "could function and get wine out the door with the way we tracked inventory." *Id*. According to FE 4, the sentiment among the employees who had helped with inventory and those with whom they discussed the results, including FE 4, was that "it was normal" that inventory was not accurate at Vintage Wine. Indeed, FE 4 bluntly recounted that "[i]nventory was a shitshow." *Id.*

Vintage Wine's archaic methods for counting inventory led to misreporting of inventory. ¶48. As FE 1 explained, he would sell bottles of wine that were in the inventory system only to be later told, after customers had paid, that it was not in inventory. *Id.*[7] Similarly, FE 2 often offered brands that appeared in the inventory system to distributors who were angered when they were informed that the brands were not ready to ship. ¶51. As FE 2 recounted, brands "that were supposed to be in stock were not in stock" and inventory was routinely unavailable for sale until well after the relevant products were supposed to have launched. ¶49. This cycle eroded the trust that distributors had in Vintage Wine and in FE 2. ¶51. The inaccurate inventory was not only an external sales problem because supervisors set

---

[7] Similarly, FE 1 learned from a staff accountant, Henry Young, that that five pallets of Chardonnay from a different brand had been in the warehouse after having gone missing in the 2019-2020 end. *Id.*

annual budgets and sales goals based on the inventory as reported in the internal tracking systems. ¶49. As FE 2 explained, he was even given sales targets based on incorrect inventory records that made it impossible for him to hit his targets because "how can I sell a brand that doesn't exist?" ¶¶49-51.

The misreporting of inventory frustrated the Company's marketing efforts. In several instances, Vice President Karla Reed would send FE 1 a report identifying "wines with no movement in a while" and asked whether FE 1 wanted to use any of them for direct-to-consumer efforts. ¶52. After identifying wines FE 1 thought would be appropriate, "they would look in the warehouse and the wine wasn't actually there. Inventory would be off all the time, just saying bottles were there that weren't." *Id.* Similarly, FE 4 described the frequent frustration of seeing products identified in the inventory management system, constructing promotional campaigns around them, or even initiating email campaigns to consumers only to learn that the amount of inventory reported in the system was wrong. ¶53. As FE 4 explained, he only operated email campaigns for brands that Vintage Wine's internal marketing software showed were available for sale. Marketing associates accessed a direct-to-consumer sales platform called "CORESense," which showed how many cases of each brand were available. FE 4 determined when and whether to launch a campaign for a brand based on inventory levels and how quickly the brand was selling. *Id*. But beginning in fall 2019 and continuing through the end of his employment (April 2022), FE 4 observed that at least once per quarter, the email marketing campaigns he managed would result in sales that could not be fulfilled because there were "often times issues with finding the wine." ¶54. On other occasions, the Company simply did not have the wine the FE 4 was marketing: as FE 4 explained, "[t]here would just be these situations where we would not have what we thought we did" in inventory. *Id*. The inability to fulfill orders resulted from CORESense overreporting the number of a brand's cases that were available for sale. FE 4 was astonished by these failures, asking "[h]ow did we not know that there was not enough wine" to fulfill sales? ¶54.

Along with causing frustration for the Company's marketing efforts, mismanagement also complicated the ability to maintain product quality, which also affected the value of Vintage Wine's inventory. ¶56. In 2021 for example, according to FE 1, two imports, a Provençal Rosé and Côtes de Rhone, each approximately 2600 cases, arrived at the Company's warehouse, were improperly stored, and went bad. Apparently, instead of being transferred to stainless steel storage containers, the wines

were left to languish in the large plastic bladders they were shipped in. *Id.* Contamination and poor recordkeeping combined to have a similarly corrosive effect on the value inventory.[8] ¶57.

Former employees corroborate that senior management knew of these inventory management problems. FE 1's understanding is that Vintage Wine's upper management, including Roney and DeVillers, were "hyper aware" of the problems with its inventory management before taking the Company public. ¶58. FE 2 had many discussions with his supervisors about these inventory problems. ¶59. According to FE 2, the problems were the result of a "lack of good leadership from Roney on down." *Id*. FE 2 complained about the issues regarding brands that were supposed to be in stock that were not in stock, inventory routinely unavailable until months after their launch dates, and receiving received sales goals to sell wine that was not physically available to Jason Strobbe (Vice President), Mike Gilboy (SVP of Sales), and Terry Wheatley (President). *Id.* FE 2 also attended weekly meetings with the nationwide sales staff in which the inventory problems were frequently discussed, which were usually led by Strobbe and Gilboy with Wheatley often attending. *Id.*[9]

Moreover, FE 6 noted that the vice president of operations who oversaw Ray's Station, Aaron Niderost, regularly complained to his superiors in Santa Rosa that the facility was understaffed and under-resourced. ¶60. FE 6 attended weekly remote meetings with personnel from the Santa Rosa headquarters, including Director of Demand and Production Planning Chris Resler - and which COO Long attended approximately once a month - where the warehouse employees regularly complained to corporate personnel about the lack of staff resources and that they did not have enough access to the corporate purchasing and planning team to effectively plan bottling schedules. *Id*. After the meetings, Niderost inevitably remarked to the Ray's Station staff that he was "fighting" to get more resources for the warehouse, but "was not getting traction" from corporate. *Id.* FE 6 said that the warehouse personnel complained about lack of resources during these meetings throughout his tenure. *Id*.

---

[8] For example, in 2019, contamination during bottling of a Pinot Noir caused the wine to become fizzy. ¶57. FE 1 claims that the Company's efforts to determine which specific batches of the wine had been affected did not succeed, resulting in customer complaints about the unsatisfactory wine for years. *Id.*

[9] Even if the CEO and CFO were not involved in these meetings, it is illogical that these high-ranking individuals would have *weekly* meetings where inventory problems were discussed, and these facts were not disclosed to the CEO and CFO.

After the Company went public, annual physical counts of Vintage Wine's inventory were conducted in June, instead of December as they had been previously. ¶61. According to FE 1, "[i]t was routine" for miscounts or inaccurate data to surface "shortly after the completion" of the physical recount. Corrections were asked for on known miscounts or issues, but "little to no follow up occurred on if they were corrected or not after being identified." *Id.*

## II.   THE COMPLAINT SUFFICIENTLY PLEADS THAT DEFENDANTS COMMITTED SECURITIES FRAUD

### A.   Applicable Standards Do Not Favor Defendants' Motion

On a motion to dismiss, a complaint need only "contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Although the PSLRA raised the pleading standards for certain elements of a securities fraud claim, on a motion to dismiss a court still must "accept the plaintiffs' allegations as true and construe them in the light most favorable to the plaintiffs." *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1013 (9th Cir. 2005). As such, "it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6)." *In re China Educ. Alliance, Inc. Sec. Litig.*, 2011 WL 4978483, at *3 (C.D. Cal. Oct. 11, 2011). This is because "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

To state a claim for securities fraud, a complaint must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014). Defendants only contest scienter, waiving arguments as to the other elements.

### B.   Plaintiffs Allege A Strong Inference Of Scienter

To plead scienter, a plaintiff must allege facts that defendants acted with the intent to deceive, knowledge of falsity, or "deliberate recklessness." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982,

987 (9th Cir. 2008). Scienter "can be established by direct or circumstantial evidence." *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996). "There is no bright-line rule" as to when "an inference of deliberate recklessness is *sufficiently strong*." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). An inference of scienter is "strong" when it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc v. Makor Issues & Rights., Ltd*, 551 U.S. 308, 324 (2007). Under this standard, a "tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). The inference "need not be irrefutable . . . or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. Further a court must review "all the allegations holistically" since the relevant inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 310, 326. Here, the allegations of six former employees alone support the strong inference Defendants were at least deliberately reckless in failing to disclose the Company's accounting and inventory mismanagement, and this inference is even stronger when coupled with Plaintiffs' other allegations.

        **1.**         **The Confidential Witnesses Confirm Defendants' Were Deliberately Reckless Issuing Financial Statements While Knowing Of Significant Inventory Management Issues That Undermined The Financial Results**

A defendant is reckless if "he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Bruce v. Suntech Power Holdings Co.*, 64 F. Supp. 3d 1365, 1371 (N.D. Cal. 2014). In fact, knowledge of facts suggesting that statements were "inaccurate or misleadingly incomplete" is "classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005). This is exactly what Plaintiffs sufficiently allege here.

The SAC now presents detailed, specific allegations concerning the known inventory management issues and their potential effect on the financial statements which were not disclosed to the public even though the Company was reporting purportedly accurate inventory results. Specifically, FE 5, who was added to the SAC, worked as an inventory management analyst from August 2020 to July 2023, as well as a data manager from March 2011 to December 2021. ¶29, n. 2. The SAC recites FE 5's description of exactly how significant inventory issues arose, including that the Company was unable to effectively sync software systems used to manage inventory, and that one of the Company's primary

14

inventory management systems did not account for obsolete inventory. ¶64. The SAC further establishes that Roney, DeVillers and Johnston were party to "periodic conference calls" during FE 5's employment from August 2020 until July 2023 "in which the inventory problems and discrepancies with Microsoft NAV/CoreSense were discussed." ¶¶29, 65. The SAC identifies that Roney, DeVillers and other high-ranking executives were routinely copied on emails in which inventory problems were discussed during FE 5's employment from August 2020 until July 2023. ¶66. The SAC also shows that, during FE 5's employment, on more than one occasion DeVillers sent emails "related to discussions about inaccurate inventory data in Microsoft NAV in which she pasted screenshots from Microsoft NAV." ¶66.

Additionally, the SAC identifies another former employee (FE 1), who was employed during the Class Period, who confirms other high-ranking employees at the Company, including President Terry Wheatley and COO Zach Long, "acknowledged the problems with the calculations in Microsoft NAV during multiple weekly production meetings." ¶68. The SAC identifies multiple occasions where, during the Class Period, FE 1 was given inventory which FE 1 related to his senior managers was inflated in value in the Company's inventory system. ¶¶69-71.[10]

The reliability of FE 1 and FE 5's testimony is further "bolster[ed]" because these and other former employees' statements corroborate each other in several ways. *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1260 (D. Nev. 2019). For example, new allegations corroborative of the above allegations include FE 4 confirming the massive extent of the issues with calculating inventory (¶55), and FE 6 confirming that employees "were not properly posting shipments or posting movements of

---

[10] This and other allegations regarding the former employees reporting relevant information to supervisors now provides the detail the Court previously found lacking, including what was discussed (inflated value of inventory in the inventory system), who was informed and when it occurred. And these were not only "snippets of information" but discussions about the inventory being inflated. *See* Order at 18-20. As such, confidential witness statements may provide "some an inference of scienter" even when the confidential witnesses did not directly interact with the defendants. *Jackson v. Microchip Tech. Inc.*, 2020 WL 1170843, at *11 (D. Ariz. Mar. 11, 2020) "(Under the principles of *respondeat superior*, a plaintiff may establish scienter of the corporation through the scienter of its corporate officers or directors."); *see also Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1576-78 (9th Cir. 1990) (as amended) (*en banc*) (affirming that principles of corporate agency law and *respondeat superior* apply in Section 10(b) cases); *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d. 1190, 1204–05 (N.D. Cal. 2012) (collecting cases and imputing scienter of company vice president to company).

goods" to the inventory system. ¶46.[11] But the staff frequently made mistakes – and production was posted incorrectly to the inventory system – because they were not following the correct process. *Id.*

As the Ninth Circuit recently reaffirmed, a complaint must describe the confidential witnesses "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023) (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017). The court considers "the level of detail provided by the confidential witnesses, the plausibility of the allegations, the number of sources, the reliability of the sources, corroborating facts, and similar indicia of reliability." *Glazer Cap. Mgmt, L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 767 (9th Cir. 2023). "In essence, we ask whether the complaint describes the Former Employees "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *NVIDIA*, 81 F.4th at 938. Here, the SAC provides detailed background information regarding the former employees' positions, the time frame of their employment, and who they reported to. *See* ¶¶25-30. But, even more importantly, as discussed above, the SAC explains how each former employee learned of the information alleged. For example, FE 5 worked as an inventory management analyst during the entire Class Period. ¶29. Certainly, he is in a position to know of inventory problems and that the Individual Defendants were on phone calls with him discussing them.[12]

The SAC establishes that the Individual Defendants knew at all relevant times that Vintage Wine

---

[11] New testimony from FE 4 further confirms this, stating that inventory was "mismanaged." ¶47.

[12] This Court's Order previously identified certain deficiencies related to the former employees and distinguished Plaintiffs' reliance on *Jackson*, and *Robb v. Fitbit Inc.* 2017 WL 219673 (N.D. Cal. Jan. 19, 2017). *See* Order at 19-20. The SAC now sets out claims significantly analogous to *Jackson* and *Fitbit. Jackson* concerns confidential witnesses who did not directly interact with the individual defendants where such witnesses relied on firsthand-knowledge and include detailed factual allegations regarding interactions with management to support an inference of scienter. 2020 WL 1170843, at *11. Here, FE 5 identifies, based on his first-hand knowledge, specific "conference calls" wherein "inventory problems and discrepancies with Microsoft NAV/CoreSense were discussed," which Individual Defendants were present for (¶65) as well as specific emails chains Roney and DeVillers were copied on which discussed the issues (¶66) and emails that DeVillers herself sent which acknowledged the issue (¶66). Similarly, as in *Robb*, "plaintiffs here have alleged specific misstatements regarding [] monitoring accuracy, and rely on confidential witnesses." 2017 WL 219673, at *5. Plaintiffs in that case were hired for the purpose of testing this accuracy, which is analogous to the FEs in this case which

had serious inventory management problems, but recklessly portrayed their financial results as accurate. The SAC further sets out how the Individual Defendants' recklessness resulted in the Company reporting overstated inventory balances, cost of goods sold and net revenue. ¶¶98-117.[13] This is sufficient to demonstrate scienter. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 704 (9th Cir. 2012) (scienter established where defendants received reports on cost of goods sold and specifically monitored how inventory costs impacted company financials, but failed to correct inventory valuations they knew, or were reckless in not knowing, were inaccurate); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13 (2d Cir. 2011) (scienter plead where confidential witness reported meetings "concerned levels of obsolete inventory, problems affecting sales, profit and loss margins, customer satisfaction, and on-time deliveries" in "monthly calls" sufficient to show officers had recklessly misrepresented volume of inventory in company's facilities); *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016) (falsity found where defendant denied "inventory build-up," minimized "looming inventory bubble," remanding for discussion of scienter); *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *5 (N.D. Cal. May 1, 2017) (finding scienter where Finisar would have been given information about customer inventory and demand during negotiations with customers which would have alerted Defendants of inventory build-up, but Company refused to report inventory buildup).

The Ninth Circuit's recent NVIDIA case is instructive. *NVIDIA*, 81 F.4th at 937. In that case, the Ninth Circuit held that scienter was adequately alleged where confidential witnesses stated that senior management reviewed the company's sales data and was prone to micromanagement. *Id*. There, the court closely examined the alleged statements by former employees to evaluate "whether the Former Employees were described with sufficient particularity to establish their reliability and personal knowledge" and "the level of detail [they] provided" and ultimately held former employees statements that the CEO had "access to" sales reports and a close "attention to detail" as "relevant and probative"

include an inventory management analyst (¶29) and a production logistics coordinator (¶30). Further, the SAC now sets out detailed allegations concerning the reports the Individual Defendants were alleged to have reviewed, specifically, NAV reports which detailed "all active inventory," which FE 3 has first-hand knowledge that senior management was copied on. ¶73.

[13] The new allegations in the SAC are certainly not the type that "merely reflect[ed] matters that companies deal with on a daily basis." Order at 16 (quoting *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 954 (D. Ariz. 2007)).

of the knowing or reckless falsity of statements made. *Id.* at 938. Here, the Company held Roney out in its public filings as being "hands-on in every aspect of the wine and spirits business" and former employees confirmed this. ¶120. Defendants cannot represent to the public one thing repeatedly and then credibly claim here that it is not true. This argument is even more tenuous as Defendants are claiming that their disclosures of the internal control issues during the Class Period undermines scienter. "Every aspect of the wine and spirits business" certainly includes the Company's disclosed internal control and accounting deficiencies and reported remedial efforts.

In contrast, Defendants rely on several cases that are now inapposite, given the additional claims alleged in the SAC. For example, Defendants rely heavily on *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1150 (D. Colo. 2011) and *In re Molycorp, Inc. Securities Litigation*, 2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015), which the Court used as a substantial basis for dismissal in the Order. But. in *Crocs*, the court found confidential witnesses' "general allegations," lacking any "specific allegations regarding" the individual defendants' "knowledge of Crocs' inventory problems," were insufficient. 774 F. Supp. 2d at 1150. Here, unlike in *Crocs*, the allegations regarding knowledge of inventory problems, especially the how and why the former employees had contact with the Individual Defendants (¶¶25-30), contain specifics of how these issues were relayed to the Individual Defendants. Indeed, the SAC explains that the former employees were on conference calls (¶65) and on specific email chains (¶66) with the Individual Defendants – and even received emails from DeVillers – concerning inventory issues. ¶66. Defendants' reliance on *Molycorp* is similarly distinguishable, as in that case, the court found witness statements concerning inadequate inventory accounting measures were insufficient because "not a single informant offers any information from which one could infer that ... individual defendants knew or had reason to know anything about [the erroneous numbers]." 2015 WL 1097355, at *15. Here, the SAC describes multiple specific instances where the Individual Defendants were both directly informed of the inventory issues, and themselves *acknowledged the inventory issues.* ¶¶65-66.

**2.    The Core Operations Doctrine Supports A Strong Inference Of Scienter**

Scienter may be inferred where individual defendants "have knowledge of the 'core operations' of the company." *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014) (scienter adequately alleged where "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that

18

management was without knowledge of the matter"); *see also Berson*, 527 F.3d at 989. An inference of scienter is particularly appropriate where it is alleged that individual defendants were personally involved with or oversaw the operations giving rise to allegations of fraud. *See, e.g.*, *NVIDIA*, 81 F.4th at 937-41 (scienter adequately alleged where former employee described individual officer as micromanager familiar with the Company's sales). Here, the additional allegations in the SAC bolster the case for the application of the core operations doctrine and a finding of scienter.

### a)    It Is Absurd To Suggest Roney And Devillers Were Ignorant Of The Inventory Problems

The value of the wine inventory was central to the Company's business, the sole purpose of which is the production and sale of wine. ¶123. Both Roney and DeVillers had substantial experience in the wine industry. ¶¶21-22. A manager's expertise and "the importance of the corporate information" at issue support a strong inference of scienter where "made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008).

The problems with inventory were not minor or obscure as they were both generally well known within the Company and the subject of repeated public statements to investors about the need for a remedial process to address them. Contrary to Defendants' claims, those statements, standing alone, are not exculpatory. *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1249–50 (N.D. Cal. 2008) (well-known nature of major discrepancies with inventory support finding of scienter). Defendants' consistent failure to remediate the problems they identified (*see, e.g.*, ¶¶44, 72, 79), weigh in favor of finding scienter. At a minimum, the representations about its internal control and accounting remediation process support the inference that its senior executives were knowledgeable about the scale and nature of the issues plaguing the Company. *See Reese*, 747 F.3d at 575. Courts have held that the inference of scienter is strengthened in similar situations. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (defendant's repeated statements "weigh strongly in favor of the inference that" he "paid special attention" to the subject of the fraud "or, at the least, was reckless in not doing so while continuing to publicly tout improvements").

Further, the scope of the inventory issues supports the application of the "absurdity" prong of

the core operations doctrine. The $19.1 million write-down constituted 9% of inventory, which was $211.2 million before the write-down. ¶80; Dkt. No. 51-4 at 10 (reporting "[i]nventories" of $192.1 million after write-down). Likewise, $12.4 million of the write-down was for inventory "count" adjustments, which means that 5.8% of inventory was missing or unsalvageable. ¶80. These amounts are sufficiently prominent for the core operations doctrine to apply. *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) (strong inference that officers knew of materially overstated inventory and financial results where they allegedly refused to mark down inventory they knew to be "worthless," "obsolete," and "unsalable."). Indeed, as alleged by FE 4 and FE 6, "anybody"—brand managers, forklift drivers, tasting room employees—were pressed into working on inventory, and the consensus among employees that helped with inventory was that it was a "shitshow." ¶¶46-47, 55. The inventory issues here are thus categorically different from Defendants' authority where the gradual revelation of additional material weaknesses, not the failure to remedy previously disclosed weakness, weighed against scienter. *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 298 (S.D.N.Y. 2014).[14]

### b)    Defendants Had Access To Disputed Information

The Individual Defendants had direct exposure to and personal involvement with valuing inventory and failed to correct known material weaknesses in the period immediately preceding the substantial corrections that precipitated the collapse of the Company's stock price. Indeed, the Company touted their expertise and direct involvement with Vintage Wine's operations. For example, the Company described Roney as "hands-on in every aspect of the wine and spirits business" and touted his decades of experience. ¶120. FE 3 worked directly with Roney and echoed this characterization, describing meetings where Roney was involved with inventory questions and demonstrated his knowledge of how differing approaches to moving and storing inventory influenced the Company's cash position, stating "I would say that Pat was in charge of [inventory]." ¶¶120-121. Additionally, FE 5 stated Roney and DeVillers were regularly in conference calls in which the inventory problems with

---

[14] Moreover, the inventory valuation problems in *Magnum* were unique to petroleum accounting, including the volume of proved reserves and estimated costs of extraction. 26 F. Supp. 3d at 284. Whether a bottle of wine is on the shelf and how much it might sell for are more straightforward calculations than valuing an estimated quantity of resources based on geological and engineering data.

the Microsoft NAV system were discussed. ¶65. "[S]pecific admissions from top executives that they [were] involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 746 (9th Cir. 2008). In short, the touting of Roney's expertise and hands-on approach, both corroborated by former employees, precludes Defendants' defense based on mere incompetence or mismanagement.

Similarly, DeVillers was highly knowledgeable about the cost of goods sold and the value of inventory. ¶122. According to FE 3, DeVillers' approval was both required for individual expenditures and hinged on her understanding of the Company's margin. *Id.* DeVillers allegedly sent emails *discussing* the inaccuracy of the Microsoft NAV data, with screenshots from the database itself. ¶66. DeVillers' involvement in the minutiae of the Company's finances supports the inference that she knew or should have known that the publicly reported inventory statements were inaccurate, particularly given the scale of the write-down. *Luna v. Marvell Tech. Grp. Ltd*, 2016 WL 5930655, at *12 (N.D. Cal. Oct. 12, 2016) (alleging officer was "micro manager and had his fingers in everything"); *Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) (executive's "hands-on style and general accounting acumen" supported inference of scienter). DeVillers' close monitoring of inventory and cost of goods sold, coupled with the later significant revisions to inventory valuations, thus support an inference of scienter. *VeriFone*, 704 F.3d at 704 (finding scienter where defendants received weekly reports on cost of goods sold and specifically monitored how inventory costs impacted company financials).

Presented with these allegations, Defendants have abandoned their previous argument that there was "no reason to believe that top officials of the company would have had particular insight into the movements and booking of inventory" (Dkt. No. 39 at 18) and have opted instead to ignore the substance of the core operations doctrine entirely. Defendants now argue that the routine involvement of Roney and DeVillers' in inventory management does not support an inference of scienter without allegations that they were presented with an alternative set of books "different from those reported in the Company's financial statements." Def. Br. at 20. Not so. Requiring Plaintiffs to plead evidence of alternative record keeping would eliminate the "absurdity" prong of the core operations doctrine and impermissibly require "smoking-gun" evidence at the pleading stage. *See Tellabs*, 551 U.S. at 324. Well pled allegations based on statements from former employees that an executive recklessly reported

inaccurate inventory and financial information relating to operations that they oversaw is sufficient to satisfy the PSLRA's pleading requirements. *NVIDIA*, 81 F.4th at 937-41.

### 3. The Timing Of The "Resignations" Of The Individual Defendants Further Supports An Inference Of Scienter

The Court previously found that Roney and DeVillers removal from their positions did not suggest scienter because, "[i]f the Company was intentionally overstating inventory balances, as Plaintiffs allege, the fact that the Company moved DeVillers to a different position and brought in a more experienced public company CFO cuts against the inference of scienter." Order at 31. But Plaintiffs' allegations are not that the Company was overstating inventory to intentionally inflate their inventory; the allegations are the Company's failure to disclose the full extent of its known inventory management issues and their potential effect on the financial statements while reporting purportedly accurate inventory results was "deliberate recklessness." As such, that Roney and DeVillers were removed from their positions as the Company and Board of Directors uncovered the full extent of the inventory issues is logical and provides additional evidence of scienter. *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) (defendants' terminations and resignations, occurring at the same time as company's restatement, "add one more piece to the scienter puzzle."). At a minimum, that the Board "decided" that it was "critical that [it] make the necessary leadership changes" after uncovering the inventory issues is an additional fact that should be considered in the "scienter puzzle." *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (corporate reshuffling while company was restating financials added to "scienter puzzle"); *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) (various remedial measures, including terminations and segregation of duties, combined with restatement, established "strong inference that the company itself believes that fraud led to materially misleading financials").

### 4. Defendants' Accounting Violations And Ignoring Red Flags Support An Inference of Scienter

As this Court recognized in the Order, GAAP violations, standing alone, do not create a strong inference of scienter. *In re Mckesson HBOC, Inc., Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000). "However, when significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all books do not cook themselves." *Id.*

In this case, the SAC goes well beyond merely alleging that misapplied accounting principles and that, consequently, the Company had to restate its financials. The SAC alleges facts that show Defendants made deliberately reckless false statements concerning inventory that violated accounting principles, resulting in a significant restatement, the magnitude of which amplifies the inference of scienter. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000).[15]

Defendants argue that the SAC fails to allege any new facts demonstrating Defendants knew the net realizable value of its inventory was lower than its cost. But, as set out above, the SAC now sets out that Defendants knew or were reckless in not knowing that the inventory figures in its systems were inaccurate, yet still issued its financial results. Although some inventory write downs may involve the exercise of subjective judgments, courts have rejected the notion that "the valuation of inventory and the timing of markdown" are mere "matters of business judgment" when "managers deliberately make materially false statements concerning inventory with the intent to deceive the investment community." *Kasaks*, 216 F.3d at 312; *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (defendant's failure to write down nonsaleable inventory supports scienter, rejecting the contention that "failure to write down worthless or unsaleable inventory constituted a matter of business judgment"). This was acknowledged in the appeal of *Crocs*, wherein the Tenth Circuit's decision turned on the court's finding that the complaint did not identify how defendants would have known the "day-to-day inventory tracking system was error-prone." *Sanchez v. Crocs, Inc.*, 667 F. App'x 710, 721 (10th Cir. 2016) (quoting *Novack,* 216 F.3d at 312). Here, the SAC does identify how the "day-to-day inventory tracking system was error-prone."

***

Taken collectively, Defendants' own admissions and the restatement, the FEs' statements about employees' knowledge, the context of the GAAP violations, the core operations inference, and the

---

[15] Additionally, while not indicative of scienter alone, courts also consider the magnitude of inventory adjustments required to establish scienter. *VeriFone*, 704 F.3d at 704 (scienter found where defendants failed to question the magnitude of inventory adjustments); *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir.2001) ("[T]he sheer size of the [ ] write-down adds to the inference that the defendants must have been aware the problem was brewing"). The magnitude of the restatement (roughly 9% of the Company's inventory) being so great is another fact in the scienter analysis. *See In re Commtouch Software Ltd. Sec. Litig.*, 2002 WL 31417998, at *9 (N.D. Cal. July 24, 2002) ("size and character of the restatement" supported scienter).

23

"resignation" at the same time as the restatement all give rise to a strong inference of scienter. *See Tellabs*, 551 U.S. at 325; *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1190 (D. Nev. 2009) ("the Court does not make a presumption of fraud solely based on the fact that Defendants issued restatements, because of the temporal proximity of the errors, or because Defendants disclosed two accounting mistakes in two years. The Court does, however, find an inference of scienter when viewing the totality of the specific circumstances alleged regarding Defendants' improper accounting practices."). In response, Defendants claim that there is no scienter because the most logical story is that the Company disclosed its inventory management issue as it learned about them, as supported by its disclosure of the material weakness before the Class Period. Def. Br. at 23. But this argument is incorrect because the Company did not in fact disclose known issues in a timely matter. Indeed, Defendants repeatedly issued financial results while knowing that there were significant inventory management issues that likely impacted the financial statements. This was "deliberate recklessness." *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022) (rejecting "straw man" that fraud "ma[de] no sense," because defendants were alleged to have "withheld important warning signs"). Just because Defendants were publicly stating that they were working on fixing internal control issues, that does not negate that they were reckless in issuing their financial results without disclosing that the then-existing issues could impact these same results.

### C.   The Complaint Adequately Alleges Control Person Liability

"Section 20(a) provides derivative liability for those who control others found to be primarily liable under the [Exchange] Act." *UCBH*, 890 F. Supp. 2d at 1205. Defendants' sole argument against §20(a) liability is that Plaintiffs fail to plead an underlying primary violation. Def. Br. at 24. Since a primary violation has been alleged, so too has a §20(a) violation.

### III.   CONCLUSION

Defendants' Motion should be denied. In the alternative, should the Court grant any portion of the Motion, Plaintiffs request leave to amend, as amendment would not be futile. *In re Paysign, Inc. Sec. Litig.*, 2023 WL 1868476, at *6 (D. Nev. Feb. 9, 2023) ("[l]eave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by amendment"); *Eminence Capital*, 316 F.3d at 1052-53 (noting amendment should be granted with liberality in PSLRA cases).

24

Dated: June 14, 2024          By:  /s/ Andrew R. Muehlbauer

Andrew R. Muehlbauer
Nevada Bar No. 10161
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
andrew@mlolegal.com

*Liaison Counsel for Lead Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Casey E. Sadler
Charles H. Linehan (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
csadler@glancylaw.com
clinehan@glancylaw.com

*Lead Counsel for Lead Plaintiffs*

**BLOCK & LEVITON LLP**
Jeffrey C. Block (*pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jeff@blockleviton.com

*Counsel for Additional Plaintiff Michael F. Salbenblatt*

25

**<u>PROOF OF SERVICE</u>**

I hereby certify that on this 14th day of June, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Andrew R. Muehlbauer*
Andrew R. Muehlbauer

26