Andrew R. Muehlbauer,
Nevada Bar No. 10161
  *andrew@mlolegal.com*
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141

Casey E. Sadler (pro hac vice)
  *csadler@glancylaw.com*
John C. Roberts, Jr. (pro hac vice)
  *jroberts@glancylaw.com*
Charles H. Linehan (pro hac vice)
  *clinehan@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| MARILYN EZZES, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VINTAGE WINE ESTATES, INC., PATRICK RONEY, KATHERINE DEVILLERS, and KRISTINA JOHNSTON,<br><br>Defendants. | Case No. 2:22-cv-01915-GMN-DJA<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION** |

**TABLE OF CONTENTS**

I.  INTRODUCTION..................................................................................................... 1

II. STATEMENT OF FACTS......................................................................................... 3

    A.  Brief Procedural History ................................................................................ 3

    B.  Defendants' Attempts To Gain Access To Plaintiffs' Counsel's Investigative
    Memoranda, Notes, And Communications.................................................... 4

    C.  The ESI Protocol .......................................................................................... 4

III. LEGAL STANDARD ............................................................................................ 5

IV. ARGUMENT ....................................................................................................... 5

    A.  The Court Should Deny The Motion To Compel ......................................... 5

        1.  The Motion Is Untimely ................................................................... 6

        2.  Plaintiffs Have Already Stated That They Do Not Have Additional Non-
        Privileged, Responsive Documents To Produce ........................................ 6

            a)  RFP 1............................................................................................... 6

            b)  RFPs 2 and 3 ................................................................................... 7

            c)  RFP 8............................................................................................... 7

            d)  RFP 10 and Interrogatory 3 ............................................................ 7

        3.  Defendants Are Not Entitled to the Discovery They Seek............................ 8

            a)  RFPs. 4, 5, and 6. ............................................................................ 8

            b)  RFP 7............................................................................................... 11

            c)  RFP 9............................................................................................... 11

            d)  Interrogatory 2................................................................................ 12

            e)  Interrogatory 4 ................................................................................ 12

        4.  There Is No Evidence That One of the Former Employees Recanted, But
        Even If He Did, That Does Not Warrant Invading The Work-Product
        Doctrine........................................................................................................ 12

            a)  Documents Confirm The Existence Of Pervasive Inventory, IT, And
            Accounting Problems ...................................................................... 14

b)      Documents Confirm That Defendants Were At Least Reckless As To The Falsity Of Their Public Statements.................................... 16

5.      Plaintiffs Are Not Required to Log Contacts with the Confidential Witnesses........................................................................................................... 20

B.      The Courts Should Require Defendants To Pay Plaintiffs For The Expenses Incurred In Opposing This Motion........................................................................... 20

V.      CONCLUSION ................................................................................................................. 22

# TABLE OF AUTHORITIES

## CASES

*Aldava v. Smith's Food & Drug Centers, Inc.*,
   2025 WL 2754043 (D. Nev. Sept. 29, 2025) ............................................................................ 1

*Bartech Sys. Int'l, Inc. v. Mobile Simple Sols., Inc.*,
   2018 WL 1787905 (D. Nev. Jan. 31, 2018) ............................................................................. 6

*Brincko v. Rio Props., Inc.*,
   278 F.R.D. 576 (D. Nev. 2011) ................................................................................................ 9

*Clarke v. Am. Com. Nat'l Bank*,
   974 F.2d 127 (9th Cir. 1992) ................................................................................................... 9

*Collins v. Landry's Inc.*,
   2014 WL 2770702 (D. Nev. June 17, 2014) ............................................................................ 5

*E.E.O.C. v. Collegeville/Imagineering Ent.*,
   2007 WL 1089712 (D. Ariz. Apr. 10, 2007) ........................................................................... 9

*G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*,
   2008 WL 11388585 (D. Nev. June 18, 2008) .......................................................................... 8

*Garcia v. Serv. Emps. Int'l Union*,
   332 F.R.D. 351 (D. Nev. 2019) ............................................................................................... 6

*Hatamian v. Advanced Micro Devices, Inc.*,
   2015 WL 511175 (N.D. Cal. Feb. 6, 2015) ................................................................... 8, 9, 11

*In re Bofi Holding, Inc. Sec. Litig.*,
   2021 WL 3700749 (S.D. Cal. July 27, 2021) ................................................................ 8, 9, 12

*In re GTI Cap. Holdings, LLC*,
   399 F. App'x 236 (9th Cir. 2010) .......................................................................................... 21

*In re Harmonic, Inc. Sec. Litig*,
   245 F.R.D. 424, 427 (N.D. Cal. 2007) .................................................................................... 8

*Langley v. Garcia*,
   2020 WL 1532313 (E.D. Cal. Mar. 31, 2020) ...................................................................... 22

*Manago v. McMahon*,
   2022 WL 17363067 (C.D. Cal. Aug. 15, 2022) ...................................................................... 5

*Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*,
   400 F. Supp. 3d 7 (S.D.N.Y. 2019) .................................................................................. 10, 11

*O'Connor v. Boeing North Am., Inc.*,
    216 F.R.D. 640 (C.D. Cal. 2003) ...................................................................................... 11

*Olympic Ref. Co. v. Carter*,
    332 F.2d 260 (9th Cir. 1964) ........................................................................................... 13

*Pierce v. Underwood*,
    487 U.S. 552 (1988) ........................................................................................................... 5

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
    2005 WL 1459555 (N.D. Cal. June 21, 2005) ................................................................... 9

*Reygo Pac. Corp. v. Johnston Pump Co.*,
    680 F.2d 647 (9th Cir. 1982) ............................................................................................. 5

*Strauss v. Credit Lyonnais, S.A.*,
    242 F.R.D. 199 (E.D.N.Y. 2007) .................................................................................... 12

*Tradeshift, Inc. v. BuyerQuest, Inc.*,
    2021 WL 1586283 (N.D. Cal. Apr. 23, 2021) ........................................................... 10, 11

*Union Asset Mgmt. Holding AG v. Sandisk LLC*,
    227 F. Supp. 3d 1098 (N.D. Cal. 2017) .......................................................................... 13

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) ......................................................................................................... 11

*We the Protesters, Inc. v. Sinyangwe*,
    348 F.R.D. 175 (S.D.N.Y. 2024) .................................................................................... 10

**STATUTES**

15 U.S.C. § 78u-4(b)(3)(B) .................................................................................................. 3

**RULES**

Fed. R. Civ. P. 37(a)(5)(B) ............................................................................................ 5, 21

Rule 26(b)(1) of the Federal Rules of Civil Procedure ...................................................... 5

**OTHER AUTHORITIES**

Gideon Mark, *Confidential Witness Interviews in Securities Litigation*,
    96 N.C. L. Rev. 789 (2018) ............................................................................................. 13

Lead Plaintiffs Marilyn Ezzes and Jeffrey A. Davies, and additional plaintiff Michael F. Salbenblatt (collectively, "Plaintiffs"), by and through their attorneys of record, hereby submit their opposition to the motion to compel ("Motion to Compel" or "Motion") filed by Defendants Patrick Roney, Katherine DeVillers, and Kristina Johnston (collectively, "Defendants"), who were executives of the now-defunct Vintage Wine Estates ("Vintage Wine," "VWE," or "Company"). *See* ECF No. 102. Pursuant to Rule 37(a)(5)(B), Plaintiffs request that the Court deny the Motion to Compel and require Defendants, the attorneys filing the Motion, or both, to pay Plaintiffs the reasonable expenses incurred in opposing the Motion, including attorney's fees, because the filing of the Motion was not substantially justified in fact and law.[1]

## I.    INTRODUCTION

After this Court denied Defendants' motion to dismiss this securities class action, hundreds of thousands of documents have been produced by non-parties that substantiate Plaintiffs' claims. Rather than confronting any of the facts present in these documents, which Defendants already have in their possession, Defendants have maintained a strange fixation with Plaintiffs' counsel's investigative file, and they have devoted uncommon efforts to try to obtain what is clearly privileged and protected information from Plaintiffs. The Motion to Compel should be denied because, for some requests, Plaintiffs have already stated that they are not in possession of any non-privileged, responsive materials, and for the others, Plaintiffs are under no obligation to produce them.

Make no mistake about it: the requests put forward by Defendants here are extreme. The requests target Plaintiffs' counsel's memoranda, notes, and communications, a core area of opinion work product that is subject to near-absolute immunity, and core parts of Plaintiffs' investigative

[1] Defendants have also failed to comply with the letter and spirit of LR IA 1-3(f) and LR 26-6(c), which require them to include a declaration setting forth, for "each disputed discovery request," the "details" of the meet-and-confer conference as well as the "result." Here, Defendants do not set out request-by-request details for RFPs 1-10 or Interrogatories 2-4; their declaration states, in relevant part, that the parties "substantively discussed the Discovery Requests and other outstanding discovery matters" and "were not able to resolve the privilege issue or any other issues that are subject to this Motion." But this is insufficient under this Court's own case law. *See Aldava v. Smith's Food & Drug Centers, Inc.*, 2025 WL 2754043, at *2 (D. Nev. Sept. 29, 2025) (finding declaration deficient where "counsel merely rattle[d] off what the parties discussed on December 12, 2024, and that 'no resolution was achieved'").

file. As explained herein, Defendants have shown absolutely no entitlement to these documents. Even beyond that, Defendants already specified that "*[they] do not seek Plaintiffs' counsel's prefiling investigation, notes, [or] summaries*,"[2]  Adams Decl., ECF No. 102-1, Ex. D (August 6, 2025 Adams Letter) at 6, that they are "*[not] requesting Plaintiffs' counsel's or counsel's investigator's communications with the Former Employees*," *id*., and that Defendants themselves "*will not be sharing any of [counsel's] e-mails going forward*," *id*, Ex. H (September 12, 2025 Adams Letter) at 2.

Now, when those agreements are no longer to their advantage, Defendants want to disavow them. But Plaintiffs are entitled to hold them to their word. Moreover, the Parties' agreement, that they need not log privileged communications since the initiation of this action, was codified in the Court-ordered ESI Protocol, which specifically states that "*The Parties shall have no obligation to log communications involving counsel that post-date November 14, 2022 that concern or arise under this litigation*." ECF No. 95 at 15.[3]  Consistent with this, Defendants themselves have engaged in all manner of communications with third parties, and yet they have neither produced these documents to Plaintiffs, or placed them on a privilege log, despite the fact that they are technically still responsive to Plaintiffs' document requests. Defendants should be held to previous agreements and not allowed to change positions at their convenience. There should not be, as Defendants would have it, "one rule for me, and one for thee."

When one applies the case law, the attorney work-product doctrine, the parties' previous agreements about not logging third-party communications, and the Court-ordered ESI Protocol, it is clear that Defendants are not entitled to additional documents in response to RFPs 1-10. The requests have multiple, disqualifying faults which suggest that the Motion never should have been brought in the first place.  Defendants are also not entitled to additional responses to Interrogatories

---

[2] Unless otherwise noted, all emphasis is added.

[3] Defendants do not even mention this provision in their Motion. Defendants' failure to address this key provision, which is unquestionably relevant to the Motion and has been flagged to counsel for Defendants, demonstrates a lack of candor and a failure to provide the Court with the proper context with which to assess their claims.

2-4, which largely seek the same information as the requests for production but in the form of interrogatories. They too constitute unjustified intrusions into attorney work product.

Defendants wrongly suggest that this is somehow an issue of Plaintiffs being stingy with documents. In fact, Plaintiffs have taken the lead in third-party discovery and allowed Defendants access to literally millions of documents. What is happening with respect to these particular requests, and why they are being resisted, is that with them Defendants seek documents and communications that are clearly privileged or protected work product: Plaintiffs have drawn a line here and said "no."

The Court should deny the Motion to Compel and require Defendants, the attorneys filing the Motion, or both, to pay Plaintiffs the reasonable expenses incurred in opposing the Motion, including attorney's fees.

## II. STATEMENT OF FACTS

### A. Brief Procedural History

This securities fraud action was first filed with this Court on November 14, 2022. *See* ECF No. 1. Defendants were Individual Defendants at that time. *Id*. Plaintiffs' operative Complaint, ECF No. 48, alleges that Defendants concealed problems with the Company's inventory management and accounting for inventory, among other things.

In an Order dated December 13, 2024, Judge Navarro denied Defendants' second motion to dismiss, finding that Plaintiffs had adequately pleaded the existence of false and misleading statements and a strong inference of scienter under the stringent requirements of the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b). *See* ECF No. 61. The denial of the motion to dismiss lifted the automatic PSLRA discovery stay in the matter. *See* 15 U.S.C. § 78u-4(b)(3)(B).

To date, the Parties have received more than 3 million documents from Vintage Wine's Liquidating Trustee and additional documents from two former independent outside auditors. *After* the substantial completion deadline, Defendants produced approximately 154,000 documents, including a large number of text messages from the mobile devices of Defendants. Under the current schedule, fact discovery is set to close on April 17, 2026.

3

**B.    Defendants' Attempts To Gain Access To Plaintiffs' Counsel's Investigative Memoranda, Notes, And Communications**

Defendants served their first set of interrogatories and requests for production of documents on May 23, 2025, and Plaintiffs served their responses and objections on June 23, 2025. The parties engaged in a letter writing campaign to negotiate these requests: Defendants wrote letters on July 2 and August 6, and Plaintiffs wrote letters on July 14 and August 13. The parties held a meet-and-confer on numerous issues on September 3, including Defendants' first set of document requests, and there were further letters following that, including on September 5 and September 12. Plaintiffs amended their responses and objections to the first interrogatories on September 19. Defendants waited nearly *three months after* that supposed meet-and-confer before dropping the instant Motion on Plaintiffs, without warning, on November 24, 2025, the Monday before Thanksgiving and just before a scheduled in-person mediation.

**C.    The ESI Protocol**

On September 30, 2025, the parties entered a stipulation regarding the production of electronically stored information and hard copy documents ("ESI Protocol"), ECF No. 93, which was subsequently entered by the Court on October 2, 2025, ECF No. 95. With respect to privilege logs and the logging of counsel communications that post-date the onset of the litigation, Section 7 states as follows:

> The Parties agree to provide a privilege log produced and/or supplemented on a rolling basis contemporaneously with each partial production of documents, and in no event later than thirty (30) calendar days after each such logged document is produced (or would have been produced, but for withholding or redaction). Any claim that produced Documents are covered by the attorney-client privilege, work product doctrine or other applicable privilege or immunity ("Privileged Material"), any belief that such Documents are not Privileged Materials and any challenge to such claim shall be subject to the terms of the Stipulated Protective Order agreed upon by the Parties and entered by the Court. ***The Parties shall have no obligation to log communications involving counsel that post-date November 14, 2022 that concern or arise under this litigation.***

ECF No. 93 at 15.

4

## III.    LEGAL STANDARD

Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, a party is entitled to seek discovery of "any ***nonprivileged*** matter that is relevant to any party's claim or defense and proportional to the needs of the case."

If the Court denies the motion to compel, Defendants must pay costs for the motion, unless "the motion was substantially justified or other circumstances make an award of expenses unjust." *Manago v. McMahon*, 2022 WL 17363067, at \*4 (C.D. Cal. Aug. 15, 2022) (citing Fed. R. Civ. P. 37(a)(5)(B)). A request for discovery is "substantially justified" if "reasonable people could differ as to whether the party requested must comply." *Reygo Pac. Corp. v. Johnston Pump Co.*, 680 F.2d 647, 649 (9th Cir. 1982); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (explaining "substantially justified" to mean "justified to a degree that could satisfy a reasonable person, or [had] a reasonable basis both in law and fact"). The burden is on the losing party to affirmatively demonstrate that its discovery conduct was substantially justified." *Collins v. Landry's Inc.*, 2014 WL 2770702, at \*4 (D. Nev. June 17, 2014).

## IV.    ARGUMENT

### A.    The Court Should Deny The Motion To Compel

The instant Motion to Compel is a brazen attempt by Defendants to obtain documents and communications from Plaintiffs' counsel's investigative files and documents protected by the attorney-client privilege and attorney work-product doctrine, including counsel's memoranda, investigative notes, and communications with third parties. Not only is the Motion untimely, procedurally improper, and a clear example of gamesmanship by Defendants, it is also utterly without merit, and based on truly unreasonable interpretations of fact and law.

Defendants move to compel as to RFPs 1-10 and Rogs 2-4, although neither the Motion nor the Adams Declaration spends any time explaining the details of each particular request, sticking instead to generalities. As explained herein, the Motion should be denied *in full*.

5

**1.      The Motion Is Untimely**

As a threshold matter, the Motion to Compel should be dismissed as untimely. The requests at issue on this Motion were issued *nearly six months ago*, and the operative meet-and-confer, according to Defendants, was *more than three months ago*.

Under this Court's case law, Defendants' Motion is untimely, given the length of time that elapsed before and after the meet and confer on this discovery dispute. *See Bartech Sys. Int'l, Inc. v. Mobile Simple Sols., Inc.*, 2018 WL 1787905, at *2 (D. Nev. Jan. 31, 2018) (dismissing motion to compel where, among other things, "[p]laintiff waited nearly four months to conduct a meet and confer . . . and, after the meet and confer failed to resolve the issue, Plaintiff waited over two months to file its motion to compel. Therefore, Plaintiff waited more than six months after it knew about the discovery issue to file its motion."); *Garcia v. Serv. Emps. Int'l Union*, 332 F.R.D. 351, 356 n.8 (D. Nev. 2019) (holding that "a six-week delay between the conclusion of meet-and-confer efforts and the filing of a motion to compel is indicia of an untimely motion"). Here, the almost-six-month delay renders the Motion untimely, and this Court need not go further to dispose of it.

**2.      Plaintiffs Have Already Stated That They Do Not Have Additional Non-Privileged, Responsive Documents To Produce**

Even if the Court were to look past the Motion's untimeliness, *see supra* Section IV.A.1, and the deficient LR 26-6(c) declaration, *see supra* n.1, the Motion itself is utterly without merit. For several of the requests, Plaintiffs have already stated that they do not have non-privileged, responsive documents.

**a)      RFP 1**

RFP 1 seeks "seeks documents and communications relied upon to answer the interrogatories," Mot. at 6, 16-17, but there have been no documents or communications relied upon to answer the interrogatories. In their Motion, Defendants seem to acknowledge they are asking for documents or communications that would be relied upon in a hypothetical future amended interrogatory response. *Id*. at 17. But there is presently nothing to compel here, as these future amended responses remain unwritten.

6

**b)      RFPs 2 and 3**

RFPs 2 and 3 seek all documents received by Plaintiffs or Plaintiffs' counsel from former employees or other third parties, but as Plaintiffs have already informed Defendants, they are not in possession of such documents, if by "document" one means Company documents and/or documents from their time at the Company. The former employees did not take any Company documents with them and did not turn any Company documents over to Plaintiffs' counsel. Plaintiffs have stated this multiple times. *See, e.g.*, Adams Decl., ECF No. 102-1, Ex. G; Roberts Decl., Ex. 36 (August 28, 2025 Roberts Letter) at 2.[4] To the extent Defendants still seeks such documents on this Motion, they are arguing over nothing and wasting the Court's time.

**c)      RFP 8.**

RFP 8 seeks all documents and communications that support the Former Employees' allegations in the Complaint. But again, the Former Employees did not provide Plaintiffs' counsel with any documents from the Company. To the extent that Defendants want to know which documents from within all of the discovery produced to date supports Plaintiffs' claims, those documents are equally accessible to Defendants, and anything that Plaintiffs would point to would be something already in Defendants' possession.  To require Plaintiffs to identify the precise documents that support their prima facie case is premature, as this case is nowhere near the summary judgment stage.

**d)      RFP 10 and Interrogatory 3**

RFP 10 seeks all communications or documents that support FE 5's allegations in Paragraphs 65 and 66 of the Complaint that the Defendants "were aware of the inventory and software problems . . . and participated in periodic conference calls . . ." and "were routinely copied on various emails in which inventory problems were discussed." But all of the documents that Plaintiffs would give to Defendants in response to this request would be documents that they already possess, as they are found in the documents produced by Defendants and by the Liquidating Trustee.

---

[4] All references to the "Roberts Decl." are to the Declaration of John C. Roberts Jr. in Support of Plaintiffs' Opposition to Motion to Compel, filed concurrently herewith.

Similarly, Interrogatory 3 seeks information substantiating certain paragraphs of the complaint attributed to FE 5. But the facts that Plaintiffs obtained throughout the course of their interviews with former Vintage Wine employees are already available to Defendants in the SAC. Defendants repeatedly attempt to clarify that they seek "only factual information" regarding the allegations and the FEs' accounts. Letter at 3, 5. Thus, "Plaintiffs have already divulged the contents of those interviews or at least substantial portions thereof by filing the SAC." *In re Harmonic, Inc. Sec. Litig.*, 245 F.R.D. 424, 427 (N.D. Cal. 2007). Defendants now want Plaintiffs to explain what was and was not included in Plaintiffs complaint, but the decision to exclude information from such persons is itself indicative of counsel's mental impressions and analysis of the case. *See G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*, 2008 WL 11388585, at *5 (D. Nev. June 18, 2008) (defendants "are not entitled…to discover plaintiffs' counsel's personal recollections, notes or memoranda regarding any interview of the Simon employee. Such information is clearly attorney opinion work product and is entitled to the highest level of protection.")

### 3.    Defendants Are Not Entitled to the Discovery They Seek

As to the remaining requests, even if Plaintiffs had responsive information, it is protected by attorney-client privilege and work-product doctrine. Thus, Defendants are not entitled to its production.

### a)    RFPs. 4, 5, and 6.

RFPs 4, 5, and 6 seek communications between Plaintiffs' counsel and any third party, including the Former Employees. But these requests should be denied because they seek protected attorney work product and Defendants' positions are precluded by specific agreements between the parties not to produce counsel communications that post-date the onset of the litigation.

First, the requested communications form part of Plaintiffs' counsel's investigative file and are protected under the attorney work-product doctrine as, among other things, interview correspondence. *See Hatamian v. Advanced Micro Devices, Inc.*, 2015 WL 511175 (N.D. Cal. Feb. 6, 2015); *In re Bofi Holding, Inc. Sec. Litig.*, 2021 WL 3700749 (S.D. Cal. July 27, 2021). In *Advanced Micro Devices*, the court held that communications between confidential witnesses ("CWs") and counsel were protected work product, reasoning that "the communications were

8

between plaintiffs' counsel's investigators and confidential witnesses who were being contacted for the purposes of investigating claims to draft the complaint" and therefore "constituted interview correspondence for the purposes of witness development." 2015 WL 511175, at *6.[5] The same is true here. In *Bofi Holding*, the court found that neither "discovery into the conduct of plaintiff's counsel's prefiling investigation" nor "communications between the [CWs] and plaintiff (or its agents)" were relevant, and therefore denied the motion to compel as to those categories. 2021 WL 3700749, at *4-5. Again, the same is true here.[6] *See also E.E.O.C. v. Collegeville/Imagineering Ent.*, 2007 WL 1089712, *1 (D. Ariz. Apr. 10, 2007) (noting that "where a party does not seek to learn of witnesses with knowledge about the case, and instead seeks to learn who has been contacted by opposing counsel, work product concerns arise," as "[s]uch discovery requests seek to track the steps of opposing counsel and their witness interview choices"). Again, Defendants are not entitled to look over Plaintiffs' shoulders at their homework: they should complete the assignment for themselves.

Second, even putting aside issues of work-product doctrine, Defendants specifically represented to Plaintiffs that they were not seeking counsel's communications with the former employees. In their August 6 letter, for example, Defendants stated that they were not seeking communications between Plaintiffs' counsel and the former employees, specifically: "***Nor are Defendants requesting Plaintiffs' counsel's or counsel's investigator's communications with the***

---

[5] *Bofl* also held that the identities of the CWs was relevant and therefore discoverable. Here, Plaintiffs have already confirmed the identities of the former employees.

[6] Defendants cite *Clarke v. Am. Com. Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992), but that case involved the separate matter of billing statements; it did not involve confidential witnesses, and it did not involve a Court-ordered ESI Protocol that specifically stated that the information in dispute need not be logged. Defendants cites *Brincko v. Rio Props., Inc.*, 278 F.R.D. 576, 583 (D. Nev. 2011), but this is for the truism that "[n]ot all communications between an attorney and client are privileged." Even the truism misses the mark, however, as the focus here is primarily on the attorney work-product doctrine. Finally, Defendants cite *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 2005 WL 1459555, at *4 (N.D. Cal. June 21, 2005), but there the court actually noted that the "parties may be compelled to disclose the identity of persons having knowledge, but may not be forced to disclose which of these individuals have in fact been interviewed," as that would be attorney work product. Thus, the case hurts, not helps, Defendants.

9

*Former Employees*." Adams Decl., ECF No. 102-1, Ex. D (August 6, 2025 Adams Letter) at 6. Plaintiffs told Defendants that they would hold them to their word and they will. That agreement is binding on the parties. *See We the Protesters, Inc. v. Sinyangwe*, 348 F.R.D. 175, 178 (S.D.N.Y. 2024) ("Rule 29(b) specifically affords parties the flexibility to design their own, mutually agreed upon protocols for handling discovery," which a party cannot "unilaterally" later adjust).

Third, Defendants' Motion is surprising in light of the fact that the parties had an agreement for months that they were not producing counsel communications sent or received after the advent of the litigation. Indeed, it was Defendants who first stated in response to Plaintiffs' request for their communications with the third-party Liquidating Trustee: "***We will not be sharing any of our firm's e-mails going forward***." Adams Decl., ECF No. 102-1, Ex. H (September 12, 2025 Adams Letter) at 2. This is consistent with what Defendants stated at the meet-and-confer conference, *i.e.*, that counsel for Defendants had never shared their email communications regarding in-progress litigation and would not start now. *See* Roberts Decl., Ex. 37 (October 30, 2025 Roberts Email). And it is not just that Defendants stated this position; the agreement was codified in the ESI Protocol, and it is how they have conducted themselves in the litigation. Defendants have obviously made third-party communications, including to the former employees themselves, and have never produced anything to Plaintiffs or included anything on any log, despite the fact that it is technically covered by one of Plaintiffs' requests for production. Plaintiffs will not allow Defendants to back-track on the agreements they have made in this case. *See Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 14–15 (S.D.N.Y. 2019) (acknowledging binding nature of stipulations and agreements among litigants); *Tradeshift, Inc. v. BuyerQuest, Inc.*, 2021 WL 1586283, at *2 (N.D. Cal. Apr. 23, 2021) (enforcing a party's obligation to review certain emails in part because "[a]ll agreements are voluntary; once made, they are binding"). And Defendants are not entitled to discovery when they have refused to reciprocate under the same circumstances. That is fundamental fairness.

Thus, Plaintiffs are not entitled to counsel communications after the advent of the litigation, and, therefore, not entitled to anything more under RFPs 4, 5, and 6.

10

**b)    RFP 7**

RFP 7 could not be targeted more directly at privileged and protected information, as it seeks "[a]ll documents, including notes, memoranda, recordings, or other documentation containing, summarizing, or relating to information provided to You by the Former Employees," with "You" including Plaintiffs' counsel. The request is obviously overbroad, and the requested documents are protected work product: indeed, courts have consistently held that "[n]otes and memoranda of an attorney, or an attorney's agent, from a witness interview are opinion work product entitled to almost absolute immunity.'"[7] *O'Connor v. Boeing North Am., Inc.*, 216 F.R.D. 640, 643 (C.D. Cal. 2003) (citation omitted); *see also Upjohn Co. v. United States*, 449 U.S. 383, 399 (1981) ("[f]orcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes"); *Advanced Micro Devices*, 2015 WL 511175, *6 (finding notes and memoranda to be "protected work product"). Plaintiffs' counsel should not be required to turn its memoranda and notes over to Defendants' counsel. This is *clearly* protected.

Defendants appeared to understand this when they specifically conceded on August 6 that they were not seeking "Plaintiffs' counsel's prefiling investigation, notes, [or] summaries." *Id.* at 6. Again, it is unclear why Defendants are back-tracking now, except for temporary strategic gain, but Plaintiffs have relied on this representation for months, and Defendants can and should be held to their word. *See LJC Dismantling*, 400 F. Supp. at 7, 14–15; *BuyerQuest*, 2021 WL 1586283, at *2.

**c)    RFP 9.**

RFP 9 seeks efforts undertaken by Plaintiffs and their counsel to verify information provided by the Former Employees. But this is just another way of stating that Defendants want Plaintiffs to

---

[7] There is no "substantial need" within the meaning of Rule 26(b)(3)(A)(ii) because Defendants can go straight to the source, *i.e.*, to the Former Employees themselves, as Defendants have done here. Indeed, Defendants even spoke in the Motion of their "upcoming depositions." Mot. at 2; *see also Advanced Micro Devices*, 2015 WL 511175, *18 ("Courts often find no substantial need for otherwise protected materials where the requesting party has the opportunity to depose the witness about his earlier statements."). And of course, even "substantial need" is not sufficient to overcome opinion work product protections.

produce all of their counsel's investigative documents, and this is plainly inappropriate. *See Bofi Holding*, 2021 WL 3700749, at *4-5 (denying "discovery into the conduct of plaintiff's counsel's prefiling investigation" as irrelevant).

### d)    Interrogatory 2

Interrogatory 2 seeks information regarding communications with FEs. If Plaintiffs do not have to produce copies of the communications of their counsel with the former employees, and they are not required to log such communications, then they cannot be required to summarize the contents of those communications for Defendants' review. Plaintiffs are not required to log communications with third parties, even in response to an interrogatory.

### e)    Interrogatory 4

Interrogatory 4 seeks documents regarding persons who prepared any of the discovery responses. What the Motion seeks here is inappropriate and clearly infringes on attorney work product. *See, e.g.*, *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 232 (E.D.N.Y. 2007) (denying a motion to compel a response to an interrogatory that sought "the identities of individuals upon whom plaintiffs relied to assist in the preparation of their interrogatory responses" based on work-product doctrine).

### 4.    There Is No Evidence That One of the Former Employees Recanted, But Even If He Did, That Does Not Warrant Impinging Upon The Work-Product Doctrine

Defendants assert in their Motion that "one of" the former employees in the Complaint has stated that he does not recall telling Plaintiffs' counsel any of the statements attributed to him in the Complaint. Mot. at 3. That sets up Defendants' dramatic flourish: "If this case lacks any merit in real facts and evidence, then Defendants are entitled to know that now." Mot. at 3. But discovery thus far has shown plenty of merit; indeed, the former employees have essentially been proven right already.

As a threshold matter, Defendants' Motion does not submit any actual evidence of a "recantation." To have a former employee who served as a confidential witness state that he or she "does not recall" making a particular statement is not a recantation. Indeed, such a response is not even surprising when that former employee is being pressed by defense counsel after losing the

12

protection of confidentiality. *See Union Asset Mgmt. Holding AG v. Sandisk LLC*, 227 F. Supp. 3d 1098, 1099 (N.D. Cal. 2017) (recognizing that "[the CW's] declaration testimony . . . might be false, because the witness feels intimidated by the defendants").[8] And notably, Defendants do not provide any declaration or affidavit supporting the existence of the "recantation." In the absence of that, this is merely Defendants' say-so. Defendants cite *Olympic Ref. Co. v. Carter*, 332 F.2d 260, 264 (9th Cir. 1964) (Mot. at 13), a 60-year-old case for the notion that Defendants are entitled to documents so that it can confirm what he actually said, but again, Defendants have done absolutely nothing to show that they are entitled to anything like that.

Moreover, discovery has only confirmed the Plaintiffs' allegations, including the recollections of the former employees, and, indeed, has demonstrated that the situation was significantly worse than Plaintiffs pled. Not only was the Company's internal controls and inventory management systems in shambles, but Defendants were informed of these facts yet intentionally did not remedy the issues (while claiming to the public that they were).

These documents show that the dysfunction at Vintage Wine was severe: it long preexisted the Class Period, and it persisted long after, all the way until the Company's demise. Everyone knew it, it was talked about at every level of the Company, it was never fixed, and it impacted nearly every facet of the Company, from problems with inventory and accounting, to problems with IT controls, to an inability to budget or forecast, to an inability to fulfill orders or sustain sales initiatives. The documents show that Defendants were clearly aware that Vintage Wine had no real working inventory or internal control system but nevertheless claimed to supply accurate results, *i.e.*, they were at least reckless as to the truth or falsity of their statements.

---

[8] As a legal scholar recently noted with respect to a study of alleged CW recantations, "it seems likely that much of the recanting that does occur is the product of coercion by defendants and their counsel, and/or the fear of retaliation experienced by confidential witnesses." Gideon Mark, *Confidential Witness Interviews in Securities Litigation*, 96 N.C. L. Rev. 789, 806-07 (2018).

a)  **Documents Confirm The Existence Of Pervasive Inventory, IT, And Accounting Problems**

Allegations of problems with inventory, inventory accounting, and related issues are well-supported by documents throughout the Class Period, as well as before and after. The evidence on these points is voluminous.

Documents produced in this litigation provide ample evidence that the Company's accounting was riddled with errors. *See*, *e.g.*, Roberts Decl., Ex. 1 (DeVillers stating: "Kranz created the spreadsheet but *I added the adjustments in the statements and may have messed something up*."); *id.*, Ex. 2 (Johnston text to Wheatley: "Error in Meiers plan - *Kathy gave us bad numbers*. Ebitda is now 50m."); *id.*, Ex. 3 (Johnston states that she erred in her calculation of the FY22 EBITDA: "*My EBITDA adjustment is wrong* - it needs to be 19M NOT 24M . . . I'm sorry - I know this changes all of the decks/model as this puts FY22 EBITDA back to 45M."). Indeed, the Company had to make huge adjustments during the period. *See*, *e.g.*, *id.*, Ex. 4 (DeVillers relaying concerns to the Company's audit committee regarding the inventory adjustment entries found by Moss Adams: "*I have reviewed the data as best as I can and have arrived at $9.2MM of adjustments*. . . . . My biggest concern about booking all the inventory adjustments is we could be double booking something given the nature of how the data flows and it wouldn't be evident on the surface.").

The discrepancies were even so large that they affected relationships with customers. For example, Roney was advised by the Company's Chief Operating Officer of a large discrepancy in a VWE billing who stated: "*I can see their concern about being billed for 1mil cases when ending inventory at October was 650k cases*." Roberts Decl., Ex. 5. In another instance, VWE inventory records showed 180 cases of a product but only 15 could be found to fill an urgent order for 28 cases: "*Oh dear people aren't going to be happy about this* . . . [ . . . ] . . . 180cs showing . . . and only 15 total can be found?!" *Id.*, Ex. 6 at LT00043428. Again, there are countless examples of documents of this type.

Documents show that the Company had a culture of non-compliance in which inventory discrepancies were tolerated as the norm and nothing was done to correct the root cause of the problem. Discrepancies were present nearly every time they went to count something. *See, e.g., id.*,

14

Ex. 7 at LT00090726 (Vintage Wine employee: "***nothing is there from an inventory standpoint***."); *id.*, Ex. 8 at LT00012057 ("… where was the =$1.2M bottled inventory on the acquisition date?"); *id.* ("***There is a difference of about 2,000 bottles***…"); *id.*, Ex. 9 (VP of Supply Chain Courtney Prose asks for a summary of the July inventory adjustments resulting from the FY22 year-end physical inventory. "***I know the inventory adj requests are beyond ridiculous***. I know you are frustrated, and I am equally so."); *id.*, Ex. 10 (VP Prose: "***I am - looking at COGS, which is ridiculous. No one has a handle on it***.").

In addition to all the colorful emails sent back and forth on this topic, inventory variances were regularly captured in reports and circulated by upper management to the Company's audit committee. *See*, *e.g.*, Roberts Decl., Ex. 4 (DeVillers circulating list of potential adjusting entries to audit committee).

Documents have also confirmed the problems with the Company's two management software systems, Microsoft NAV and CoreSense, and the syncing of the two. Chief Digital Officer Jessica Kogan raised red flags regarding the need for improvements in CoreSense and the lack of talented tech personnel. *See* Roberts Decl., Ex. 11. But NAV was not updated in a timely manner and contradicted other information in the system. *See id.*, Ex. 12 at LT00338810 (a write-off for Josh Chardonnay partly because: "***NAV is not being updated in a timely manner or at all*** so MRP signals & plans in the system contradict what's showing in emails & on spreadsheets."). In April 2022, Kogan and Wheatley again discussed the problem with Roney and Chief Information Officer Joe Gregg. CIO Gregg: "***One of the root problems is that when changes in Coresense occurred last year the testing did not include checking on how the data flowed (or did not flow) into Nav***." *Id.*, Ex. 13. Wheatley stated that, to that point, "***there was not an internal resource with the expertise or the bandwith*** [sic]." *Id.*, Ex. 14. Wheatley admitted that "[t]he Coresense/NAV issue surfaced because our February financials did not match what we are tracking daily" and "[*it*] ***appears the problem has not been fixed***." *Id.*, Ex. 13. And in July 2022, Johnston emails Roney with priorities for her new tenure as CFO, including that the Company "***still had phantom inventory in Nav***." *Id.*, Ex. 15. There are hundreds of documents similar to these, in which the Company outlines all of the problems with NAV and CoreSense.

The documents also make abundantly clear that Defendants knew there were deficiencies in inventory management and reporting but were not actually working to solve the material weakness. Indeed, Defendants had already dropped the ball in allowing the significant deficiency to fester into a material weakness and "back-slid[ing]" to that point. Defendants then ignored the material weakness for a long period of time, despite paying lip service to remediation efforts. In fact, Defendant DeVillers went all the way until January 2022 without talking to the auditor about the material weakness or a remediation plan. Even then, she resisted the need for physical audits that would have determined actual inventory levels. *See* Roberts Decl., Ex. 16 (complaining about being asked by auditor to do a Q3 physical inventory). Throughout this time, Company efforts to remediate the material weakness were hampered by staffing shortages. *Id.*, Ex. 17 (February 2022 audit committee discussion of staffing shortages); *id.*, Ex. 18 (same in May 2022).

### b)    Documents Confirm That Defendants Were At Least Reckless As To The Falsity Of Their Public Statements

Documents produced in this case already establish that each Defendant was keenly aware of the collapsing controls at the Company, which will establish that Defendants knew the falsity of their statements during the Class Period.

The inventory and accounting issues were hardly a surprise to Defendants. As far back as March 2021, the Company's then-independent outside auditor, Moss Adams, noted a significant deficiency related to inventory and IT security and access. With respect to inventory, the report noted that "***reconciliations of certain account balances were not performed on a regular basis***" and that, "[w]ithout periodic account reconciliations, information provided to management may not be accurate, and the likelihood that errors will occur and go undetected is increased." Roberts Decl., Ex. 19 at LT00022577. The report recommended, among other things, that "all the inventory and related accrual accounts be reconciled on a monthly basis as part of the normal closing process." *Id*. This unequivocally put Defendants on notice of the problems, but the monthly reconciliations were never executed, and nothing improved.

Also in March 2021, Moss Adams specifically informed the Company that it could not rely on Company records to determine the value of inventory connected to an acquisition. *See* Roberts

16

Decl., Ex. 20 at LT00008595. The auditor insisted instead on full counts, explaining among other things that it was "***not . . . able to fully rely on internal controls or reports directly from the inventory system***" and had noted "bulk wine quantity/count variances . . . in a couple of the past transactions." *Id*. This was another critical red flag.

It got worse. The end-of-year audit for FY21, ended June 30, 2021, was performed by Moss Adams in the second half of calendar year 2021, and it was a complete disaster because of a total lack of adequate documentation and a number of accounting errors that cropped up one after another. The Company could not provide answers to basic financial questions; the auditor needed to find much of the relevant information itself, and the Company ultimately needed to delay its 10-K filing. As the Company's audit chair stated to Defendant Roney: "I spoke with Tony [O'Donnell of Moss Adams] this afternoon (1:1). One of his challenges is that he doesn't have sub-ledgers that tie to our general ledger, so ***they are having to sift through a lot of detail in order to get to the right answer***. Not defending him, but ***when we can't provide basic reconciliations, it makes it difficult to rely on anything***." Roberts Decl., Ex. 21. Again, this was not the opinion of some dissenter in the low ranks of the Company—it was the audit chair.

By September 2021, the Company's audit chair was beginning to doubt the Company's FY22 net income/EBITDA guidance: "The fact that the majority of the year end adjustments were related to the current year tells me we don't have good forecasting. So why do we believe FY22 forecasting is going to be any better? I understand we might be taking some P&L hits that would have otherwise hit us in FY22, but I'm concerned that Kathy won't have any time to update a forecast and I dont have a high level of confidence in what's been done to date." Roberts Decl., Ex. 22. Another audit committee member, Jon Moramarco, responded: "I am not sure there is a way to get more comfortable with the forecast right now." *Id*.

But the problems kept coming. Even though the Company had already run down numerous problems as part of the end-of-year audit with Moss Adams, they discovered yet another misstatement late in the process that should have been found to be material, as it constituted 12.5% of net income and thus exceeded the Company's established quantitative materiality standard. The

17

Company managed to claim it was not material on the flimsy basis that it was not material when considered "qualitatively," Roberts Decl., Ex. 23, but this was a mere fig leaf.

The documents show that, at the conclusion of the FY22 audit, Moss Adams elevated the significant deficiency to a material weakness. Upon learning of the material weakness, the Company's audit committee chair specifically noted that "*[t]he escalation from SD to Material Weakness would suggest that we haven't implemented the recommendation [of monthly account reconciliations]*," and that the Company had "*back-slid*" on compliance. Roberts Decl., Ex. 24. Indeed, when Moss Adams presented to the audit committee on the material weakness, it specifically called out its difficulties getting answers from Vintage Wine management: "*There were significant delays in management providing audit schedules and accounting memos, and a large volume of late client entries recorded throughout fieldwork, which resulted in extensive effort from management and the audit team to complete the audit in order to meet the filing deadline*." *Id*., Ex. 25 at LT00287775.

After the disastrous audit, Moss Adams employees approached their supervisors and stated that they did not want to work on the Vintage Wine account any longer. Moss Adams told the Company's audit chair that "*much of the audit team approach[ed] [Sarah Ratra] or Tony [O'Donnell of Moss Adams] after the 10-K was filed and state[d] that they were burnt out and don't want to work on our account any longer*." Roberts Decl., Ex. 26. Moss Adams resigned as the Company's independent outside auditor shortly thereafter. The audit committee was furious over the "*extraordinarily short notice*." *Id*., Ex. 27. By December 2021, as more accounting issues cropped up after Moss Adams' departure, the Company's audit chair was openly wondering: "*What other accounting land mines are out there waiting for us to find?*" *Id*., Ex. 28.

The documents show that Defendants were specifically aware of this material weakness but were still not doing anything to remedy it. Indeed, it was not until January 2022 that Defendant DeVillers set up a meeting with Cherry Bekaert to talk about it. As the audit chair stated to Defendant Roney: "*We're halfway through the year and Kathy hasn't provided any visibility to the AC on what is happening to remediate our material weakness, nor does she appear to be taking ownership*." Roberts Decl., Ex. 29. The audit chair made the argument "if we aren't making

18

the progress we need to make, *we need to . . . accept that it's highly likely we'll have a repeat of the material weakness for a second year*." *Id*. In March 2022, Johnston asked DeVillers whether she was working on a list of inventory controls, and then asked, "*Have you even seen the remediation workplan*?" *Id*., Ex. 30.

By April 2022, Defendant Johnston herself admitted that "*the duct tape holding these reports together is fraying!!!*" Roberts Decl., Ex. 31. As one senior Vintage Wine executive mused: "Feel like I was working in the clouds and am now crashing to earth. *Makes me question every report I receive*. . . . Makes us look like amateurs. Perhaps we are . . ." *Id*. The VP of Supply Chain advised Roney that same month: "There are ongoing, multiple requests for inventory adjustments. This is a daily occurrence. *This indicates a lack of veracity in our inventory counts and process*." *Id*., Ex. 32. Around the same time, DeVillers admitted in a text message exchange with Brinkley that the topic of a restatement "*[h]as been the topic for a while now*." *Id*., Ex. 33. There are scores of documents like this.

Perhaps not surprisingly, the FY22 audit was also a disaster, with the discovery of huge inventory adjustments and other problems. Defendants work their hardest until the last possible moment to cover them up and, unable to do so, were forced to disclose the truth in a series of corrective disclosures. Even as the problems piled up, Brinkley opined: "*She [Defendant Johnston] is probably still trying to play her numbers game to bury it*." *Id*., Ex. 34.

Indeed, ghost inventory management discrepancies continued to haunt Vintage Wine post-Chapter 11 filing and highlight that system's core deficiencies. One entity, which had bought a large portion of VWE's inventory through the bankruptcy proceedings, discovered *a 52,000-case discrepancy* between the Company's internal records and the product actually received, indicating a long-term and continuing VWE system-wide inventory accounting failure. As they put it on January 3, 2025:

> Unfortunately, *the discrepancy at Western Wine Services is not a one-off but rather appears to be systemic and consistent with what we have uncovered throughout the Vintage Wine Estates operations. . . . [T]he most significant issue is the fact that ... the starting inventory in each location is significantly less than what was represented on the APA [Asset Purchase Agreement] . . .* To put it politely, the product that was shipped on the single BOL [Bill of Lading] at the end of December

is *a complete mess* . . . . All in, our current best estimate is that . . . the difference at this point is 52,035 cases . . . .

Roberts Decl., Ex. 35 at RDJ477183-84.

\* \* \*

Defendants' suggestion that the instant case is "without merit" could not be further from the truth. Indeed, the fact pattern could not be much more *unfavorable* for Defendants: their outside independent auditors resigned due to their dysfunction, senior executives were fired or reassigned, there was a financial restatement, there was an SEC investigation, and there were internal accusations of ethical violations by at least one Defendant. The documents show a Company that lacked a culture of compliance, with the Company going to great lengths to suppress earlier misstatements until they could not be suppressed anymore. In short, everything that the Former Employees stated in the Complaint has been proven true.

### 5.   Plaintiffs Are Not Required to Log Contacts with the Confidential Witnesses

Defendants claim that, in lieu of production, Plaintiffs should be required to log communications between their Counsel and any third parties in the case. Mot. at 17-18. But their position is directly foreclosed by Section 7 of the Court-ordered ESI Protocol, which specifically states: "***The Parties shall have no obligation to log communications involving counsel that post-date November 14, 2022 that concern or arise under this litigation***." ECF No. 95 at 15. As Plaintiffs have already explained to Defendants, its communications with the former employees took place after November 14, 2022, and thus, even putting all other matters aside, there is no obligation to log such communications under the ESI Protocol. This should be as clear as day, and yet Defendants do not even mention Section 7 in their Motion. Defendants' failure to address this key provision in its Motion raises serious questions about whether it is providing the Court with the proper context with which to assess their claims. In any case, the ESI Protocol controls.

### B.   The Courts Should Require Defendants To Pay Plaintiffs For The Expenses Incurred In Opposing This Motion

The Court should require Defendants, the attorneys filing the Motion, or both, to pay Plaintiffs its expenses incurred in opposing the Motion, including attorney's fees, because the

20

Motion was not substantially justified. *See* FRCP 37(a)(5)(B).

Under Rule 37(a)(5)(B), "If the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust."

Defendants' Motion here was not substantially justified—indeed, Defendants' arguments suffered from numerous fatal flaws. It was unreasonable for Defendants to believe that they could compel the production of documents that were so clearly protected by the attorney work-product doctrine, such as counsel's investigative notes, memoranda, and communications, and it was certainly unreasonable to believe that they could do so after they themselves admitted that "[they] [did] not seek Plaintiffs' counsel's prefiling investigation, notes, [or] summaries." Adams Decl., ECF No. 102-1, Ex. D (August 6, 2025 Adams Letter) at 6. It was unreasonable to believe they could compel the production of counsel's communications with third parties, including the Former Employees, when Defendants themselves had previously stated that they were "[not] requesting Plaintiffs' counsel's or counsel's investigator's communications with the Former Employees," *id*., and that Defendants "[would] not be sharing any of [their own] e-mails going forward," Adams Decl., ECF No. 102-1, Ex. H (September 12, 2025 Adams Letter) at 2. It was unreasonable for Defendants to believe that they could compel the production of Plaintiffs' counsel's communications with third parties, when they themselves failed on multiple occasions to do the same. It was not reasonable for Defendants to saber-rattle about a privilege log for counsel communications when the Court-ordered ESI Protocol specifically stated that Plaintiffs did not need to submit one for post-filing counsel communications. Defendants had the audacity to suggest that there had been some sort of recantation, but there is no declaration or affidavit from that Former Employee attached to the Motion, nor anything else to back it up.

Motions lack a reasonable basis in fact and law when they are directly precluded by applicable Court orders and the express agreements of the parties. *See In re GTI Cap. Holdings,*

*LLC*, 399 F. App'x 236 (9th Cir. 2010) (finding that the appellants "failed at all levels to demonstrate that their motion to compel was 'substantially justified'"); *Langley v. Garcia*, 2020 WL 1532313, *1 (E.D. Cal. Mar. 31, 2020) (noting that the plaintiff failed to show that his two motions to compel were "substantially justified" where the motions "provided no facts or evidence to support the allegations" and were "based on self-serving beliefs and bare assertions").

Even beyond the about-faces described above, disregarding Court-ordered deadlines has unfortunately been something of a pattern for Defendants. It was Defendants who originally claim not to be in possession of a significant number of documents, only to admit much later in the case that they were. *See* Roberts Decl., ¶3. It was Defendants who subsequently missed the deadline for substantial completion of document production, and it is Defendants who are currently in violation of their obligations to privilege logs within 30-days of production. *Id*., ¶4. This pattern, and the suspicious timing surrounding the filing of the instant Motion, further support a lack of reasonableness.

**V.    CONCLUSION**

The Court should deny the Motion to Compel and require Defendants, the attorneys filing the Motion, or both, to pay Plaintiffs its reasonable expenses incurred in opposing the Motion, including attorney's fees.

22

December 8, 2025

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ John C. Roberts, Jr.*

Casey E. Sadler (pro hac vice)
John C. Roberts, Jr. (pro hac vice)
Charles H. Linehan (pro hac vice)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Tel. (310) 201-9150
csadler@glancylaw.com

*Lead Counsel for Lead Plaintiffs*

Andrew R. Muehlbauer
Nevada Bar No. 10161
  andrew@mlolegal.com
MUEHLBAUER LAW OFFICE, LTD.
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Tel: (702) 330-4505
Fax: (702) 825-0141

*Liaison Counsel for Lead Plaintiffs*

Jeffrey C. Block (pro hac vice)
  jeff@blockleviton.com
Jacob Walker
  jake@blockleviton.com
Brendan Jarboe
  brendan@blockleviton.com
BLOCK & LEVITON LLP
260 Franklin Street, Suite 1860
Boston, MA 02110
Tel: (617) 398-5600
Fax: (617) 507-6020

*Counsel for Additional Plaintiff*
*Michael F. Salbenblatt*

23

**<u>PROOF OF SERVICE</u>**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On December 8, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the District of Nevada, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 8, 2025, at Los Angeles, California.

*/s/ John C. Roberts, Jr.*
John C. Roberts, Jr.